FILED - KZ
November 12, 2025 8:54 AM
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
_ems_ Scanned by ES 11/12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

THE UNITED STATES OF AMERICA
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF ARKANSAS
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF CALIFORNIA
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF COLORADO
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF CONNECTICUT
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF DELAWARE
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

DISTRICT OF COLUMBIA
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF FLORIDA

**Case. No.** 1:22-cv-994

**FIRST AMENDED COMPLAINT UNDER FEDERAL AND STATE FALSE CLAIM ACTS**

**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN PACER**

**DO NOT PUT IN PRESS BOX**

*ex rel.* SCOTT MILLARD, KRISTINE COOPER, and LOREN COOPER

and

STATE OF GEORGIA *ex rel.* SCOTT MILLARD, KRISTINE COOPER, and LOREN COOPER

and

STATE OF HAWAII *ex rel.* SCOTT MILLARD, KRISTINE COOPER, and LOREN COOPER

and

STATE OF ILLINOIS *ex rel.* SCOTT MILLARD, KRISTINE COOPER, and LOREN COOPER

and

STATE OF INDIANA *ex rel.* SCOTT MILLARD, KRISTINE COOPER, and LOREN COOPER

and

STATE OF IOWA *ex rel.* SCOTT MILLARD, KRISTINE COOPER, and LOREN COOPER

and

STATE OF LOUISIANA *ex rel.* SCOTT MILLARD, KRISTINE COOPER, and LOREN COOPER

and

STATE OF MARYLAND *ex rel.* SCOTT MILLARD, KRISTINE COOPER, and LOREN COOPER

and

**FIRST AMENDED COMPLAINT UNDER FEDERAL AND STATE FALSE CLAIM ACTS**

**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN PACER**

**DO NOT PUT IN PRESS BOX**

COMMONWEALTH OF MASSACHUSETTS
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF MICHIGAN
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF MINNESOTA
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF MONTANA
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF NEVADA
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF NEW JERSEY
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF NEW MEXICO
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF NEW YORK
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

**FIRST AMENDED COMPLAINT UNDER FEDERAL AND STATE FALSE CLAIM ACTS**

**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN PACER**

**DO NOT PUT IN PRESS BOX**

and

STATE OF NORTH CAROLINA
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF OKLAHOMA
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF RHODE ISLAND
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF TENNESSEE
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF TEXAS
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF UTAH
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

STATE OF VERMONT
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,
and LOREN COOPER

and

COMMONWEALTH OF VIRGINIA
*ex rel.* SCOTT MILLARD, KRISTINE COOPER,

**FIRST AMENDED COMPLAINT UNDER FEDERAL AND STATE FALSE CLAIM ACTS**

**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN PACER**

**DO NOT PUT IN PRESS BOX**

| | | |
|---|---|---|
| and LOREN COOPER | : | |
| and | : | |
| STATE OF WASHINGTON<br>*ex rel.* SCOTT MILLARD, KRISTINE COOPER,<br>and LOREN COOPER | : | |
| and | : | |
| STATE OF WISCONSIN<br>*ex rel.* SCOTT MILLARD, KRISTINE COOPER,<br>and LOREN COOPER | : | |
| and | : | |
| DOE STATES 1-19<br>*ex rel.* SCOTT MILLARD, KRISTINE COOPER,<br>and LOREN COOPER | : | **FIRST AMENDED COMPLAINT UNDER FEDERAL AND STATE FALSE CLAIMS ACTS** |
| and | : | **FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| DOE TERRITORIES 1-5<br>*ex rel.* SCOTT MILLARD, KRISTINE COOPER,<br>and LOREN COOPER | : | |
| and | : | **DO NOT ENTER IN PACER** |
| DOE INDIAN TRIBAL ORGANIZATIONS 1-33<br>*Ex rel.* SCOTT MILLARD, KRISTINE COOPER,<br>and LOREN COOPER | : | **DO NOT PUT IN PRESS BOX** |
| **Plaintiffs,** | : | |
| v. | : | |
| ABBOTT LABORATORIES<br>100 Abbott Park Road<br>Abbott Park, Illinois 60064 | : | |
| **SERVE ON REGISTERED AGENT:**<br>CT Corporation System<br>208 South Lasalle Street, Suite 814<br>Chicago, Illinois 60604 | : | |
| **Defendant.** | : | |
| ----------------------------------- | X | |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION. .......... 1

II. JURISDICTION AND VENUE. .......... 6

III. THE PARTIES .......... 7

A. Plaintiffs. .......... 7

B. Relators. .......... 8

C. Defendant. .......... 12

IV. THE PRODUCTS AT ISSUE. .......... 14

A. Infant Formula. .......... 14

B. Nutritional Therapy Products – Tetra Pak and Recloseable Plastic Bottle Products .......... 16

V. THE FEDERAL AND STATE HEALTH CARE PROGRAMS. .......... 17

A. The Medicare Program. .......... 17

B. The Medicaid Program. .......... 19

VI. SPECIAL SUPPLEMENTAL NUTRITION PROGRAM FOR WOMEN, INFANTS, AND CHILDREN ("WIC PROGRAM"). .......... 20

A. Overview. .......... 20

B. Requirements for Infant Formula Under the WIC Program. .......... 24

C. WIC Program Disruption From Abbott's Recalls and Shortages. .......... 25

VII. APPLICABLE LAW. .......... 27

A. The Federal and State False Claim Statutes .......... 27

B. State Insurance Frauds Prevention Acts. .......... 28

C. FDA Laws Addressing Manufacturing, Testing, And Releasing Infant Formula and Nutritional Therapy Products. .......... 31

i) FDA Requirements Prohibit Adulteration. .......... 31

ii) CGMPs and Quality Factor Requirements for Infant Formula and Nutritional Therapy Products. ..... 33

iii) FDA Recordkeeping Requirements. ..... 36

VIII. RELATORS' DISCLOSURES TO UNITED STATES. ..... 40

IX. ABBOTT'S WRONGFUL CONDUCT. ..... 43

A. Abbott Violated and Continues to Violate Federal Laws By Manufacturing, Testing, and Releasing Substandard and Adulterated Products. ..... 47

B. Ongoing and Systemic Violations of the FDCA and CGMP Requirements. ..... 48

i) Inadequate Clean-in-Place Practices. ..... 49

ii) Water Leaks. ..... 57

iii) Inadequate Temperature Control for Bulk Finished Product ("FP") Storage Tanks and Heat Treatment Rooms. ..... 61

iii) Systemic Technical Equipment, Engineering, and Production Violations. ..... 63

iv) Approving Substandard and Adulterated Products with Unvalidated Data (SQE and ZARPAC Reports). ..... 64

v) Falsification of Maintenance Records and Root Causes. ..... 66

vi) Systemic Seam Integrity Violations Adulterating Powdered Infant Formula. ..... 69

vii) Protein In Fat ("PIF") Tank and Positive Displacement ("PD") Pump Violations. ..... 71

viii) Out of Specification ("OOS") Products. ..... 72

ix) Falsification of Batch Records. ..... 74

a. Batch Records. ..... 74

b. Sturgis – Purple Folders. ..... 75

c. Casa Grande – Rework and Sampling Folders. ..... 78

d. Falsification of Batch Records – Back Room Record Removal. ..... 79

C. Releasing Inadequately Tested Infant Formula and Nutritional Therapy Products Based on Use of "Time Code Removals" and Failure to Appropriately Bracket. 85

i) Time Code Removals in General. ..... 85

ii) Bracketing Contaminated Batches. ..... 87

iii) Implementation of the "Time Code Removal" Scheme. ..... 88

iv) Bracket And "Time Code Removal" Examples ..... 91

a. Casa Grande – Examples of Post Release Events. ..... 91

b. Casa Grande –Infant Formula Brackets for 2022. ..... 95

c. Casa Grande – Tetra Pak Spoilage Brackets November 2021-April 2022. ..... 97

d. Casa Grande – October 2021 Bracket (34597RE00). ..... 98

e. Sturgis – 2019 Microbiological Batches. ..... 103

f. Sturgis – Spring 2021 Seamer Bracket. ..... 104

g. Casa Grande – March 2023 Bubble Leak Time Code Removal. ..... 105

h. Casa Grande – March Bracketing for Dec. 2022-Feb. 2023 OOTL for SPC. ..... 116

i. Casa Grande – May 2023 Microcontamination Events and Brackets ..... 119

j. Casa Grande – May-July 2023 Pest Events and Document Manipulation. ..... 122

k. Casa Grande – December 2023 Contaminated Metal Shavings Bracket. ..... 125

D. Abbott Failed to Respond to Ongoing Serious Medical Complaints and Issued Only Partial Recalls If Any. ..... 127

E. Abbott Concealed Violations from FDA and Other Regulators at Sturgis and Casa Grande. ..... 129

X. RETALIATION. ..... 136

XI. DAMAGES. ..... 142

**FIRST AMENDED COMPLAINT**

**COME NOW**, through the undersigned counsel, Relators Scott Millard, Kristine Cooper, and Loren Cooper, on behalf of themselves, the United States of America ("United States"), and the states of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Utah, Vermont, Washington, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia and Doe States 1-19 (the "States"), Doe Territories 1-5, and Doe Indian Tribal Organizations 1-33, bring this *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") and similar state laws to recover monetary damages, civil penalties, and all other remedies for violations of the federal and state health care programs including Medicare, Medicaid, and the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC Program") administered by the United States Department of Agriculture (collectively "Federal Payer Programs"). Relators also bring this action on behalf of themselves and the States of California and Illinois to recover statutory damages, civil penalties, and other monetary relief for violations of the California Insurance Frauds Prevention Act, CAL. INS. CODE § 1871(a) *et seq.*, and the Illinois Insurance Claims Fraud Prevention Act, 740 ILL. COMP. STAT. ANN. § 92/1 *et seq.* (collectively, "Private Payers").

Relators hereby allege as follows:

## I. NATURE OF THE ACTION.

1. The FCA was enacted in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War." 132 CONG. REC. H9382-03 (daily ed. Oct. 7, 1986). The law allows private persons with knowledge of a fraud

to bring an action in federal district court directly and on behalf of the United States against those who have defrauded the government. The private persons are known as Relators, and the action that Relators bring is called a *qui tam*.

2. Relators allege in this *qui tam* that Abbott Laboratories d/b/a Abbott Nutrition ("Abbott") knowingly made, submitted, and caused to be made or submitted, false statements, certifications, and claims for payments to the United States, the States, the Territories, the Indian Tribal Organizations, and Private Payers for substandard, adulterated, and non-compliant infant formula and nutritional therapy products that failed to comply with the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), current Good Manufacturing Practices ("cGMP"), and other legal requirements. The fraudulent scheme, whereby Abbott made and sold substandard, adulterated, and non-compliant infant formula and nutritional therapy products for distribution to Federal Payer Programs and Private Payers, and submitted false claims for payment to the federal government, is reflected, in part, in the following illustrative violations (hereinafter, "Manufacturing Violations") that contributed to the widespread, including interstate, distribution of substandard, adulterated, and non-compliant infant formula and nutritional therapy products:

- Inadequate Clean-in-Place Practices (*see infra* Section IX.B.i);
- Inadequate Temperature Control for Bulk Finished Product ("FP") Storage Tanks and Heat Treatment Rooms (*see infra* Section IX.B.ii);
- Systemic Technical Equipment, Engineering, and Production Violations (*see infra* Section IX.B.iii);
- Approving Substandard and Adulterated Products with Unvalidated Data (SQE and ZARPAC Reports) (*see infra* Section IX.B.iv);
- Falsification of Maintenance Records (*see infra* Section IX.B.v);
- Systemic Seam Integrity Violations Adulterating Infant Formula (*see infra* Section IX.B.vi);
- Protein In Fat ("PIF") Tank and Positive Displacement ("PD") Pump Violations (*see infra* Section IX.B.vii);
- Out of Specification ("OOS") Products (*see infra* Section IX.B.viii);
- Falsification of Batch Records (*see infra* Section IX.B.ix);
- Providing Falsified Batch Records to FDA (*see infra* Section IX.B.ix.d);

- Non-Validated "Time Code Removal" Practices to Release Batches of Products with Confirmed Microbiological and/or Other Contamination Verified by Internal Tests (*see infra* Section IX.C); and
- Ongoing Current Contamination Events on Released Batches at Sturgis and Casa Grande, including Critical Process Calibration Failures (*see infra* Section IX.C.iv.a-k).

3. Relators voluntarily disclosed to federal and state authorities these and other violations occurring at Abbott facilities located in Sturgis, Michigan and Casa Grande, Arizona, as well as other Abbott facilities. Relators' evidentiary disclosures were made on numerous occasions since September 2020, including but not limited to the United States Food and Drug Administration ("FDA"), the United States Department of Health and Human Services – Office of Inspector General ("HHS-OIG"), the Department of Justice ("DOJ"), the United States Department of Agriculture ("USDA"), the United States Occupational Safety and Health Administration ("OSHA"), and Congress. Following Relators' disclosures, FDA inspections in 2021 and 2022 at the Sturgis facility confirmed Abbott's violations. FDA issued numerous Form 483 Inspectional Observations concluding, *inter alia*, that Abbott failed to "establish a system of process controls covering all stages of processing that was designed to ensure that infant formula does not become adulterated due to the presence of microorganisms in the infant formula or in the processing environment" and "ensure that all surfaces that contacted infant formula were maintained to protect infant formula from being contaminated by any source." *See gen.* Department of Health and Human Services, Food and Drug Administration, Form FDA 483 Inspectional Observations (Mar. 18, 2022).

4. Abbott's fraudulent scheme is systemic and not isolated to Sturgis and Casa Grande. Central to the scheme are practices concealing violations affecting infant formula and nutritional therapy products. These practices are known to senior management at Abbott, including Abbott Nutrition Division executives (hereinafter "Abbott Division"), and implemented by

Abbott's senior leadership. The concealment of these violations induced the United States, States, Doe Territories, and Doe Indian Tribal Organizations to select and retain Abbott as an exclusive provider of infant formula pursuant to the WIC Program. Through the WIC Program, Abbott knowingly supplied substandard, adulterated, and non-compliant infant formula it falsely certified was in compliance with FDCA and cGMP requirements. Abbott also, through Medicaid, Medicare, and Private Payers supplied substandard, adulterated, and non-compliant infant formula and nutritional therapy products that it falsely certified was in compliance with FDCA and cGMP requirements.

5. Due to Abbott's conduct and non-compliance, babies are placed at risk (some of whom have known metabolic deficiencies) and senior citizens are more susceptible to serious adverse events, injuries, and deaths. At least nine (9) babies' deaths and hundreds of injuries have been reported to FDA for investigation, including several babies' deaths tied to *Cronobacter sakazakii* confirmed by the United States Centers for Disease Control and Prevention ("CDC").

6. To conceal the widespread Manufacturing Violations, Abbott manipulates documentation, root cause investigations, microcontaminant testing, and implements a "time code removal" scheme. "Time code removal" is a non-validated Abbott practice used when analytical tests confirm the presence of microbiological organisms and other contaminants in infant formula or nutritional therapy products, in the machinery contacting the product, or when other defects are detected. Abbott uses "time code removal" to arbitrarily select several minutes (e.g., 10 minutes) around the confirmed contamination test or other defect based on the time stamp printed on each product container. Product outside of the arbitrary time code period is released without further testing.

7. The "time code removal" practice is not scientifically validated. It is not conducted with testing rigor to identify the root cause and full scope of confirmed microbiological or other contamination. As demonstrated by the significant number of babies' injuries and deaths, and Relators' evidence, "time code removal" fails to prevent the release of Abbott contaminated products. ***First***, product outside the designated "time code removal" range with a positive contaminant result (from finished product or environmental contact) is commercially released by Abbott with no additional testing. ***Second***, as illustrated by Sturgis, the "time code removal" practice is improperly implemented. For example, Abbott's designated Quality Assurance ("QA") employees use pallet placement for "time code removal" even though Abbott knows pallets contain product with mixed, that is, non-sequential, time codes. ***Third***, when Abbott learns it has released contaminated product prior to discovery of a nonconformity ("NCR") or potential nonconformity ("pNCR"), it limits its analysis to only unreleased product to avoid notifying FDA or issuing a recall.

8. Abbott directs and oversees specific and definitive actions to conceal the "time code removal" scheme from FDA by, for example, materially altering and falsifying product batch records. When requested by FDA, Abbott provides the falsified batch records to FDA investigators as complete and not altered. On multiple occasions, and in numerous ways, Abbott alters batch records to prevent the detection of cGMP and other FDCA violations. Abbott further fails to conduct follow up testing when contamination is detected, and fails to perform a fulsome root cause analyses ("RCAs") to identify and rectify the cause of the contamination, focusing instead on churning product and profit rather than ensuring safety and compliance.

9. By manufacturing and selling substandard, adulterated, and non-compliant infant formula and nutritional therapy products, Abbott knowingly caused to be submitted false claims

for payment. The substandard infant formula and nutritional therapy products Abbott shipped via interstate commerce were misbranded. Distributing the substandard and non-compliant infant formula and nutritional products purchased by federal programs and submitting, or causing to be submitted, claims for payment violates the FCA. Further, Abbott has made false statements and false certifications that its substandard infant formula and nutritional therapies comply with FDCA, cGMP, and federal requirements, thus violating federal and state laws, resulting in substantial damage to the United States, the States, the Doe Territories, the Doe Indian Tribal Organizations, the Federal Payer Programs, Private Payers, and consumers, as alleged herein.

10. This First Amended Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). It will not be served on Defendant until the Court so orders. A disclosure of substantially all material evidence and information Relators possess has been served on the Attorney General of the United States and the United States Attorney for the Western District of Michigan in accordance with 31 U.S.C. § 3730(b)(2) and Federal Rules of Civil Procedure 4.

## II. JURISDICTION AND VENUE.

11. This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relators seek remedies on behalf of the United States for Defendant's violations of 31 U.S.C. § 3729.

12. This Court has pendant jurisdiction over the claims pursuant to 31 U.S.C. § 3732(b), 31 U.S.C. § 3730(e), and 28 U.S.C. § 1367.

13. This Complaint has been timely filed within the period prescribed by 31 U.S.C. § 3731(b). The allegations and transactions set forth in this Complaint have not been publicly disclosed prior to filing, in accordance with 31 U.S.C. § 3730(e).

14. At all times material to this Complaint, Defendant regularly conducted substantial business within the State of Michigan. Defendant maintains a facility in Sturgis, Michigan.

Defendant also committed the acts prohibited by the False Claims Act in Michigan and other states. Defendant is thus subject to personal jurisdiction in Michigan.

15. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because the Defendant conducts business in this District and/or, in furtherance of its fraudulent misconduct, caused to be submitted or conspired to submit false claims in this District.

## III. THE PARTIES.

### A. Plaintiffs.

16. Plaintiff United States of America brings this action by and through its administrative agencies (i) the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS"), which is responsible for the administration of all federal health care programs, and (ii) the USDA, which is responsible for the administration of the WIC Program.

17. The States of Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Utah, Vermont, Washington, and Wisconsin, the Commonwealths of Massachusetts and Virginia, and the District of Columbia are named as Plaintiffs pursuant to the Court's pendant jurisdiction under 31 U.S.C. § 3732(b) with respect to the related states' false claim statutes.

18. The States of California and Illinois are named as Plaintiffs pursuant to the Court's pendant jurisdiction under 31 U.S.C. § 3732(b) with respect to the related states' false claim statutes, and/or the Court's supplemental jurisdiction under 28 U.S.C. § 1367 with respect to the related claims brought for violations of the California Insurance Frauds Prevention Act and the Illinois Insurance Claims Fraud Prevention Act.

19. Additionally, Plaintiff Doe States 1-19 include Alabama, Alaska, Arizona, Idaho, Kansas, Maine, Mississippi, Missouri, Nebraska, New Hampshire, North Dakota, Ohio, Oregon, South Carolina, South Dakota, West Virginia, Wyoming, and the Commonwealths of Kentucky and Pennsylvania; Plaintiff Doe Territories 1-5 include American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands; and Plaintiff Doe Indian Tribal Organizations 1-33 include Indian Township, ME; Pleasant Point, ME; Choctaw Indians, MS; Eastern Cherokee, NC; Inter-Tribal Council, AZ; Navajo Nation, AZ; Acoma, Canoncito & Laguna, NM; Eight Northern Pueblos, NM; Five Sandoval Pueblos, NM; Isleta Pueblo, NM; San Felipe Pueblo, NM; Santo Domingo Tribe, NM; Zuni Pueblo, NM; Cherokee Nation, OK; Chickasaw Nation, OK; Choctaw Nation, OK; Citizen Potawatomi Nation, OK; Inter-Tribal Council, OK; Muscogee Creek Nation, OK; Osage Tribal Council, OK; Otoe-Missouria Tribe, OK; Wichita, Caddo & Delaware (WCD), OK; Ute Mountain Ute Tribe, CO; Omaha Sioux, NE; Santee Sioux, NE; Winnebago Tribe, NE; Standing Rock Sioux Tribe, ND; Three Affiliated Tribes, ND; Cheyenne River Sioux, SD; Rosebud Sioux, SD; Northern Arapahoe, WY; Shoshone Tribe, WY; and Inter-Tribal Council, NV. Doe States 1-19, Doe Territories 1-5, and Doe Indian Tribal Organizations 1-33 are named Plaintiff parties based on their participation in contracting under Medicaid, Medicare, and the WIC Program, and include those that enact false claim statutes with relevant *qui tam* provisions subsequent to the filing of this Complaint.

**B. Relators.**

**i) Relator Scott Millard.**

20. Relator Millard worked in Abbott's Quality Systems ("QS") Department, a sub-unit of the QA organization in Sturgis, Michigan, within Abbott's Nutritional Division.

21. Relator Millard graduated cum laude from Ferris State University with a Bachelor of Science degree in Health Care Systems Administration. Relator Millard previously worked at Monsanto (now Bayer) where he was responsible for coordinating the logistics for storing and shipping $500 million in finished product inventory. He was also involved with monitoring bagging operations to ensure consistency in quality and fill levels.

22. In January of 2015, Relator Millard began working at Abbott. He served as a processing operator for dry blending and liquid processing. In that role, he was responsible for blending, discharging, and sampling finished product, including infant formula. He staged and mixed ingredients and supported the production of a full range of products across multiple departments. Later, Relator Millard worked as a Batch Records Coordinator, Senior Batch Records Coordinator, and was promoted to QA Specialist, which is part of the QS unit. As a QA Specialist, among other things, he coordinated and organized first-lot-to-stock ("FLTS") products – new products or formulation revisions – from packaging to batch release, reviewed work orders for product specifications, coordinated third-party testing logistics, analyzed data from batches to identify anomalies, initiated Corrective and Preventive Actions ("CAPAs"), and conducted root-cause analyses.

23. During his time with Abbott, Relator Millard received a Better Process Certification in 2016 and a Food Safety Preventive Controls Alliance Certification in 2018. He was repeatedly recognized and awarded the "Best in Abbott" Award.

24. Notwithstanding a demonstrated track record of accomplishments, Abbott retaliated against Relator Millard for internally reporting numerous violations such as those discussed herein, including violations by senior QS and QA leadership at Sturgis. As a

consequence of reporting these violations, Relator Millard was wrongfully terminated from employment.

**ii) Relator Kristine Cooper.**

25. Relator K. Cooper is currently employed as a QA Supervisor in Abbott's Casa Grande facility. She began working at Abbott in August 2017 as a QS Specialist at Abbott's Sturgis facility. Her employment at both Sturgis and Casa Grande makes her uniquely knowledgeable about Abbott's practices at multiple facilities.

26. Relator K. Cooper graduated from Grand Valley State University where she earned a Bachelor of Science degree in Biomedical Sciences. She previously worked as a temporary employee in the QA Department at Mead Johnson Nutrition. She served as a QA Records Coordinator and later was promoted to a full-time QA Analyst before joining Abbott. As a QA Analyst at Mead Johnson Nutrition, she conducted complaint investigations and trend analyses for nonconformities, provided data for FDA during audits of batch records, and kept track of quality and efficiency metrics, among other duties.

27. Once Relator K. Cooper was hired as a QA Specialist at Abbott's Sturgis facility in 2017, she was responsible for conducting secondary and final reviews of powdered infant formula before product release, reviewing batch records and work orders for compliance with FDA requirements, identifying and investigating product anomalies, and initiating CAPAs, among other responsibilities. During her time at the Sturgis facility, the Sturgis batch release team consisted of four (4) full-time auditors, two (2) QA Specialists (Relators K. Cooper and Millard), and a supervisor responsible for signing and certifying product release.

28. In January 2022, Relator K. Cooper transferred to Abbott's Casa Grande, Arizona facility and was promoted to QA Supervisor. In this position she obtained additional job

responsibilities such as participating in QA oversight for Casa Grande's powdered infant formula and Tetra Pak and recloseable plastic bottle ("RPB") liquid products.

**iii) Relator Loren Cooper.**

29. Relator L. Cooper is currently employed as a Multicraft Maintenance Technician at Abbott's Casa Grande facility. He previously worked at Abbott's Sturgis facility beginning in April 2019. His employment at both Sturgis and Casa Grande makes him knowledgeable about Abbott's violations at both facilities.

30. Relator L. Cooper earned an Associate Degree in Computer Systems Technology from ITT Technical Institute. In April 2019, he was hired as a Mechanic II at Abbott's Sturgis facility to work on production line machinery and components including seamers. He conducted maintenance on equipment and kept work logs to track production line issues. He was assigned work orders by a maintenance planner and reported directly to Robert Bischko, a Maintenance Supervisor at Sturgis.

31. Relator L. Cooper transferred to Casa Grande in January 2022 as a Multicraft Maintenance Technician where he continues to service production line machinery. He possesses technical knowledge about production line equipment at Abbott's Sturgis and Casa Grande facilities.

32. By virtue of their positions and responsibilities within Abbott, Relators have direct and independent knowledge of Abbott's fraudulent conduct, as alleged herein. Pursuant to 31 U.S.C. § 3730(e)(4)(B), Relators are the "original sources" of the information provided herein regarding Abbott's illegal conduct in violation of federal and state law.

**C. Defendant.**

33. Abbott Laboratories is an Illinois corporation listed on the New York Stock Exchange (ABT). Among other products, it manufactures and markets well-known products such as Similac, Pedialyte, Pediasure, Ensure, Glucerna, ZonePerfect, FreeStyle Libre, and BinaxNOW. Abbott Laboratories is a component of the S&P 100 and has a market cap of over $200 billion. The company reported nearly $43.1 billion in net sales (revenue) in fiscal year 2021.[1] From 2018 to 2022, in SEC filings Abbott reported $9.46 billion in revenue just from domestic pediatric nutritional products, and $1.97 billion and $2.2 billion in 2023 and 2024 respectively for the same.

34. Abbott manufactures infant formula and nutrition products and the following facilities typically manufacture product for distribution to the U.S. market: Columbus, OH; Tipp City, OH; Sturgis, MI; Altavista, VA; Casa Grande, AZ; Fairfield, CA; Cootehill, Ireland; Sligo, Ireland; and Granada, Spain. Abbott ships infant formula and nutritional therapy products in interstate commerce. Approximately 21% of Abbott Laboratories' revenue is from U.S nutrition product sales.[2] As of late 2025, Abbott was producing more than $1 billion worth of product at its Casa Grande facility, which includes approximately 80% of Abbott's U.S. powdered infant formula production.

35. The U.S. infant formula market was valued at around $3.9 billion in 2020. Between 2018 and 2022, Abbott's market share was approximately 42%.[3] In 2018, 56% of the U.S. infant

---

[1] *See* Abbott, *2021 Annual Report*, 39, https://www.abbottinvestor.com/static-files/28e5aeb5-7a6c-48a7-9c4c-2847a4f0bb1a (last visited Nov. 10, 2025).
[2] *Id.* at 47.
[3] *Leslie Hodges, et al., Manufacturers' Bids for Infant Formula Rebate Contracts, 2013-23, at Fig. 7, USDA (Apr. 2025), available at https://www.ers.usda.gov/publications/pub-details?pubid=111288*; Julie Creswell & Madeleine Ngo, *Baby Formula Shortage Has an Aggravating Factor: Few Producers*, N.Y. Times, (May 20, 2022), https://www.nytimes.com/2022/05/20/business/economy/baby-formula-shortage-market.html.

formula was consumed by infants receiving formula from the WIC Program, and more than 90% of WIC's infant formula spend is spent on powdered infant formula.

36. Abbott's Sturgis facility historically manufactured a significant percentage of the U.S. market's infant formula. The facility was temporarily closed in February 2022 after multiple infants were exposed to *Cronobacter sakazakii*, *Salmonella*, and *E. coli* from consuming products manufactured in Abbott's Sturgis facility. FDA investigated and concluded that the Sturgis facility had widespread failures and lacked required process controls to ensure that infant formula products were unadulterated in violation of the FDCA, implementing laws, and cGMP.[4] After briefly re-opening, Abbott again shut down the facility in June 2022 before again fully reopening in July 2022.

37. Abbott recalled certain Similac, Alimentum, and EleCare products manufactured at Sturgis in 2022. These recalls, and the forced closing of Sturgis, required Abbott to increase production in Casa Grande and its other facilities.

38. On May 16, 2022, DOJ filed a Complaint for Injunctive Relief against Abbott and Co-Defendants Keenan S. Gale, TJ Hathaway, and Lori R. Randall alleging, among other claims, that Abbott violated (i) 21 U.S.C. § 331(a) by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce articles of food that are adulterated within the meaning of 21 U.S.C. § 342(a)(4); (ii) 21 U.S.C. § 331(a) by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce articles of food, namely infant formula as defined in 21 U.S.C. § 321(z), that are adulterated within the meaning of 21 U.S.C. § 350a(a)(3), 21 U.S.C. § 350a(b)(2), and 21 C.F.R.

---

[4] *See* U.S. Dep't Health & Human Services, U.S. Food & Drug Admin., Form FDA 483 Inspectional Observations, (Mar 18. 2022), https://www.fda.gov/media/157708/download (last visited Oct. 28, 2025).

Part 106; (iii) 21 U.S.C. § 331(k) by causing articles of food that are held for sale after shipment of one or more of their components in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 342(a)(4); and (iv) 21 U.S.C. § 331(k) by causing articles of food, namely infant formula as defined in 21 U.S.C. § 321(z), that are held for sale after shipment of one or more of their components in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 350a(a)(3).

39. Abbott entered into a Consent Decree of Permanent Injunction pursuant to which the United States requires Abbott to implement specific practices at the Sturgis facility addressing the FDCA and cGMP violations. Among other aspects, the Consent Decree provides for liquidated damages for any future violations of the Decree, the FDCA, or its implementing regulations, in addition to other remedies available to the United States.

## IV. THE PRODUCTS AT ISSUE.

### A. Infant Formula.

40. Abbott manufactures and markets numerous varieties of powdered and liquid infant formula. These products contain key nutrients for infant development, including but not limited to fats and fatty acids, carbohydrates, oligosaccharides (prebiotics), lutein and beta carotene for eye development, vitamins E, D, and A, and minerals such as iron, calcium, phosphorus, and zinc. The manufacturing process for powdered infant formula involves wet blending the nutrients in stainless steel tanks and mixing in milk, pasteurizing the liquid through a rapid heating and cooling process, homogenizing the liquid to break fat and oil particles into small droplets, checking the contents of the liquid, administering a heat treatment, spray drying the liquid to reduce it to a powder, blending in dry ingredients for certain products (EleCare, Alimentum, Sim Spit-up, etc.), and finally packaging the product.

41. Exhibit A identifies the infant formula products subject to Relators' allegations in this Complaint by product name, formulation, description, packaging type, and manufacturing location. The main WIC stock keeping unit ("sku") of Similac Advance, 5595776, is the 12.4 oz container. One batch contains 13,000-15,000 cases with 6 cans per case, totaling 78,000-90,000 cans per batch.

42. Abbott produces nearly all of its infant formula for the U.S. market at domestic facilities, including the powdered infant formulas Similac, EleCare, and Alimentum. Similac, one of the most popular domestic infant formulas, and other similar products are vital to infant health since approximately 36% of parents report feeding their newborn formula before six months. Nearly 75% of parents use powdered and liquid infant formula to supplement breastmilk for babies less than one year old.[5]

43. The Sturgis and Casa Grande facilities manufacture almost all powdered infant formula sold by Abbott. The approximate breakdown of manufacturing of powdered infant formula was 80% from Sturgis and 20% from Casa Grande prior to the shutdown of the Sturgis facility in 2022. For example, based on Abbott batch tracker records for WIC powdered infant formula produced in 2021:

- **Casa Grande:** 516 powdered infant formula batches released, which included 43 batches Similac Advance (5595776), 22 batches Similac Sensitive (5753978), 1 batch Similac Neosure (5743013), and 21 batches Isomil (5596378).

- **Sturgis:** 2,125 powdered infant formula batches produced, which included 206 batches Similac Advance (5595776), 122 batches Similac Sensitive (5753978), 28 batches Similac Sensitive Spit Up (5095976), 78 batches of Similac Total Comfort (62599), 77 batches Alimentum (64715), and 1 first lot to stock ("FLTS") batch Alimentum HMO.

---

[5] *See* CDC, *Results: Breastfeeding Rates*, https://www.cdc.gov/breastfeeding/data/nis_data/results.html (last visited August 31, 2022).

Following the 2022 shutdown, the site-specific production breakdown reversed with Casa Grande making at least 80% of Abbott's WIC powdered infant formula.

44. Even more recently, in a plant-wide meeting at Casa Grande in October 2025, the Plant Director stated that Abbott produced more than $1 billion worth of product at Casa Grande annually, which includes the majority of Abbott's WIC powdered infant formula.

**B. Nutritional Therapy Products – Tetra Pak and Recloseable Plastic Bottle Products.**

45. Exhibit A identifies the nutritional therapy products subject to Relators' allegations in this Complaint by product name, formulation, description, packaging type, and manufacturing location.

46. Tetra Paks are resealable containers resembling milk cartons made from cardboard, plastic, and aluminum foil. Tetra Pak is a registered trademark of Tetra Laval, a Swedish foodstuff packaging company domiciled in Switzerland. Abbott partnered with Tetra Laval to manufacture Abbott Recloseable Containers ("ARCs") by Tetra Pak in 2017.[6]

47. Abbott fills Tetra Paks with adult liquid nutritional therapy products, including the following sole source nutrition products: (a) Jevity, Osmolite, Periative, and Pivot 1.5 Cal for feeding tube nutrition; (b) Promote for high protein diets; (c) Pulmocare for respiratory failure; (d) Suplena with Carbsteady for chronic kidney disease; (e) Twocal HN and Ensure Clear for weight gain; and (f) Vital for gastrointestinal issues. Abbott primarily sells these products to hospitals and nursing homes. The adult liquid nutritional product manufacturing process is similar to the process

---

[6]*See* Abbott, *Introducing the New ARC: Abbott Recloseable Container and Label System*, https://static.abbottnutrition.com/cms-prod/abbottengage.com/img/Engage%20ARC%20%26%20Label%20System%20Sales%20Aid%20%232%20161889a(1).pdf (last visited August 31, 2022).

for powdered infant formula products though Abbott adult products typically substitute milk for water and do not need to be dried before packaging.

48. Recloseable Plastic Bottles ("RPBs") are resealable containers made from plastic with an aluminum pop end. Abbott fills RPBs with liquid nutrition, dietary, and meal replacement products such as Ensure, Glucerna, Pedialyte, and Momcare by Similac.

49. All products intended for human consumption, including infant formula and nutritional therapy products, are subject to the FDCA, cGMP requirements, and other federal laws.

## V. <u>THE FEDERAL AND STATE HEALTH CARE PROGRAMS.</u>

### A. The Medicare Program.

50. Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. establishes the Health Insurance for the Aged and Disabled Program ("Medicare"). The Medicare program is composed of several parts. Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. § 1395c. Medicare Part B is a federally subsidized, voluntary insurance program that helps cover doctors' services and outpatient care. It also covers some other medical services that Part A does not cover (*i.e.*, physical and occupational therapist services, etc.). Part B helps pay for covered health services and supplies when they are medically necessary. 42 U.S.C. §§ 1395(k), 1395(l), 1395(s). Medicare Part D was added to the Medicare laws in 2003 with the Medicare Prescription Drug, Improvement and Modernization Act. 42 U.S.C. § 1395w (effective 2006). Part D provides voluntary prescription drug benefits, including certain drugs prescribed during the course of outpatient treatment, for qualified seniors and disabled persons.

51. Subsidization of the Medicare Program is accomplished through a Medicare Trust Fund that is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last forty years, the Medicare Program has enabled the elderly

and disabled to obtain necessary medical services from medical providers throughout the United States.

52. The Secretary of the U.S. Department of Health and Human Services ("HHS") administers Medicare through the CMS. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS). Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare. Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers", are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund. Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("Part D Sponsors") offered by private companies that contract with the federal government. Part D Sponsors are charged with and responsible for accepting Medicare Part D claims, determining coverage, and making payments from the Medicare Trust Fund. The principal function of both intermediaries and carriers is to make and audit payments for Medicare services to assure that federal funds are spent properly.

53. Nutritional therapy, which includes enteral nutritional therapy administered through a feeding tube inserted into the stomach or intestines and parenteral nutritional therapy administered through an intravenous line, are covered under Medicare. Under Medicare Part A, coverage for nutritional therapy administered during a covered stay is available provided coverage criteria are met. Reimbursement of nutritional therapy is not separately reimbursable but rather included in the established reimbursement rate under this Part.

54. Under Medicare Part B, coverage of nutritional therapy is provided under the prosthetic device provision set forth in § 1861(s)(8) of the Social Security Act. The *Medicare Benefit Policy Manual* expressly includes as covered items under the prosthetic device provision "parenteral and enteral" ("PEN") nutrition.[7] The patient receiving the therapy must have a permanently inoperative internal body organ or function thereof, which means situations involving temporary impairments are generally not covered. As a result, enteral and parenteral nutritional therapy are normally not covered under Part B in situations involving temporary impairments.[8] If the coverage requirements for enteral or parenteral nutritional therapy are met, related supplies, equipment and nutrients are also covered.[9]

**B. The Medicaid Program.**

55. Title XIX of the Social Security Act ("Medicaid" or the "Medicaid Program") authorizes grants to states for medical assistance to individuals whose income and resources are not sufficient to meet the costs of necessary medical care. 42 U.S.C. § 1396; 42 C.F.R. § 430.0; *see* 42 U.S.C. §§ 1396-1396v. The Medicaid Program is jointly funded by the federal government and participating states. The amount of federal funding in a state's program ("Federal Financial Participation") is determined by a statutory formula set forth in 42 U.S.C. §§ 1396b(a) and 1396d(b). A state that elects to participate in the Medicaid Program must establish a plan for providing medical assistance to qualified beneficiaries. 42 U.S.C. §1396a(a)-(b); *see* 42 C.F.R. § 430(A) & (B); CMS State Medicaid Manual § 13025. In exchange, the federal government,

---

[7] *See* CMS, *Medicare Benefit Policy Manual*, Ch. 15, § 120, *https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf* (last visited Aug. 31, 2022).

[8] *See* NCD - Enteral and Parenteral Nutritional Therapy (180.2), CMS, January 1, 2022, https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?NCDId=242&ncdver=1 (last visited Aug. 31, 2022).

[9] *See id.*

through CMS, pays to the state the federal portion of the expenditures made by the state to providers, and ensures that the state complies with minimum standards in the administration of the Medicaid Program. 42 U.S.C. §§ 1396, 1396a, and 1396b.

56. Every state that elects to participate in the Medicaid Program must establish and maintain a State Plan consistent with federal law regarding the coverage of procedures necessitating the use of Abbott's infant formula and nutritional therapy products. State Plans must be reviewed and approved by CMS.

57. In nearly all states, Medicaid provides coverage policies for residents of nursing facilities who are not covered under a Medicare Part A skilled benefit period. Beneficiaries who do not have Part B coverage may have nutritional therapy coverage under the state Medicaid daily rate payment system if they are eligible.[10]

## VI. SPECIAL SUPPLEMENTAL NUTRITION PROGRAM FOR WOMEN, INFANTS, AND CHILDREN ("WIC PROGRAM").

### A. Overview.

58. The Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC Program") provides federal grants to states for supplemental foods, nutrition education, and health care referrals and counseling for qualifying low-income pregnant, breastfeeding, and non-breastfeeding postpartum women, and to infants and children up to age five who are found to be at nutritional risk. 42 U.S.C. § 1786; 7 C.F.R. § 246. Although the WIC Program is administered by the Food and Nutrition Service (a federal agency within the USDA), state and local agencies

---

[10] *See* Abbott, *9th Edition Reimbursement Manual*, 3, https://static.abbottnutrition.com/cms-prod/m.abbottnutrition.com/img/9th%20Edition%20Reimbursement%20Manual%20-%20Interactive%20PDF.pdf (last visited Aug. 31, 2022).

determine participant eligibility, provide benefits, authorize vendors, and award contracts to suppliers and manufacturers.

59. A core benefit provided by the WIC Program is iron-fortified infant formula for infants. In fact, approximately fifty percent (50%) of infant formula is purchased by WIC Program participants using pursuant to this benefit.[11] The WIC Program has a competitive bidding process through which infant formula manufacturers offer rebates or discounts to states in order to be selected as the sole provider of infant formula in that state. 42 U.S.C. § 1786(h)(8)(A); 7 C.F.R. § 246.16a(c)(5). The WIC Program state agency conducting the bidding process must award the contract to the bidder offering the lowest total monthly net price for infant formula or the highest monthly rebate for a standardized number of units of infant formula. 42 U.S.C. § 1786(h)(8)(A)(iii); 7 C.F.R. (c)(5). The state agency has no discretion to select between competing bidders. After awarding the contract, the agency is responsible for managing all aspects of the relationship, including billing and receiving all rebates.[12]

60. The rebates offered by infant formula manufacturers to state agencies are critical to ensuring the government can afford and provide infant formula benefits through the WIC Program. The diagram below illustrates the role of these WIC Program rebates for infant formula benefits.

---

[11] *See* The White House, *Fact Sheet: President Biden Announces Additional Steps to Address Infant Formula Shortage*, May 12, 2022, https://www.whitehouse.gov/briefing-room/statements-releases/2022/05/12/fact-sheet-president-biden-announces-additional-steps-to-address-infant-formula-shortage/ (last visited Aug. 31, 2022).

[12] *See* Food and Nutrition Service, *WIC State Agency Infant Formula Rebate Contracts*, June 27, 2022, https://www.fns.usda.gov/wic/infant-formula-rebate-contracts (last visited Aug. 31, 2022).




61. The infant formula manufacturer awarded the WIC Program contract becomes the exclusive infant formula provider to WIC Program retailers in the state. In addition to the significant revenue from this exclusivity, it contributes to increased sales among non-WIC Program participants by virtue of availability and consumer exposure. It is estimated that a manufacturer's sales to non-WIC Program participants within a state double or triple after winning a WIC Program contract.[13]

62. Abbott is one of three infant formula manufacturers who supply infant formula to WIC Program participants.[14] As of September 30, 2022, Abbott had won contracts to supply infant

---

[13] *See* Zoe Neuberger, et al., *Infant Formula Shortage Highlights WIC's Critical Role in Feeding Babies*, June 22, 2022, https://www.cbpp.org/research/food-assistance/infant-formula-shortage-highlights-wics-critical-role-in-feeding-babies (last accessed Aug. 31, 2022).

[14] *See* Food and Nutrition Service, *WIC State Agency Infant Formula Rebate Contracts*, June 27, 2022, https://www.fns.usda.gov/wic/infant-formula-rebate-contracts (last visited Aug. 31, 2022).

formula to 37 states and territories and 6 Indian Tribal Organizations.[15] These contracts are awarded through a bidding process. Contracts are generally for three-year terms and can be extended to a maximum of six years. The contracts are awarded without discretion to the bidder with the lowest total monthly net cost who also fulfilled all technical requirements. 31 of the states and territories with Abbott contracts formed two groups that awarded contracts together.

63. Among other requirements during the bidding process, bidders must certify that their company is registered under the FDCA with HHS. Specifically, and as relevant here, bidders certify that their products are in compliance with federal laws, including that each infant formula product to be supplied under the terms of the contract complies with the FDCA and that any infant formula offered for distribution meets these requirements under §§ 246.10(e)(1)(iii) and (e)(2)(iii) and is "suitable for routine issuance to the majority of generally healthy, full-term infants." 7 C.F.R. § 246.16a(c)(4).

64. Manufacturers be registered with HHS, and they must also certify as to their compliance with federal requirements pertaining to the production and manufacturing of infant formula:

> **To be eligible to participate in the program authorized by this section**, a manufacturer of infant formula that supplies formula for the program shall–
>
> (A) register with the Secretary of Health and Human Services under the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.]; and

[15] *See id.* As of August 2022, Abbott had WIC contracts with 40 states and territories and 7 tribal organizations: American Samoa, Alaska, Arizona, California, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, North Dakota, Northern Mariana Islands, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, U.S. Virgin Islands, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, as well as Cherokee Nation, OK; Choctaw Nation, OK; Inter-Tribal Council, AZ; Inter-Tribal Council, NV; Navajo Nation, AZ; Osage Tribal Council, OK; and Isleta Pueblo, NM.

> (B) before bidding for a State contract to supply infant formula for the program, **certify with the State health department that the formula complies with such Act and regulations issued pursuant to such Act.**

42 U.S.C. § 1786(f)(15) (emphasis added); *see also* 7 C.F.R § 246.10(g).

65. State agencies are prohibited from issuing bid solicitations or entering into contracts that do not include these specific registration and certification requirements. 7 C.F.R. § 246.16a(j).

66. The manufacturer's mandatory certification of compliance with FDCA and implementing regulations is critical. Most WIC state agencies utilize the bidding process to award an exclusive infant formula manufacturer to supply all the infant formula for the state's WIC Program for a set number of years. As a result, WIC Program beneficiaries, who generally lack the resources to obtain infant formula outside the auspices of the WIC Program, have no other choice but to consume the infant formula of the state's contracted supplier.

**B. Requirements for Infant Formula Under the WIC Program.**

67. Pursuant to the federal laws establishing the WIC Program, any infant formula issued through the WIC Program must comply with the manufacturing and quality requirements under the FDCA and the regulations at 21 C.F.R. parts 106 and 107.[16] Among the requirements, all infant formula must comply with FDA's quality factors set forth in 21 C.F.R. § 106.96 *et seq.*

68. Table 4 of 7 C.F.R. § 246.10(e)(12) summarizes requirements and specifications for infant formula provided under the WIC Program.

---

[16] Indeed, this requirement is built directly into the WIC Program's definition of "infant formula," which is defined as "food that meets the definition of an infant formula in section 201(z) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321(z)) and that meets the requirements for an infant formula under section 412 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 350a) and the regulations at 21 C.F.R. parts 106 and 107." 7 C.F.R. 246.2.

| WIC Program Categories | Minimum Federal Law Requirements and Specifications |
|---|---|
| Infant formula | All authorized infant formulas must:<br>(1) Meet the definition for an infant formula in section 201(z) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321(z)) and meet the requirements for an infant formula under section 412 of the Federal Food, Drug and Cosmetic Act, as amended (21 U.S.C. 350a) and the regulations at 21 C.F.R. parts 106 and 107;<br>(2) Be designed for enteral digestion via an oral or tube feeding;<br>(3) Provide at least 10 mg iron per liter (at least 1.5 mg iron/100 kilocalories) at standard dilution;<br>(4) Provide at least 67 kilocalories per 100 milliliters (approximately 20 kilocalories per fluid ounce) at standard dilution; and<br>(5) Not require the addition of any ingredients other than water prior to being served in a liquid state. |
| Exempt infant formula | All authorized exempt infant formula must:<br>(1) Meet the definition and requirements for an exempt infant formula under section 412(h) of the Federal Food, Drug, and Cosmetic Act as amended (21 U.S.C. 350a(h)) and the regulations at 21 C.F.R. parts 106 and 107; and<br>(2) Be designed for enteral digestion via an oral or tube feeding. |
| WIC Program Eligible Nutritionals | Certain enteral products that are specifically formulated to provide nutritional support for individuals with a qualifying condition, when the use of conventional foods is precluded, restricted, or inadequate. Such WIC Program-eligible nutritionals must serve the purpose of a food, meal or diet (may be nutritionally complete or incomplete) and provide a source of calories and one or more nutrients; be designed for enteral digestion via an oral or tube feeding; and may not be a conventional food, drug, flavoring, or enzyme. |

69. 7 C.F.R. §§ 246.10(e)(1)(iii) and (e)(2)(iii) require that any infant formula issued in food packages provided through the WIC Program meet the minimum requirements set forth above.

**C. WIC Program Disruption From Abbott's Recalls and Shortages.**

70. Due to Abbott's exclusive supplier status for the majority of the States, Doe Territories, and Doe Indian Tribal Organizations, Abbott's violations and the closing of the Sturgis facility resulted in a nationwide shortage of infant formula, unprecedented disruptions to the WIC

Program, and hardships to program beneficiaries. Many of the powdered infant formulas that were the subject of the February 2022 Abbott recall, including Similac, Alimentum, and EleCare, were offered through the WIC Program. Beneficiaries were not only required to return or exchange all recalled Abbott infant formula products, but then faced the additional hardship of locating retailers that had infant formula in stock.[17]

71. The USDA enacted emergency measures, including permitting WIC Program participants to use WIC benefits to buy other brands and types of infant formula.[18] In addition, other WIC manufacturers shipped infant formula to states with Abbott WIC contracts in an attempt to alleviate shortages there. These responses resulted in reports of shortages even in those states without Abbott WIC contracts.[19] Abbott, in turn, stated that it would pay rebates on WIC Program purchases of other competitive infant formula products in states where Abbott holds the contract and where Similac was unavailable.[20] In addition, the supply shortage caused by Abbott's violations prompted FDA to allow certain manufacturers to import infant formula under controlled conditions provided that the infant formula meets FDA's minimum requirements for quality factors set forth in 21 C.F.R. § 106.96 *et seq.*

[17] *See* Food and Nutrition Service, *Voluntary Recall of Certain Abbott Power Formulas, including Similac, Alimentum, and EleCare*, Feb. 18, 2022, https://www.fns.usda.gov/wic/voluntary-recall-certain-abbott-powder-formulas (last visited Aug. 31, 2022).

[18] *See USDA Grants Additional WIC Flexibilities Amid Abbott Recall of Certain Powder Infant Formula,* USDA, February 23, 2022, https://www.usda.gov/media/press-releases/2022/02/23/usda-grants-additional-wic-flexibilities-amid-abbott-recall-certain (last visited Aug. 31, 2022).

[19] *See id.*

[20] *See Abbott Extends WIC* Rebates, Abbott, July 15, 2022, https:*//www.abbott.com/corpnewsroom/nutrition-health-and-wellness/abbott-update-on-powder-formula-recall.html* (last visited Aug. 31, 2022).

## VII. APPLICABLE LAW.

### A. The Federal and State False Claim Statutes.

72. The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) knowingly presents, or causes to be presented, to the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim made to the United States; or (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government, is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B), (G).

73. The False Claims Act also provides that any person who conspires to violate any provision of the Act is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(C).

74. The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §§ 3729(b)(1)(A)(i)-(iii). These terms "require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

75. The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the United States' behalf or to advance a Government program or interest, and if the United

States (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

76. The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

77. The states have enacted FCA statutes, the provisions of which substantially mirror the federal FCA provided in the preceding paragraphs. Relators assert claims under the statutes enacted by the states for the state portion of Medicaid false claims as stated herein.

78. As further discussed herein, federal and state payors' reimbursement payments for claims using infant formula and nutritional therapy products were based on false or fraudulent statements and certifications by Abbott that these products complied with federal requirements.

**B. State Insurance Frauds Prevention Acts.**

79. The California Insurance Frauds Prevention Act ("CIFPA"), CAL. INS. CODE § 1871 *et seq*. and the Illinois Insurance Claims Fraud Prevention Act ("IICFPA"), ILL. COMP. STAT. ANN. § 92 *et seq*. are statutes designed to root out and put a stop to fraudulent activities in the insurance arena. Both statutes contain a *qui tam* provision similar to that contained in the federal and various state False Claims Acts. The statutes are premised on the idea that the costs of insurance fraud are ultimately passed on to consumers in the form of increased premiums, and the *qui tam* provisions are designed to promote more effective investigation, discovery, and prosecution of insurance frauds. *See* CAL. INS. CODE § 1871(a). The California statute explicitly references health care fraud as one of the areas the statute is intended to target, finding that "[h]ealth care fraud causes losses in premium dollars and increases health care costs unnecessarily." *Id.* at § 1871(h).

80. Defendant's fraudulent conduct as alleged by Relators herein violate the CIFPA and the IICFPA for claims submitted to private insurers.

81. **California Insurance Frauds Prevention Act**. CIFPA creates civil liability for "[e]very person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation, as defined in Section 3207 of the Labor Code or pursuant to a contract of insurance." CAL. INS. CODE § 1871(b).

82. CAL. PENAL CODE § 550(b) states:

> It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:
>
> (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
>
> (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
>
> (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.
>
> (4) Prepare or make any written or oral statement, intended to be presented to any insurer or producer for the purpose of obtaining a motor vehicle insurance policy, that the person to be the insured resides or is domiciled in this state when, in fact, that person resides or is domiciled in a state other than this state.

83. The statute contains a *qui tam* provision that states "[a]ny interested person, including an insurer, may bring a civil action for violation of this section for the person and for the State of California…" CAL. INS. CODE § 1871.7(e)(1).

84. **Illinois Insurance Claims Fraud Prevention Act**. IICFPA states "[a] person who violates any provision of this Act, Section 17-8.5 or Section 17-10.5 of the Criminal Code of 1961 or the Criminal Code of 2012, or Article 46 of the Criminal Code of 1961 shall be subject… to a civil penalty…"). 740 ILL. COMP. STAT. ANN. § 92/5(b).

85. ILL. CRIM. CODE § 17-10.5(a) states:

> (1) A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.
>
> (2) A person commits health care benefits fraud against a provider, other than a governmental unit or agency, when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider.

86. "Deception," as further defined by statute, means knowingly to:

> (1) Create or confirm another's impression which is false and which the offender does not believe to be true; or
>
> (2) Fail to correct a false impression which the offender previously has created or confirmed; or
>
> (3) Prevent another from acquiring information pertinent to the disposition of the property involved; or
>
> (4) Sell or otherwise transfer or encumber property, failing to disclose a lien, adverse claim, or other legal impediment to the enjoyment of the property, whether such impediment is or is not valid, or is or is not a matter of official record; or

(5) Promise performance which the offender does not intend to perform or knows will not be performed.

720 ILL. COMP. STAT. ANN. § 5/15-4.

87. Under the IICFPA, "[a]n interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois…." 740 ILL. COMP. STAT. ANN. § 92/15(a).

### C. FDA Laws Addressing Manufacturing, Testing, And Releasing Infant Formula and Nutritional Therapy Products.

88. The distribution and consumption of substandard, adulterated, and non-compliant infant formula and nutritional therapy products is of particular concern because of the vulnerability of its intended recipients, mainly babies and senior citizens, who are uniquely susceptible to the negative effects of any degradation in quality or safety or of any failure to supply required nutrients.[21] Consistent with these concerns, FDA has mandated comprehensive requirements regarding the quality factors and good manufacturing practices applicable to infant formulas and nutritional therapy products manufactured by Abbott.

#### i) FDA Requirements Prohibit Adulteration.

89. The FDCA prohibits the introduction or delivery for introduction into interstate commerce of any food that is adulterated. 21 U.S.C. § 331(a). The Act also prohibits "the alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act" concerning a food "while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated." 21 U.S.C. § 331(k).

---

[21] *See The Washington Post*, "New documents show more claims of baby formula illness and death," June 10, 2022, *available at* https://www.washingtonpost.com/business/2022/06/10/baby-formula-deaths-abbott/ (last visited Aug. 31, 2022).

90. Under the FDCA, food is deemed adulterated:

> (1) If it bears or contains any poisonous or deleterious substance which may render it injurious to health . . .; or
>
> (2)(A) if it bears or contains any added poisonous or added deleterious substance . . . that is unsafe within the meaning of section 346 of this title; or (B) if it bears or contains a pesticide chemical residue that is unsafe within the meaning of section 346a(a) of this title; or (C) if it is or if it bears or contains (i) any food additive that is unsafe within the meaning of section 348 of this title; . . . or
>
> (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or
>
> (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health.

21 U.S.C. § 342(a).

91. Infant formula, including an infant formula powder, is deemed to be adulterated if:

> (1) such infant formula does not provide nutrients as required by subsection (i),
>
> (2) such infant formula does not meet the quality factor requirements prescribed by the Secretary under subsection (b)(1), or
>
> (3) the processing of such infant formula is not in compliance with the good manufacturing practices and the quality control procedures prescribed by the Secretary under subsection (b)(2).

21 U.S.C. § 350a(a).

92. The FDCA prohibits a manufacturer from approving or releasing infant formula that does not meet nutrient and quality requirements or that has not been manufactured, packaged, labeled, and held under conditions to prevent adulteration. 21 CFR § 106.70(d). Likewise, the approval and release of any ingredient, container, or closure not manufactured, packaged, labeled, or held under conditions to prevent adulteration is prohibited. 21 CFR § 106.40(f)(3). Other FDA provisions set forth in 21 C.F.R. Parts 106 and 107 address cGMP requirements, nutrient quality

control procedures, maintenance of batch records, submission requirements, and infant formula recalls.

**ii) CGMPs and Quality Factor Requirements for Infant Formula and Nutritional Therapy Products.**

93. The cGMPs applicable to human food generally require that "the manufacturer, processor, packer, and holder of food must ***at all times*** utilize quality control operations that reduce natural or unavoidable defects to the lowest level currently feasible." 21 C.F.R. § 117.110(a) (emphasis added).

94. FDA has promulgated detailed cGMPs and quality factor requirements at 21 C.F.R. §§ 106 and 107 pertaining to infant formula specifically. These are detailed below:

95. **Ingredients, Containers, and Closures.** 21 C.F.R. § 106.40(d) provides: "A manufacturer shall develop written specifications for ingredients, containers, and closures used in manufacturing infant formula and shall develop and follow written procedures to determine whether all ingredients, containers, and closures meet these specifications. When any specification is not met, an individual qualified by education, training, or experience shall conduct a documented review, shall determine whether a failure to meet such a specification could result in an adulterated infant formula, and shall make and document a material disposition decision to reject the ingredient, container, or closure or the affected infant formula; to reprocess or otherwise recondition the ingredient, container, or closure or the affected infant formula; or to approve and release the ingredient, container, or closure or the affected infant formula for use."

96. 21 CFR § 106.50(d)(4) requires, in pertinent part, that a manufacturer "[e]nsur[e] that each container of finished product is properly sealed."

97. **Packaging and Labeling.** 21 C.F.R. § 106.60(a) provides that "[a] manufacturer shall examine packaged and labeled infant formula during finishing operations to ensure that all

containers and packages in the production aggregate have the correct label, the correct use-by date, and the correct code established under § 106.80."

98. 21 C.F.R. § 106.60(b) requires: "Labels shall be designed, printed, and applied so that the labels remain legible and attached during the conditions of processing, storage, handling, distribution, and use."

99. 21 C.F.R. § 106.80 requires that "each production aggregate of infant formula shall be coded with a sequential number that identifies the product and the establishment where the product was packed and that permits tracing of all stages of manufacture of that production aggregate, including the year, the days of the year, and the period during those days that the product was packed, and the receipt and handling of raw materials used."

100. **Personnel.** 21 C.F.R. § 106.10(a) provides: "A manufacturer shall employ sufficient personnel, qualified by education, training, or experience, to perform all operations, including all required recordkeeping, in the manufacture, processing, packing, and holding of each infant formula and to supervise such operations to ensure that the operations are correctly and fully performed."

101. **Equipment and Utensils.** 21 C.F.R. § 106.30(a) provides that "[a] manufacturer shall ensure that equipment and utensils used in the manufacture, processing, packing, or holding of an infant formula are of appropriate design and are installed to facilitate their intended function and their cleaning and maintenance."

102. 21 C.F.R. § 106.30(b) provides, in pertinent part: "A manufacturer shall ensure that equipment and utensils used in the manufacture, processing, packing, or holding of an infant formula are constructed so that surfaces that contact ingredients, in-process materials, or infant formula are made of nontoxic materials and are not reactive or absorptive. A manufacturer shall

ensure that such equipment and utensils are designed to be easily cleanable and to withstand the environment of their intended use and that all surfaces that contact ingredients, in-process materials, or infant formula are cleaned and sanitized, as necessary, and are maintained to protect infant formula from being contaminated by any source. . . . "

103. 21 C.F.R. § 106.30(f) provides, in pertinent part: "[a] manufacturer shall ensure that equipment and utensils used in the manufacture of infant formula are cleaned, sanitized, and maintained at regular intervals to prevent adulteration of the infant formula. An individual qualified by education, training, or experience to conduct such a review shall review all cleaning, sanitizing, and maintenance to ensure that it has been satisfactorily completed. . . ."

104. A manufacturer must make and retain all records on: "[e]quipment cleaning, sanitizing, and maintenance that show the date and time of such cleaning, sanitizing, and maintenance and the production aggregate number of each infant formula processed between equipment startup and shutdown for cleaning, sanitizing, and maintenance." 21 C.F.R. § 106.100(f)(4). Furthermore, "the person performing and checking the cleaning, sanitizing, and maintenance shall date and sign or initial the record indicating that the work was performed." 21 C.F.R. § 106.100(f)(4).

105. Relatedly, a manufacturer must prepare and maintain records relating to "accuracy checks of instruments and controls," including records specifying "the instrument or control being checked, the date of the accuracy check, the standard used, the calibration method used, the results found, any actions taken if the instrument is found to be out of calibration, and the initials or name of the individual performing the test." 21 C.F.R. § 106.100(f)(2).

106. **Systems.** 21 C.F.R. § 106.35(b) provides:

> All systems shall be designed, installed, tested, and maintained in a manner that will ensure that they are capable of performing their intended function

> and of producing or analyzing infant formula in accordance with this subpart and subpart C of this part.
>
> (1) A manufacturer shall ensure, at any point, step, or stage where control is necessary to prevent adulteration of the infant formula, that all hardware is routinely inspected and checked according to written procedures and that hardware that is capable of being calibrated is routinely calibrated according to written procedures.
>
> (2) A manufacturer shall check and document the accuracy of input into, and output generated by, any system used in the production or quality control of an infant formula to ensure that the infant formula is not adulterated....
>
> (3) A manufacturer shall ensure that each system is validated prior to the release for distribution of any infant formula manufactured using the system.
>
> (4) A manufacturer shall ensure that any system that is modified is revalidated following the modification and prior to the release for distribution of any infant formula manufactured using the modified system....

107. The manufacturer must make and retain all records on: "[a]ll mechanical and electronic equipment used in the production or quality control of infant formula," including "(iii) [r]ecords that document installation, calibration, testing or validation, and maintenance of the systems used." 21 C.F.R. § 106.100(f)(5).

108. Further, 21 C.F.R. § 106.20(a) provides: "Buildings used in the manufacture, processing, packing, or holding of infant formula shall be maintained in a clean and sanitary condition and shall have space for the separation of incompatible operations, such as the handling of raw materials, the manufacture of the product, and packaging and labeling operations."

**iii) FDA Recordkeeping Requirements.**

109. FDA's recordkeeping requirements, applicable to human food generally and infant formula, detail Abbott's obligations with respect to preparing, maintaining, and making available records.

110. **<u>Recordkeeping Pertaining to Human Food</u>.** 21 C.F.R. § 117.305 requires, in relevant part, that any records pertaining to human food:

> (b) Contain the actual values and observations obtained during monitoring and, as appropriate, during verification activities;
>
> (c) Be accurate, indelible, and legible;
>
> (d) Be created concurrently with performance of the activity documented;
>
> (e) Be as detailed as necessary to provide history of work performed; and
>
> (f) Include: (1) Information adequate to identify the plant or facility (*e.g.,* the name, and when necessary, the location of the plant or facility); (2) The date and, when appropriate, the time of the activity documented; (3) The signature or initials of the person performing the activity; and (4) Where appropriate, the identity of the product and the lot code, if any.

111. **<u>Recordkeeping Pertaining to Infant Formula</u>.** For each production aggregate of infant formula, a manufacturer must prepare and maintain records that include complete information relating to the production and control of the production aggregate, including: (i) the master manufacturing order (21 C.F.R. § 106.100(e)(1)); and (ii) records on ingredients, containers, and closures used in the manufacture of infant formula, including the results of any test or examination performed thereon and the disposition thereof. 21 C.F.R. § 106.100(f)(6).

112. For any deviations from the master manufacturing order, any corrective actions, and the monitoring of such events, every manufacturer must maintain records concerning:

> (a) Any such deviations and any corrective actions taken because of the deviation. 21 C.F.R. § 106.100(e)(2).
>
> (b) The monitoring at any point, step, or stage in the manufacturer 's production process where control is deemed necessary to prevent adulteration, including: (i) A list of the specifications established at each point, step, or stage in the production process where control is deemed necessary to prevent adulteration; (ii) the actual values

obtained during the monitoring operation, any deviations from established specifications, and any corrective actions taken; and (iii) identification of the person monitoring. 21 C.F.R. § 106.100(e)(3).

(c) The conclusions and follow up, along with the identity of the individual qualified by education, training, or experience who investigated: (i) any deviations from the master manufacturing order and any corrective actions taken; (ii) any finding that a production aggregate or any of its ingredients failed to meet the infant formula manufacturer's specifications; and (iii) a failure to meet any specification at any point, step, or stage in the production process where control is deemed necessary to prevent adulteration. 21 C.F.R. § 106.100(e)(4).

113. In addition, every manufacturer is required to maintain the following testing records:

(a) All results of testing on the in-process production aggregate, at the final product stage, and on finished product throughout the shelf life of the product, including: (i) results of all quality control testing to verify that each required nutrient is present at the required levels and that all other nutrients added by the manufacturer are present at the appropriate level; and (ii) for powdered infant formula, results of any testing conducted to verify compliance with the microbiological quality standards. 21 C.F.R. § 106.100(e)(5).

(b) Frequency and results of testing of the water used in the production of infant formula. 21 C.F.R. § 106.100(f)(1).

(c) A full description of the methodology used to test powdered infant formula to verify compliance with the microbiological quality standards and the methodology used to do quality control testing. 21 C.F.R. § 106.100(f)(7).

114. Every manufacturer must also maintain detailed procedures concerning how all complaints concerning infant formula are to be handled, with "complaint" to be construed as "any allegation . . . expressing dissatisfaction with a product for any reason, including concerns about the possible existence of a hazard to health and about . . . quality." 21 C.F.R. § 106.100(k).

115. **Requirement to Make All Records Readily Available.** Under 21 C.F.R. § 106.100(l), every infant formula manufacturer must make "readily available for authorized inspection ***all records*** required under [Part 106] or copies of such records" (emphasis added). Specifically, every manufacturer must maintain "***all records*** required under [Part 106] in a manner that ensures that . . . the Food and Drug Administration can be provided with access to such records within 24 hours." 21 C.F.R. § 106.100(m) (emphasis added). Notably, these obligations require the manufacturer to make available for authorized inspection all records pertaining to any deviations from the master manufacturing order and any corrective actions as well as the written conclusions and follow-up of any investigations of such deviations. 21 C.F.R. § 106.100(e)(2), (e)(4).

116. The FDCA and its implementing regulations do not permit an infant formula manufacturer to remove or omit certain records prior to making ***"all records"*** available for authorized inspection based on discretion or internal process.

117. Further, a failure to comply with these record requirements renders the related infant formula adulterated under section 412(a)(2) of the FDCA with respect to quality factor requirements and adulterated under section 412(a)(3) of the FDCA with respect to cGMP and quality control requirements. 21 C.F.R. § 106.100(r).

118. As required under 21 C.F.R. § 117.305, which applies to records pertaining to the manufacturing or production of human food generally, all such records must be created concurrently with the activity being documented, "be accurate", and must "[c]ontain the ***actual values and observations*** obtained during monitoring and, as appropriate, during verification activities" (emphasis added). In other words, non-contemporaneous, reconstructed, or incomplete data is not permitted.

## VIII. RELATORS' DISCLOSURES TO UNITED STATES.

119. Since September 2020, Relators repeatedly disclosed Abbott's violations to various federal and state government officials. As evidenced by the detailed timeline in Exhibit B, Relators' information was disclosed in numerous formal and informal submissions, emails, phone calls, and hours of interviews conducted by FDA and other federal agents (via videoconference and in-person).

120. The disclosures to FDA by Relator Millard included written and oral submissions and an extensive interview prior to FDA's "for cause" inspections of Sturgis in 2022. Relator Millard responded to follow-up inquiries by FDA and continued to provide additional information. Those inspections resulted in observations of violations, published March 18, 2022, in FDA Form 483.

121. The violations disclosed to FDA, MIOSHA, and OSHA between September 2020 and August 2021 include, but are not limited to: (a) 2019 microbiological events including failures in Abbott's Clean-In-Place ("CIP") staffing, spray balls for cleaning equipment, a scrubber that was not being properly cleaned during CIP, and dryer malfunctions or defects leading to microbiological contamination of several batches; (b) Abbott's release of infant formula in 2019 that had batches with positive microbiological results without issuing a required recall; (c) Abbott's failure to provide fulsome documentation and answers to FDA staff during a 2019 audit; (d) Abbott's falsification of rework documentation for Calcilo XD after the recall; (e) Abbott failing to perform proper seam check validation on empty cans to avoid known seam integrity issues; (f) Abbott's knowing release of infant formula in 2020 with seam issues, destroying some batches, but not issuing a recall; (g) Abbott's packaging violations resulting in low fill weight; (h) Abbott's lack of product traceability resulting in the inability to locate and destroy adulterated

product pre-release; (i) Abbott's line clearance issues; and (j) Abbott's failure to resolve technical equipment/engineering violations.

122. On September 9, 2021, Relator Millard notified FDA's Office of Regulatory Programs and others alerting them to Abbott's various violations.

123. Several weeks later, from September 20-24, 2021, FDA conducted an inspection at Sturgis, resulting in five observations memorialized in FDA Form 483 that documents some of the information reported by Relator Millard. ***First***, Abbott failed to maintain its facilities in a clean and sanitary condition, as evidenced by the following observed conditions: (i) standing water was present, and (ii) equipment designed for liquid processing use only was utilized in other areas. ***Second***, Abbott failed to maintain its product filling machine. ***Third***, Abbott failed to implement or otherwise enforce sanitary protocols, as evidenced by relevant personnel failing to properly wash their soiled or contaminated hands, sanitize or change their gloves before touching food contact surfaces, and/or cover exposed skin. ***Fourth***, Abbot failed to maintain flow sensors, pressure sensors, and flow meters. ***Fifth***, Abbott failed to monitor the temperature in a piece of thermal processing equipment, as evidenced by the indicating thermometer temperature for a pasteurizer was not documented in a master work order.

124. In October 2021, Relator Millard's submission was provided to numerous other FDA officials. It detailed extensive regulatory violations relating to the production of infant formula, including (i) Abbott's falsification of records, (ii) Abbott's release of untested infant formula, (iii) Abbott's withholding material information during the 2019 FDA audit, (iv) Abbott's failure to provide adequate CIP staffing and procedures, (v) Abbott's failure to take corrective measures, (vi) Abbott's episodes of bacterial contamination, and (vii) Abbott's lack of traceability. FDA acknowledged receipt of the submission.

125. FDA assigned specific investigators who interviewed Relator Millard on December 22, 2021, including agents involved in FDA inspections of Sturgis.

126. FDA's "for cause" inspections occurred from January 31, 2022, until March 18, 2022. During these inspections, Abbott recalled products including products directly related to Relator Millard's disclosures. In addition, while FDA was conducting the inspections, an FDA Compliance Officer contacted Relator Millard to obtain information about batch records, the use of "purple folders," and other issues, *see infra*.

127. On March 18, 2022, an FDA Form 483 was released revealing four major observations. ***First***, Abbott failed to establish a system of process controls that would ensure that infant formula did not become adulterated due to the presence of microorganisms in the infant formula or in the processing environment, as evidenced by the following observations: (i) environmental samples and finished product tested positive for *Cronobacter sakazakii*, (ii) standing water was present in powdered infant formula production areas (which was a repeat observation from the previous audits), and (iii) water events occurred in dry powdered infant formula production areas. ***Second***, Abbott failed to ensure that surfaces contacting infant formula were maintained to prevent contamination, as evidenced by the following (i) dry out steps for dryers were not appropriately validated, (ii) dryers had a history of internal deterioration, and (iii) both FDA and Abbott found evidence of *Cronobacter spp.* in the powdered infant formula production environment and Abbott found *Cronobacter spp.* in finished product. ***Third***, Abbott's investigation files on consumer complaints did not adequately determine whether a hazard to health exists, specifically that: (i) the investigations failed to identify the root causes of reported *Cronobacter sakazakii* and *Salmonella newport* illness and death and (ii) samples for microbial analysis were not maintained in accordance with written policy. ***Fourth***, relevant personnel failed

to wear necessary protective apparel, including that certain personnel failed to observe proper shoe sanitization and shoe change policy in the facility.

128. Relator Millard continued to provide information to, and cooperate with, multiple government agencies. In June and July of 2022, Relators contacted FDA's Office of the Chief Counsel with additional violations regarding the Sturgis and Casa Grande facilities. Information and substantiation of further violations was provided, including but not limited to (i) multiple examples at the Sturgis and Casa Grande facilities of implementation of brackets used to identify batches affected by microbial or environmental contamination and then testing into compliance through "time code removals," which ultimately led to the release of product that was not cleared of contamination or contaminant exposure; (ii) falsification of batch records at both facilities; and (iii) additional cGMP violations including deficient CIP practices, inadequate temperature control of FP tanks, technical equipment and engineering issues, signing off on nonconforming product, inaccurate maintenance records, seam integrity issues, bacteria in Tetra Pak products, and PIF Tank and PD pump violations.

129. In 2022, FDA representatives from ORA, CFSAN, OCI, and OCC conducted extensive interviews of Relators K. Cooper and L. Cooper including a review of evidence supporting the violations.

130. Since 2022, Relators have provided continuous information to the United States in support of the Government's investigation.

## IX. ABBOTT'S WRONGFUL CONDUCT.

131. By virtue of their positions and responsibilities, Relators are and were ideally situated to investigate and uncover the fraudulent conduct alleged herein. They directly witnessed the widespread violations and Abbott's efforts to mislead regulators regarding its fraudulent conduct. This confers upon Relators direct and independent knowledge of Abbott's conduct as to

specific fraudulent schemes and has enabled them to discover and investigate the unlawful practices, as alleged herein.

132. Relators' evidence establishes that Abbott knowingly manufactures and sells adulterated, substandard, and non-cGMP compliant infant formula and nutritional therapy products as reflected in the following violative practices, Manufacturing Violations:

- Inadequate Clean-in-Place Practices (*see infra* Section IX.B.i);
- Inadequate Temperature Control for Bulk Finished Product ("FP") Storage Tanks and Heat Treatment Rooms (*see infra* Section IX.B.ii);
- Systemic Technical Equipment, Engineering, and Production Violations (*see infra* Section IX.B.iii);
- Approving Substandard and Adulterated Products with Unvalidated Data (SQE and ZARPAC Reports) (*see infra* Section IX.B.iv);
- Falsification of Maintenance Records (*see infra* Section IX.B.v);
- Systemic Seam Integrity Violations Adulterating Infant Formula (*see infra* Section IX.B.vi);
- Protein In Fat ("PIF") Tank and Positive Displacement ("PD") Pump Violations (*see infra* Section IX.B.vii);
- Out of Specification Products (*see infra* Section IX.B.viii);
- Falsification of Batch Records (*see infra* Section IX.B.iv);
- Providing Falsified Batch Records to FDA (*see infra* Section IX.B.ix.d);
- Non-Validated "Time Code Removal" Practices to release batches of products with confirmed microbiological and/or other contamination verified by internal tests (*see infra* Section IX.C); and
- Ongoing Current Contamination Events on Released Batches at Sturgis and Casa Grande, including critical process calibration failures (*see infra* Sections IX.C.iv.a-k).

133. These violative practices are widespread and affect infant formula and nutritional therapy products produced at Sturgis and Casa Grande, as well as other Abbott facilities. Abbott internally has acknowledged the "Sturgis-like" problems at other facilities. In an Abbott-internal QA Virtual Town Hall held on November 7, 2022, Abbott Director of Quality Assurance in Columbus Doris Baginski stated that the issues that led to the problems at Sturgis also occurred at

the facilities located in Casa Grande and Cootehill. This sentiment was echoed by Kevin Doney, Director of Program Management at Sturgis who said that the issues at Sturgis occurred "at all of our sites." Doney discussed the fact that Abbott's dry out "validation on the dryers haven't been validated for 70 years."

134. At a separate meeting discussing the Sturgis consent decree, Casa Grande Site Director Douglas Taylor said, "if we are honest with ourselves some of the issues or opportunities that were found in Sturgis could have been found here."

135. An internal memorandum, dated April 1, 2022, from Abbott Division acknowledged that violations specific to dryer monitoring and the pasteurization process in the final heat treatment were present at both Sturgis and Casa Grande.

136. These illustrative violations and many others belie Abbott's continued false narrative that it maintains a "zero tolerance policy for *Cronobacter* or any pathogen in our plants."[22] Between May 9, 2023, and February 14, 2024, Abbott's environmental monitoring program identified *Cronobacter spp*. 318 times in the Casa Grande facility alone. Between May 1, 2023, and February 20, 2024, there were 14 confirmed positive swabs for *Cronobacter* in Casa Grande's Dryer Building alone.

137. In January and February 2024, Casa Grande received multiple confirmed *Cronobacter* contamination hits from the facility based on third-party testing resulting in pNCRs. Four of those pNCRs are detailed below.

---

[22] Abbott August 29, 2022 Press Release, *available here*: https://www.abbott.com/corpnewsroom/nutrition-health-and-wellness/abbott-update-on-powder-formula-recall.html.

138. **pNCR 959933**: Casa Grande received third-party lab confirmation of *Cronobacter sakazakii* from a swab collected in the Dryer Building Level 0 Powder Filling Area. Abbott thereafter cancelled the confirmed contamination hit pNCR claiming that it was not confirmed.

139. **pNCR 959924**: Casa Grande received third-party lab (Charles Rivers) confirmation of *Cronobacter malonaticus* from two swabs collected February 20, 2024, in the Dryer Building Level 4 Dryer Chamber Room, north of the agglomerator. As of March 1, 2024, there also was confirmation of *Cronobacter sakazakii* in addition to *Cronobacter malonaticus.*

140. **pNCR 960612**: Casa Grande received third-party lab (Charles Rivers) confirmation of *Cronobacter malonaticus* and *Cronobacter sakazakii* from swabbing collected on February 20, 2024, in the Dryer Building Level 0 Powder Filling Room.

141. **pNCR 960303**: Casa Grande received confirmation of *Cronobacter sakazakii* from a swab collected on January 2, 2024, in the Dryer Building Level 4, which is the main control room, agglomerator, processing for dryer, and cyclones with rotary valves.

142. Casa Grande also experienced at least 450 uncontrolled water infiltration events between May 1, 2023, and February 14, 2024. Seventy-five (75) of these events were in the Dryer Building where powdered infant formula is packaged and dried. Many of the water events were due to systemic roof leaks or failed piping which Abbott has known about for years without fixing. Samples taken from the leaks and tested for *Cronobacter* and *Salmonella* detected *Cronobacter sakazakii* 60 times, five of which were in the Dryer Building. Moreover, the Dryer Building, where Abbott manufactures powdered infant formulas often had multiple water events.

143. Apart from Casa Grande and Sturgis, additional Abbott facilities have similar violative conditions. Abbott Quality and Regulatory ("AQR") visited Altavista in mid-July 2022, specifically a week prior to a pre-announced FDA visit. AQR presented Altavista with nine key

findings to be rectified before FDA arrived, including: (i) Control Plan Management; (ii) Production and Process Control; (iii) Material Controls/warehouse; (iv) Water Treatment Plant Poor cGMP conditions; (v) Microbiology Lab-In Process; (vi) Sanitation and cleaning procedures/practices; (vii) Vitamin Dispensing Booth/Weigh Room; (viii) Aseptic Line CAM 3; and (ix) Aseptic Line Tetra Pak. Instead of correcting these known conditions, Abbott hid these violations by falsifying batch records among other acts of concealment, *see infra*. As described herein, Abbott personnel undertook actions to keep from FDA investigators material information about Abbott's violations.

### A. Abbott Violated and Continues to Violate Federal Laws By Manufacturing, Testing, and Releasing Substandard and Adulterated Products.

144. Manufacturing infant formula or nutritional therapy products involves a multi-step process, including required testing at different stages. Compliant products are created by following specific procedures with specific ingredients, processes, and testing methods. The precise procedures depend on the type of product and can be impacted by process deviations, OOS results, and contamination. The general sequence of steps from manufacturing to shipping (with sampling and analytical testing points bolded and italicized and the relevant departments and employees in parentheses) entails:[23]

- Raw Ingredients and Commodities Received (Incoming Lab/Warehouse)
- Batch Calculation Process (Quality Systems or Analytical Lab)
- Work Order Creation (Quality Systems or Analytical Lab)
- Mineral and Vitamin Weigh Rooms (Processing)
- Mixing (Processing)
- ***Analytical Testing: Ratio, AST & RAV (Analytical Lab)***
- ***Microbiological Testing In-Process ("IP") (Microbiological Lab)***
- Drying (Dryer Department)

[23] A full description of the general manufacturing, testing, and release process is available at Exhibit C.

- ***Analytical Testing: Drying In-Process ("DIP") (Sturgis: Analytical Lab; Casa Grande: Dryer Operators)***
- Powder Filling (Powder Packaging)
- Powder Packaging (Powder Packaging)
- ***Final Product Sampling***
- ***Final Product Testing (Analytical and Microbiological Labs) – General Tests and Microbiological Tests***
- Post-Production (Quality Systems)
- Quality Review (Quality Systems)
- Batch Review (Quality Systems)
- Batch Release (Quality Assurance and Quality Systems)
- Inventory Control Software (CAMBAR) Release (Quality Assurance and Quality Systems)
- Shipping (Abbott Division)

145. As described herein, Abbott knows of systemic violations along multiple points in the manufacturing process and employs a "time code removal" scheme to avoid destroying product, including product containing microbiological contamination. Abbott also has withheld critical information, including documentation, from FDA investigators to avoid detection.

**B. Ongoing and Systemic Violations of the FDCA and CGMP Requirements.**

146. Abbott knowingly violated and continues to violate FDCA and its implementing regulations and withholds material information regarding its manufacturing and testing violations. The information withheld includes cGMP violations, including but not limited to testing seams on empty cans to mask seam violations; falsely certifying products' compliance with FDCA; falsely stating or characterizing product deviations; failing to meet specifications for product fill weights as stated on product labeling; failing to maintain accurate maintenance records; removing product holds without required authorizations or failing to even place product holds; and altering product batch records, among other violations. Examples of these violations include the following:

**i) Inadequate Clean-in-Place Practices.**

147. CIP procedures refer to a validated process to clean equipment used in the production and packaging of infant formula and nutritional therapy products. CIP is an essential component of quality systems to ensure product safety and avoid contamination. In practice, CIP involves the automated cleaning of the interior surfaces of piping, tanks, and fillers. Due to the size of this equipment, cleaning is performed in place using turbulent flow through piping or spray balls for large surfaces. CIP chemicals used in Casa Grande, and potentially other Abbott facilities, include AC-101, Foam NOX, AC3, and Synergex.

148. Adequate, controlled CIP procedures are required by the FDCA and its implementing regulations. Specifically, Abbott is required to ensure (i) all surfaces that contact ingredients, in-process materials, or infant formula are cleaned and sanitized as necessary and at regular intervals to prevent adulteration of infant formula, and (ii) those locations are maintained to protect from contamination from any source. 21 C.F.R. § 106.30(b); 21 C.F.R. § 106.30(f).

149. A critical aspect of well-controlled CIP procedures includes drying the equipment. Failure to properly maintain and dry the equipment following a CIP wash leaves contaminants such as bacteria to affect the product flowing through or into the equipment.

150. The equipment at Sturgis associated with the drying process is old and consistently in need of repair. Product flow pipes were pitted and resulted in small holes that led to bacteria entering the piping system or not adequately washed through during CIP washes.

151. Neither the Sturgis nor the Casa Grande facilities have validated dry out times after a CIP procedure. This conflicts with federal laws, as well as Abbott's Global Microbiological Standards, which recognizes that "[r]esidual moisture in dry-blending equipment will support the

outgrowth of microorganisms and influence the quality of the finished product. Cleaning procedures must include procedures to rapidly and adequately dry all equipment."[24]

152. Abbott's Global Microbiological Standards "define[s] the microbiological preventative controls to ensure product safety of all nutritional products manufactured by Abbott Nutrition (AN)…developed based on the guidance of the International Committee for Microbiological Specifications for Food (ICMSF), the U.S. FDA, and the EU Commission."[25]

153. The CIP practices at Sturgis are additionally deficient due to lack of process control and record compliance and retention. FDCA and its implementing regulations require that "[a]n individual qualified by education, training, or experience to conduct such a review shall review all cleaning, sanitizing, and maintenance to ensure that it has been satisfactorily completed. . . ." as well as the retention of signed records of cleaning checks. 21 C.F.R. § 106.30(f); *see also* 21 C.F.R. § 106.100(f)(4). Sturgis failed to have staff in place with sufficient training and experience to review CIP records. Moreover, CIP records were not regularly reviewed prior to the release of a batch, and Abbott did not require CIP checklists to have signature authentications or QS staff audits. A "Sanitation Preventive Controls Improvement Project Charter" committee was formed at Sturgis to review known deviations in the CIP process. The deviations memorialized in documents included incompleteness/accuracy of records, timeliness of CIP record submission to QS, failure of QS to review CIP records prior to batch release, and creation of a reliable filing

---

[24] Abbott – Abbott Nutrition Global Microbiological Standards, ID: AN06-99-004, approved Jan 28, 2020, effective Apr. 27, 2020, Section 5.4.6.2; see also Section s 5.4.5.2 ("Prior to drying, the dryer and powder handling systems must be adequately dried. Moisture within the dryer and powder handling equipment provide the environmental conditions to support microbial growth that can influence the quality of the finished product. The cleaning procedures must include steps to rapidly dry the drying and powder handling equipment. When equipment has been down (idle) and held at ambient conditions, the start-up procedures must include procedures to dry out the equipment prior to production.").

[25] Abbott – Abbott Nutrition Global Microbiological Standards, ID: AN06-99-004, approved Jan 28, 2020, effective Apr. 27, 2020, Section 2.0.

system for CIP records to minimize the frequency of misfiled or unretrievable CIP records. Although it was repeatedly recommended that a CIP engineer or equivalently trained individual review the CIP records for compliant CIP and appropriately timed CIP completion, Sturgis' then-quality engineer (later promoted to Compliance Manager and then to QA Director), Keenan Gale, refused. Notably, as of early 2022, the CIP documentation was still unresolved.

154. Casa Grande has had mold contamination with Tetra Pak products. In at least one instance, Abbott discovered mold in the Tetra Pak filler after product had passed through. There is no batch testing for mold since the production is purported to be sterile.

155. Moreover, Abbott misuses CIP pumps at Casa Grande for infant formula product leading to unsanitary conditions and contaminated product. Relator L. Cooper witnessed a CIP pump used to pump infant formula and confirmed that Casa Grande inappropriately used a CIP pump for infant formula product even though the pump is designated for cleaning and exposed to chemicals.

156. In February 2023, Relator L. Cooper was assigned to fix a leaking pump at Casa Grande. A Casa Grande production operator identified the pump in question. It was labeled CIP pump but the operator identified it as a booster pump and explained it is used for both CIP and product.

157. The operator indicated that the use of the CIP pump to run both CIP chemicals and infant formula product was routine at Casa Grande. The operator further indicated that the pump was used to pump product away from the PIF tank after processing to send the product to blending tanks.

158. The CIP pump should never be used for, or come in contact with, infant formula product. In addition to the CIP pipes not being cleaned thoroughly of the harmful, non-ingestible

chemicals, if the CIP pipes are clogged with product, then they will be ineffective at providing the required cleaning to the product pipe and equipment.

159. The CIP pump circuit in question is pictured and labeled below.




160. On March 2, 2023, Casa Grande's maintenance department received another call that the same CIP pump motor had shorted out again. A Casa Grande maintenance technician responded. That operator removed the clamp from the motor cap and caked up infant formula product came out in a stream approximately 2-3 feet from the port at the top of the pipe where the CIP motor pushes:



161. The burnt up and peanut butter-like product was caked inside the CIP circuit for at least one hundred feet of pipe. Casa Grande employees spent more than twelve hours taking off lengths of pipe at a time and trying to clean them by using air to push the product out.

162. The CIP circuit is clearly marked with signage visible in the above photo as "PIF B HOLD TANK CIP PUMP (PP 1301-2)" while the other clearly marked circuit indicates it is "PIF B HOLD TANK PROCESSING PUMP (PP 1301-1)." The "B" circuit is used for infant formula as documented in this photo:




163. The two circuits are clearly marked because they serve different functions. One circuit is dedicated to infant formula product, and the other is dedicated to cleaning chemicals. Because they are used for different jobs, they are two different style pumps. For example, the CIP pump (the small white cylinder) is a centrifugal pump that pushes in the front. It has a wheel that can cause foam and create heat which makes the chemicals thicker, which is good for cleaning chemicals and water, but under no circumstances should it come in contact with infant formula product. The processing pump (a large silver horizontal cylinder close to the floor) is a positive displacement ("PD") pump to process fat and protein together. It is made to pump product, which is thicker and heavier.

164. The CIP circuit should be kept separate from the product circuit except for cleaning purposes. However, Abbott has the ability to easily open and close valves, altering the path of the product. As seen in the photograph above, an Abbott employee used a laptop to open and close the valves between CIP and Processing circuits.

165. When this congealed product poured out of the CIP-dedicated circuit, no one expressed any surprise that the CIP system was being used to move product.

166. As indicated on the signage, this circuit connects to PIF tank 1301, which is on the "B System" used for processing. The B System is predominately used for infant formula, whereas the A System is mainly liquid production (RPB and Tetra Pak), although some infant formula does run on the A System.

167. It is clear that infant formula is being affected by microcontamination at Casa Grande because Standard Plate Count ("SPC") is testing high in finished product. Internally, Abbott claims SPC is "process hygiene" and not an indicator of product safety. Yet as noted above, SPC is a general count of bacterial density. It alerts the presence of bacteria and the amount of bacteria, but not the type of bacteria. Abbott's decision to deem SPC as a non-product safety contaminant is misleading. *Cronobacter* could be among the bacteria growing in samples resulting in elevated SPC counts among other contaminants that would prove to affect product safety.

168. Moreover, Abbott implements 3x5 testing to learn more about contamination to its product, but again Abbott selects what tests to perform during 3x5 testing. If Abbott elects to do 3x5 testing for SPC, it will identify where there is contamination but not what contaminant is present.

169. At the very least, high SPC is most likely an indication that systems are not being properly cleaned. This is corroborated by the use of the CIP pump to pump product. The product circuit is never adequately cleaned as the CIP circuit is caked in product and is not itself clean.

170. The B System (powdered infant formula) appears to be heavily affected by the inappropriate use of the CIP pump.[26] Powdered infant formula continues to test elevated for SPC.

[26] The CIP pump misappropriation may also affect the A System (RPB and Tetra Pak).

Abbott knows of the elevated SPC tests, and it continues to release the product for infant use. With simple additional SPC tests, the identity of the contaminant could be isolated, but Abbott has not implemented these tests at great risk to product safety.

171. As of January 2024, it was almost a year before the A System CIP circuit could be validated. This was not due to a lack of validation attempts, but rather this is the result of repeated CIP failures leading to an unvalidated CIP System through which Abbott's RPB, Tetra, and infant formula was produced for almost a year. The CIP not being validated means that product passing through this system should not be released, but it has been, and continues to be, released.

172. Because the A System could not be validated, Abbott chose to write "variations" when positive or elevated microcontamination results were received on batches that were part of the validation protocol. Once the variation was approved the subject batch was then released despite the A System CIP still not being validated. Abbott received in-process microcontamination results from this CIP circuit for almost two years before the circuit could be validated. An August 21, 2023 email reported that Abbott was attempting to release four batches impacted by micro positive tests and CIP failures "without a formal variation" meaning Abbott was aware that the CIP validation failed yet they wanted to release the batches without documentation that the system met sanitation requirements.

173. Another example of sanitation failures is shown in the below photo from August 2023 of a conveyor gear ***after*** wet wash. Clearly visible in the photo is powder, water, and chemicals caked onto the conveyer. This conveyor track is one of three stacked side-by-side traveling from the check weigher after the filler discharge to the seamer.



**ii) Water Leaks.**

174. Infrastructure defects plague both Sturgis and Casa Grande, including known roof leak issues. Sturgis was afflicted with water leaking through the roof, as well as flooding, especially after heavy rain. Casa Grande has similar roof issues—a problem that has been known for years but not fixed.

175. After rain, the Casa Grande roof usually leaks for weeks, sagging like a bowl with water weighing it down. Following the heavy rains at Casa Grande, on December 2-4, 2022, water leaked from the roof in the Powder Packaging room for nearly a week. The four photos below show Abbott's ineffective makeshift efforts to control the leak, as well as product packaging continuing as water leaked into the now unsanitary room.










176. Relator K. Cooper heard Stefanie Crum say that she wanted to order five (5) "leak containment" trash buckets because of known, persistent leaks and water issues. The above photos, taken December 8, 2022, at Casa Grande were taken almost a week after the heavy rains occurred. Additional trash buckets were also placed throughout the plant to deal with separate water issues. For example, during heavy rains, on December 5, 2022, the CIP pump for the dryer in the Powder Filling room broke causing water to shoot up to the ceiling. That water pushed the ceiling tiles up

and caused water to fall back down into the room, which resulted in the pump next to the CIP pump failing.

177. In February 2023, Casa Grande Compliance Quality Manager Vince Arcuri sent an email with the subject "Leak Management." Arcuri instructed that all identified leaks need to be properly managed and documented, requiring work orders until the leak was resolved. Arcuri attached to the email nine photos of trash cans used around Casa Grande for leak containment, including the photo below.




178. Abbott's new system was to utilize *special* garbage cans to catch water leaking from the roof or pipes. The change is further evidence that longstanding practices at Casa Grande jeopardize product safety.

179. Abbott consistently failed to follow its own leak protocol. For example, in November 2023, Abbott's AQR auditors found a water leak at a hose station in processing. Abbott asked maintenance to fix it rather than following Abbott's policy requiring notification to the supervisor in charge of the area and creation of a work order, which should lead to cordoning off the area, proper swabbing, a QR report, and a paper trail to trace the incident. In November 2023, maintenance was verbally instructed to ignore the policy because the auditors found the leak so

there was no need to write it up. In the end, maintenance fixed the leak without a work order being created.

180. The below image from a video taken in June 2024 of a Casa Grande packaging line shows water streaming in from the ceiling right over product. This was a common occurrence at Casa Grande when it rained.



181. The leak failures are known to Abbott and tracked. As of September 2023, a list of backlog work orders identified more than 1,000 leaks and standing water events at Casa Grande. Notably, these are only water events that are actually documented as opposed to water events that are not properly recorded. Moreover, the ongoing Casa Grande water leaks are evidence of Abbott's failure to maintain infrastructure sufficient to maintain a compliant environment and product. Casa Grande continues to fail to address water events well after 2023.

182. Despite consistent manufacturing, packaging, and facilities problems impacting Abbott's operations and product safety and quality, Abbott's Chairman and CEO Robert Ford

announced in a company-wide email that Abbott's highest 2024 priority was "#1 is **improving our gross margin.**"

**iii) Inadequate Temperature Control for Bulk Finished Product ("FP") Storage Tanks and Heat Treatment Rooms.**

183. The Casa Grande HACCP Food Safety Plan ("CG HACCP FSP") states that "Bulk Finished Product ("FP") Storage Tanks" require a process control to prevent biological hazards, specifically, "microbial growth due to out of specification temperature."[27] The CG HACCP FSP requires that FP tank temperatures be manually monitored every four hours, continuously monitored on the visual process report ("VPR"), and identifies the subsequent records that are to be produced and maintained as part of the batch record. The VPR review and verification is maintained in the VPR web-based system and is electronically signed-off, documenting the exact time and date of the review and when verification is provided. Further, after a relevant batch processes, it is transferred to the FP tank for cold storage, which is required to be maintained at <=45 degrees for all products and <=40 degrees for infant formula in order to be shipped to U.S. customers (up to 45 degrees permitted by regulations in certain circumstances).[28] These FP tank temperature requirements are also stated in Abbott's Global Microbiological Standards and must be followed and verified on the FP tank reports to ensure product quality.

184. Abbott's Global Microbiological Standards explain the importance of temperature control to avoid adulterated product:

> The wet blending, liquefication, of ingredients may allow outgrowth of microorganisms of health significance and those that may contribute to spoilage in the finished product. A product that is not held at temperatures

---

[27] Casa Grande HACCP Food Safety Plan ("CG HACCP FSP") enumerates specific preventive control requirements for VPR review and verification. Specifically, it states that "[m]anual temperature recordings are every 4 hours. Quality Systems does not receive the manual tank temperature report from production and it is not reviewed. VPRs are only reviewed for infant formula." *See* CG HACCP FSP, ver. 6.

[28] 21 C.F.R. § 106.30(e)(2)(ii), (https://www.ecfr.gov/current/title-21/chapter-I/subchapter-B/part-106).

> to control the outgrowth of health significance microorganisms may be considered adulterated. Proper temperature and time control is important to protect the quality of the finished product. The growth of microorganisms during blending can influence the overall quality of the final product.[29]

185. Prior to late 2022 when Relator K. Cooper instructed her team to do so, Casa Grande was not reviewing the automated continuous monitoring for Tetra Pak and RPB products. In addition, manual monitoring documentation is not reviewed by QS prior to release or included in the batch record. Relators have noted specific situations where the VPR chart had no temperature data recorded at all.

186. The failure to control and review Tetra Pak and RPB FP tank temperature VPR charts has been ongoing at Casa Grande for at least three years. Casa Grande QS FLL Ciara Gonzales stated that Tetra Pak and RPB FP tank temperatures did not need to be reviewed because she believed that only infant formula needed this level of control and monitoring.

187. Sturgis also failed to maintain temperature controls and the related records. Sturgis data loggers failed to record the temperature in a heat treatment room. For example, Xanthan gum (a thickening agent used in Alimentum) needs to be maintained in a room with heat treatment for 21 days before it can be used for production. After the commodity has been heat treated, the data must be reviewed to ensure the commodity has been processed as required and that the temperature and time requirements are met.

188. To illustrate, a batch of Xanthan gum that was heat treated at Sturgis was found to be missing a large amount of data. Specifically, 10 of the 21 days of temperature data was missing. The violation was elevated to Deanna Denton, Analytical Lab Manager, who determined that the

[29] Abbott – Abbott Nutrition Global Microbiological Standards, ID: AN06-99-004, approved Jan 28, 2020, effective Apr. 27, 2020, Section 5.4.2.

commodity should be released despite there being no supporting data verifying that proper temperature controls were in place complying with the specification for heat treatment.

**iii) Systemic Technical Equipment, Engineering, and Production Violations.**

189. Abbott used Plant Information Reports ("PIRs") from production QS to report any production related deviations. The PIR identifies deviations to the master manufacturing order (referred to as a "work order").[30] The PIR also addresses corrective actions.[31] In this way, the PIR is integral to the control of the manufacturing process to prevent adulteration of products.[32] PIRs may address issues related to technical equipment and engineering issues or product that is OOS. PIR content also may be entered into ABTRAQ ("Abbott Trackwise for Quality") to create a Quality Assessment.

190. In numerous instances, PIRs or Quality Assessments were approved despite the product being OOS. At Sturgis, PIRs required sign off by QS, but frequently, no one in QS possessed knowledge to confirm whether the steps taken to address deviations from product specifications were acceptable. Abbott's Quality System Manager at Sturgis, Megan Fry, regularly

---

[30] Under the FDCA and implementing regulations, a manufacturer must "prepare and maintain records that include complete information relating to the production and control of the production aggregate. These records shall include: (1) The master manufacturing order. . . (2) Any deviations from the master manufacturing order and any corrective actions taken because of the deviations. . . [and] (3) Documentation, in accordance with § 106.6(c), of the monitoring at any point, step, or stage in the manufacturer 's production process where control is deemed necessary to prevent adulteration." 21 C.F.R. § 106.100(e).

[31] *Id.*

[32] "The master manufacturing order shall include: (i) The significant steps in the production of the production aggregate and the date on which each significant step occurred; (ii) For a manufacturing facility that has more than one set of equipment or more than one processing line, the identity of equipment and processing lines for which the manufacturer has identified points, steps, or stages in the production process where control is necessary to prevent adulteration; (iii) The identity of each lot of ingredients, containers, and closures used in producing the production aggregate of formula; (iv) The amount of each ingredient to be added to the production aggregate of infant formula and a check (verification) that the correct amount was added; and (v) A copy of each infant formula label used on a finished production aggregate of infant formula and the results of examinations conducted during the finishing operations to provide assurance that the containers and packages have the correct label." 21 C.F.R. § 106.100(e)(3).

instructed QS staff to improperly sign off on PIRs, effectively undermining a process that was designed to serve as an internal control measure.

**iv) Approving Substandard and Adulterated Products with Unvalidated Data (SQE and ZARPAC Reports).**

191. Meeting production goals and timelines assigned by Abbott leadership consistently took precedence over ensuring product safety at the facilities. As noted above, Relators know of multiple instances where Quality Assessments were approved despite the product being OOS. The OOS event was documented in a Quality Assessment, though an OOS event should have triggered a pNCR or an NCR. However, at both Sturgis and Casa Grande, Abbott improperly uses Standard Quality Evaluations ("SQE") specifically to avoid using pNCRs or NCRs.

192. SQEs are procedures used by Abbott to evaluate product that does not comply with specified work order requirements. SQEs are grouped by associated number or code based on the type of event. For example, SQE 6.13 states that if a nutrient or mineral is OOS in-process, it must test within specification at FP or project within specification at FP. Once it is verified that the mineral or nutrient tests or projects within FP specifications, the SQE is used to "pass" the product, and the event is determined as acceptable without submitting the product for a pNCR or NCR.

193. Abbott misuses SQEs to meet metrics and to avoid (a) additional analytical tests, sampling, reworks, or (b) creating pNCRs and NCRs that have a greater potential of leading to destroyed product. The use of SQE 6.16 instead of SQE 6.12 illustrates a common misuse of SQEs for improper purposes. These two SQEs relate to validations at the packaging/FP stage. Specifically, Abbott applies these inappropriately to seam integrity inspections and OOS oxygen results.

194. To meet the criteria of SQE 6.12, product testing through sampling is needed to validate whether or not the product complies with specifications. In contrast, SQE 6.16 pertains to

missed oxygen checks, "overcap" inspections, outgoing package quality checks, and similar issues. For the most part, the criteria for resolving SQE 6.16 is comparably low and can be resolved by the work order without testing or sampling the product.

195. Abbott directs QS staff to intentionally mischaracterize OOS events as SQE 6.16 and not as SQE 6.12. By applying the incorrect SQE, Abbott avoids product sampling for visually defective containers. Indeed, Abbott's management, including Susan Elgan and Megan Fry, repeatedly were confronted by employees, including Relators, about this unlawful practice.

196. On other occasions, Megan Fry directed QS employees to apply SQE 6.16 when a batch had a high oxygen test result rendering it OOS and not commercially releasable. Applying the SQE inappropriately in this manner allowed Abbott to avoid reworks, product destruction, and QRs.

197. Abbott often moves OOS batches into a category known as Quality Assessment to make it easier for OOS product to be released. To illustrate, a Quality Assessment was initiated specifically to replace a previously created pNCR regarding a batch of infant formula with low-fill weights. Low-fill weight does not comply with specifications. It is a reason not to release a product. To avoid destroying a large amount of product or otherwise determining the root cause of the problem, Abbott "shuffled" the cases of product among the pallets to re-distribute the low-fill product among the acceptable weight product. In this example, a pNCR was initiated and then cancelled, effectively concealing the low-fill issue because Abbott shuffled cases.

198. In some instances, a Quality Assessment or SQE is used instead of a pNCR or NCR to avoid testing, reworks, or product destruction. In the case of over-oxygenated product cans, it would mean that product was knowingly released where the expiration date of the product may

have been well before the expiration date disclosed on the container because the oxygenation would speed up the true expiration period, in addition to the product potentially being OOS.

199. In addition, reports from a packaging line software known as ZARPAC are used to justify and approve PIRs. However, ZARPAC is a non-validated system that was manipulated to alter and improve a department's performance metrics. It is not intended to be used to assess quality evaluations.

**v) Falsification of Maintenance Records and Root Causes.**

200. Abbott and its facilities' maintenance departments are required to ensure equipment complies with FDCA and its implementing regulation standards.[33] Each maintenance department has dedicated tasks to complete on a scheduled basis. Once a maintenance technician completes a task, he or she is required to sign and date the completion of the task in Maximo, a software system used by Abbott. However, technicians regularly enter false records in Maximo that maintenance tasks have been completed when in reality they have not been completed.

201. Sturgis maintenance employees openly used black books with calendar inserts to record their non-scheduled work, known as direct maintenance work orders,[34] prior to entering information into Maximo. This resulted in delayed or inaccurate maintenance records.

---

[33] "A manufacturer shall make and retain all records of . . . (2) accuracy checks of instruments and controls. A certification of accuracy of any known reference standard used and a history of recertification shall be maintained. At a minimum, such records shall specify the instrument or control being checked, the date of the accuracy check, the standard used, the calibration method used, the results found, any actions taken if the instrument is found to be out of calibration, and the initials or name of the individual performing the test. If calibration of an instrument shows that a specification at a point, step, or stage in the production process where control is deemed necessary to prevent adulteration has not been met, a written evaluation of all affected product, and any actions that need to be taken with respect to that product, shall be made. . . (4) equipment cleaning, sanitizing, and maintenance that show the date and time of such cleaning, sanitizing, and maintenance and the production aggregate number of each infant formula processed between equipment startup and shutdown for cleaning, sanitizing, and maintenance. The person performing and checking the cleaning, sanitizing, and maintenance shall date and sign or initial the record indicating that the work was performed." 21 C.F.R. § 106.100(f)(2), (4).

[34] Preventive Maintenance is pre-scheduled work.

Additionally, maintenance staff routinely discarded the calendars containing the handwritten notes.

202. Supervisory staff in the facilities' maintenance departments falsified RCAs when participating in CAPA investigations. Long-standing seam integrity problems are just one example of these ongoing misrepresentations. Failure to maintain product seam integrity compromises the airtight seal of the infant formula packaging because of defects such as droops, vees, false seams, knocked down flanges, and double-ended cans.[35]

203. For example, in February 2021, defects in the infant formula can seams were observed at Sturgis. The third shift maintenance team identified the problem causing the droop and vee defects and determined it was defective ends, which affected three batches. The seam defects arose because the Abbott applied sanitary can ends ("ends") were produced based on faulty specifications provided to the supplier by Abbott.[36] Since the defective ends were made to Abbott's specifications (sampled only once per quarter), Abbott could not demand replacement ends from the supplier even though it knowingly resulted in seam defects. Abbott understood that acknowledging the defective ends would have required Abbott to recall the product. Several months of commercially released product made at Sturgis were impacted, as well as product from other Abbott facilities using the same defective ends.

204. To avoid a product recall, Abbott's quality management and maintenance departments had an untrained technician adjust the pin height in the seamer causing the defects. A

---

[35] Droop is a condition where a smooth projection of the seam extends below the normal seam. This can occur any place on the seam. Vee is an irregularity on the cover hook when the cover material does not form smoothly. The material splits causing a "V" shaped opening on the face of the cover hook. They can be caused by damaged ends at cover feed. Knocked Down Flange is a critical defect and occurs when the cover and body hooks do not interlock in a localized area of the double seam which is usually 1 to 2 inches in length.

[36] The "sanitary can end" is often referred to as the "Abbott applied end." It is applied to the bottom of a can and the supplier end is applied to the top.

pin height adjustment generally does not cause droops or vees, and it was ruled out as the cause of the defective ends previously. However, the ensuing analysis wrongly attributed the untrained technician's pin height adjustment as the root cause of the seam problem.

205. Almost immediately, the same issue arose again with the Abbott applied can ends. Abbott failed to isolate batches they had already released (using the same defective ends and the faulty root cause). Instead, Abbott identified a different root cause, namely, the infeed chute that connects the ends into the seamer. To avoid detection (and a recall), Abbott determined that the only sampling required was a single batch at the beginning and one at the end of the bracket. Susan Elgan, Abbott's Site Quality Assurance Director at Sturgis, boasted "that's why I chose two metabolic batches to be the batches stat sampled." Metabolic batches are small and typically yield only a few hundred cases, which is not a representative sample of batches run in the adulterated bracket. Elgan subsequently was promoted to the position of Abbott's Global Food Safety Director.

206. Additional defects at Sturgis were caused by one of the seamers seaming two ends per can instead of one end per can. Seaming two ends causes significant seam integrity defects and causes powdered infant formula to become oxygenated. Oxygenated infant formula creates a high risk of microbiological contamination. According to applicable specifications, infant formula containing more than two percent detectable oxygen in the sealed infant formula can may not be released.

207. Still another example of a failure in manufacturing process control occurred in early 2021 when Sturgis maintenance discovered that an unvalidated Nucon rotary valve was used for more than one month before the issue was discovered. The rotary valve controls the flow of product, which means that one month's worth of batches were commercially released after being

manufactured on an unvalidated system. Yet after discovering that a month's worth of product was manufactured with this defect and without submitting the product for adequate testing, Abbott released the product, never notified FDA of the commercial release of the affected infant formula, and never issued a voluntary recall of the affected batches.

**vi) Systemic Seam Integrity Violations Adulterating Powdered Infant Formula.**

208. Powered infant formula products manufactured at Sturgis consistently experienced seam integrity defects, as noted above. For example, powdered infant formula becomes enmeshed in the seam which jeopardizes the integrity of the seal and causes powdered infant formula contamination. Powder in the seam causes an OOS, imperfect seal allowing air, moisture, and bacteria to enter and contaminate the formula.

209. Instead of correcting and disclosing these known seam defects, Abbott materially altered the test to validate seam integrity to hide the problems. Specifically, seam integrity validation should be performed on **sealed cans that actually contain powdered infant formula**. However, Abbott changed the validation to **only test empty cans without powdered infant formula**. This fraudulent validation practice was never disclosed or documented. Further, although Sturgis has since installed new seaming equipment, seam integrity issues continue.

210. In addition to not maintaining adequate seam process control and falsifying seam integrity validations, Abbott concealed these problems from FDA and consumers. For example, Abbott recalled a single lot (No. 79696K800) of Calcilo XD in 2019 on the grounds that there was "inconsistency in aroma and color." Calcilo XD, as noted in Exhibit A, is a specialty infant formula for infants requiring a Vitamin D-free formula due to hypercalcemia, such as when an infant is diagnosed with Williams syndrome, osteopetrosis, and primary neonatal hyperparathyroidism. The root cause of the recall was powder in the seam on the Abbott-applied end of the can. This

results in powdered infant formula discoloring and becoming rancid. Abbott's announcement of the recall falsely stated that "[t]his does not affect any other lots of Calcilo XD, or any other Abbott nutritional products. All other Abbott products can continue to be used with confidence."

211. In reality, several batches of Calcilo XD produced after the recall had the same defect. Relators know that the work order was altered to fraudulently misstate the true scope of the problems. For example, records were altered to appear that Abbott implemented changes to correct the seam-integrity defects. In reality, Abbott continued to perform seal check validations on empty cans without powered infant formula in order to putatively obtain "passing" results because there was no powder in the seam.

212. Further evidence of Abbott's falsification of seam check validations relates to "reworks" of powdered infant formula cans. Instead of tearing down (that is, mechanically cutting a cross section of the can, photographing, and measuring seam lengths) the powdered infant formula cans during the rework to verify whether there was any powder in the seams, Abbott directed employees to only weigh the cans. Doing this failed to account for powdered infant formula with a lower bulk density. It is well known that if powdered infant formula has a low bulk density and is too "fluffy," the sealed can may weigh within the acceptable weight range even when powdered infant formula is in the seam. In fact, Abbott knew that accurate bulk densities are a common problem with Calcilo XD, which affected both the seam integrity and the nutritional quality delivered per serving. Nevertheless, Abbott instructed that weighing the cans was all that was required. Two Abbott employees expressed concerns that they were required to perform seam check validations on empty cans that did not have powdered infant formula. Nevertheless, Abbott implemented this strategy to avoid discarding the entire batch.

213. Seam defects on powdered infant formula cans continued to be a problem. In January 2021, a PIR was issued for EleCare noting that visual defects were observed with the seams during operator checks, leading to a part of the batch later being isolated for review.

214. Yet another example of seam defects at Sturgis is reflected in the 2021 seamer bracket discussed below in Section IX.C.iv.h. Forty batches were designated in the bracket. Abbott signed off on the release of the entire bracket based on a statistical sampling of just two small batches. Elgan stated that she selected the smallest batches for the sampling because they were the least likely to reveal seam issues when the batch is run during shorter time periods – in effect, Abbott selected a non-representative sample set to release 40 batches with known seam integrity issues.

#### vii) Protein In Fat ("PIF") Tank and Positive Displacement ("PD") Pump Violations.

215. Casa Grande has used a CIP booster pump along with the PD pump to speed up infant formula production. A PD pump regulates the mixing of commodities during product manufacturing by displacing a set amount of liquid every time the pump completes a revolution. In contrast, CIP equipment never should be used for mixing commodities and always should operate with a dedicated, separate pump. This is because the chemicals used in the CIP process to clean the equipment are hazardous if ingested.

216. Despite the prohibitions against and clear risks of mixing of CIP exposed chemicals and infant formula product and commodities, Abbott decided to boost infant formula production by using a CIP booster pump. This meant that infant formula was sent through the CIP pump, as well as through the PD pump out of the PIF tank. This caused the infant formula product to cross-contaminate with residual chemicals/water. The product turned into a "peanut butter" consistency and caused the CIP pump to clog and fail. Pumps used in the manufacturing process are not taken

apart for preventive maintenance and the clog Relator L. Cooper observed was deeply compacted, hard, and burnt up, thereby indicating that it developed over an extended period of time. Below is a photo illustrating the type of clog created in the CIP pump between the housing and the impeller.



**viii) Out of Specification ("OOS") Products.**

217. Abbott has used non-validated procedures to address OOS results. In order to salvage infant formula product or commodities with OOS results, Sturgis blends OOS intermediate bulk containers ("IBC") with IBCs of in-specification product. This procedure is referred to as "bag pairing." Abbott has performed bag pairing at Sturgis when infant formula is OOS for excessive moisture, scorched particles, and OOS bulk densities.

218. For example, in or around 2016, Sturgis had a finished infant formula product that tested OOS for vitamin D. The levels were far higher than permitted under the specification to be released for infant consumption. Abbott did not want to destroy the batches and record the loss.

Instead Abbott directed that the batches be stored in the warehouse to allow the vitamin D to degrade over time. Of course, as the vitamin D degraded, so would other ingredients in the product. Further, the vitamin D degradation also impacted other ingredients in the batches. Yet only vitamin D and vitamin K were tested. Once those two tests were in specification, no further testing was performed. The batches were commercially released. Some of the batches sat in the warehouse for at least one year.

219. Another example of Abbott releasing OOS infant formula from Sturgis occurred in approximately 2015.[37] A batch received twice the specified amount of a particular ingredient during dry blending of infant formula due to operator error. Upon testing, the batch showed twice the normal level of that ingredient. Nevertheless, the product was released. The Abbott CAPA coordinator later stated that Abbott concluded it was acceptable to ingest twice the appropriate amount of that particular commodity.

220. Further, in 2016, it was discovered that for more than a year a Sturgis microbiologist used the wrong test method. The microbiologist's errors in his analysis affected every powdered product produced for approximately one year. Relators participated in a process of reviewing records and sending data to Abbott Division during off-hours. Subsequently, Abbott took no action to recall products.

221. Similarly, in the last few years, Casa Grande discovered that its RPB CAPA Specialist falsified data for investigative reports. The CAPA Specialist's fraud was discovered after an Abbott Complaint Coordinator received complaints that later showed CAPA investigations claiming to have relied on QRs, data, and policies that did not exist or had inaccurate policy

---

[37] The affected batch is believed to be either the infant or adult formulation of Ketonex. Ketonex is nutrition support for infants and toddlers with maple syrup urine disease ("MSUD") or beta-ketothiolase deficiency and is to be used under medical supervision.

numbers. The CAPA investigations were reviewed and approved by Abbott. Casa Grande's CAPA Coordinator previously reported that Abbott wanted him to "see things in the gray" and be open to interpretation when conducting investigations.

**ix) Falsification of Batch Records.**

**a. <u>Batch Records</u>.**

222. On multiple occasions, and in various ways, Abbott knowingly falsified manufacturing and batch records and provided incomplete records to FDA investigators to conceal violations of the FDCA and its implementing regulations. Batch record content evidencing violations was removed from records Abbott was required to maintain and provide to FDA upon request.

223. Batch records contain information relevant to all applicable steps in the manufacturing and testing process. For example, a batch record for a powdered infant formula product contains work orders for the Analytical Lab, the Microbiology Lab, Processing, Dryer and Packaging Departments, raw data, as well as applicable ad hoc forms, QRs, PIRs, statistical samplings, reworks, and 3x5 testing results. This data, when generated in order to satisfy cGMP requirements, becomes a permanent part of a manufacturer's cGMP data. For data integrity purposes, the FDCA and its implementing regulations require Abbott to maintain and make available to FDA "true copies" of "original records"[38] that do not alter or manipulate

[38] "A manufacturer shall maintain all records required under this part in a manner that ensures that both the manufacturer and the Food and Drug Administration can be provided with access to such records within 24 hours. The manufacturer may maintain the records required under this part as original records, as true copies such as photocopies, microfilm, microfiche, or other accurate reproductions of the original records, or as electronic records." 21 C.F.R. § 106.100(m).

documentation[39] in the batch record to conceal violations.[40] Compliance with monitoring and documentation is required to prevent infant formula adulteration. [41]

**b. <u>Sturgis – Purple Folders</u>.**

224. At Sturgis, after batch release sign off, the batch record documentation was maintained in a single expandable file based on batch number. At least until recently, batch records contained a manila folder and a purple folder.

225. Most of the batch record documentation at Sturgis was maintained in paper as opposed to electronic format. Further, when content was maintained electronically, it was manually entered from paper notes or from one system to the next, rather than maintaining a continuous and unalterable electronic chain of information for data integrity purposes. Records manually transposed from hard copy to electronic format include QRs and testing results. At Sturgis, these records were manually entered into electronic format and then printed and put in the batch record folder.

226. Every batch record at Sturgis contained a purple folder as illustrated by this photograph of the Sturgis Record Storage:

---

[39] The documentation required to be maintained includes "monitoring at any point, step, or stage in the manufacturer's production process where control is deemed necessary to prevent adulteration. These records shall include: (i) A list of the specifications established at each point, step, or stage in the production process where control is deemed necessary to prevent adulteration, in accordance with § 106.6(c)(1), including documentation of the scientific basis for each specification; (ii) The actual values obtained during the monitoring operation, any deviations from established specifications, and any corrective actions taken; and (iii) Identification of the person monitoring each point, step, or stage in the production process where control is deemed necessary to prevent adulteration." 21 C.F.R. § 106.100(e).

[40] Abbott's Global Microbiological Standards requires, "[a]ny disposition decision made for products utilizing a decision matrix must: Be documented in the batch record…" Abbott – Abbott Nutrition Global Microbiological Standards, ID: AN06-99-004, approved Jan 28, 2020, effective Apr. 27, 2020, Section 5.5.8.

[41] "A manufacturer shall maintain all records required under this part in a manner that ensures that both the manufacturer and the Food and Drug Administration can be provided with access to such records within 24 hours. The manufacturer may maintain the records required under this part as original records, as true copies such as photocopies, microfilm, microfiche, or other accurate reproductions of the original records, or as electronic records." 21 C.F.R. § 106.100(m).



227. The purple folder was used at Sturgis to segregate batch record content Abbott wanted to conceal from FDA because the content identified, or otherwise signaled, product deviations and FDCA violations. Sturgis started using purple folders for this practice prior to 2015, and it continued at least through 2021.[42]

228. Abbott's internal QS auditors reviewed batch record content including work orders with reports and raw data and then placed content into purple folders.[43] The purple folder was not provided to FDA investigators even though it is a material part of the batch record.

---

[42] Former employees with knowledge of Abbott's use of purple folders include Suzanne Sadler who held quality positions for a long time, including as Director and CAPA coordinator, and Jeff Rambadt, a long-time QS employee, who passed away in 2018.

[43] Sturgis employed four full-time and one contingent QS auditors, including John Hagner, Michael Conway, Josefina ("Josie") Miller, and Derek Blum. Prior to Blum, Maria Clementz was a QS auditor before moving to Rework Coordinator then to Complaint Coordinator, and Leah Handyside who is currently employed by Pfizer. Relators note that John Hagner maintained records spanning his 25 years at Sturgis, of all directives with which he disagreed. He described the records as "for his protection." The records were kept in two cabinets under his desk, as well as in five-six 3" binders. A lot of the records were handwritten because whoever was the leader of QS at the time did not want there to be a record of his or her directives. Additionally, Miller keeps an email folder titled by every QS supervisor with whom she has worked.

229. When FDA investigators visited Sturgis, Abbott was provided with batch numbers to be retrieved for FDA's review. The batch records were retrieved by an Abbott employee from Record Storage, located in the basement along with both sections of QS. The batch records were brought to a "Back Room" accessible only to specific Abbott employees. FDA investigators generally remained in a separate "Front Room" on a separate floor.

230. The Back Room was set up when FDA investigators visited. It was located on the second-floor conference room with laptops, monitors, access to the engineering printer in the hallway outside the conference room, and additional office supplies. The Back Room was only accessible to select Abbott employees, including but not limited to Deanna Denton, Analytical Lab Manager (responsible for Analytical Lab, Incoming Lab, and ELISA Lab); Brian Austin, Senior Quality Engineer; Adam Takace, Quality Engineer; and Scott Wonderly, Microbiologist.

231. Keenan Gale and Megan Fry had access to both the Back and Front Rooms. Susan Elgin and TJ Hathaway typically interacted with the FDA investigators in the Front Room. There was a scribe in the Front Room notating FDA's questions and review progress, which at least in Casa Grande, is projected into the Back Room in real-time.

232. Prior to a requested batch record being provided to FDA, the batch record was reviewed in the Back Room. Abbott employees conducting this review would move documentation selectively to the batch record's purple folder. The purple folder then was separated from the batch record and the record, absent the purple folder documentation, was provided to the FDA investigator(s).

233. All batch record folders are maintained in Record Storage at Sturgis. Relators estimate that this room contains between 3,000 and 5,000 batch records as it houses all batch

records including work orders for oil blends, protein free CIPs, and work orders for batches that were destroyed. Folders for unreleased batches are located in QS.

c. **Casa Grande – Rework and Sampling Folders.**

234. Casa Grande also conceals batch record content from FDA by removing batch record content reflecting cGMP violations, "time code removals," or other FDCA violations. Examples of content concealed from FDA include, but are not limited to records for sampling, reworks, cleaning, moisture checks, and inventory controls.

235. In early 2022, Casa Grande instituted a new batch record color coding system. For each batch record, there are color coded folders: manila (QS and work orders): yellow (sampling), orange (Abbott Division destruct),[44] and purple (rework), as illustrated below.



236. Using these tactics, Abbott hid the scope and severity of the issues compromising its infant formula and nutritional therapy products across multiple facilities and repeatedly made false statements to FDA.

---

[44] Abbott Division destruct indicates required approval from Abbott Division for any product destroyed that is valued at more than $2,500, which is most destructs.

**d. <u>Falsification of Batch Records – Back Room Record Removal</u>.**

237. Abbott has undertaken specific actions to hide from FDA records of FDCA and implementing regulations violations. On one hand, Abbott's internal policy acknowledges: "when microbial contamination of a health hazard is confirmed, the event must be documented and the affected product isolated. The following actions must be taken . . . Document the event in the batch record at the time the suspected event is confirmed. . . ."[45]

5.5.7.2 Health Hazard Microorganism

5.5.7.2.1 Documentation/Isolation

When microbial contamination of a health hazard is confirmed, the event must be documented and the affected product isolated. The following actions must be taken:

| Step | Action |
|---|---|
| 1. | Initiate a Potential Nonconformity per current procedures. |
| 2. | Document the event in the batch record at the time the suspected event is confirmed. |
| 3. | Assess the potential impact of the event throughout all portions of the batch(es), i.e., bracket. |
| 4. | Segregate and hold the batch(es) or portion of the batch(es). |

238. However, for years Abbott knowingly has altered records that were presented to FDA investigators as true, accurate, and complete.

**(i) Sturgis 2019 Audit.**

239. The 2019 FDA audit of Sturgis illustrates Abbott's scheme. At the time, Abbott was concerned that FDA would discover batches with microbiological contamination discussed in Section IX.C.iv.f. During the audit, QA leadership kept QS staff apprised of the areas of investigation by FDA. Abbott's Quality System Manager, Megan Fry, commented internally that

---

[45] Documentation of the event in the batch record at the time the suspected event is confirmed is also required "when a finished product batch is over the defined process hygiene indicator trend limit or action level" according to Section 5.5.7.3.1 of Abbott's Global Microbiological Standards. This "hygiene indicator" refers to testing for Standard Plate Count ("SPC"), *Enterobacteriaceae*/Coliform, Yeast & Mold, Bacillus *cereus*, and others.

FDA was on the "right trail" to identify the violations. Later, Fry expressed surprise that FDA ultimately failed to identify the violations with the batches.

240. After the audit, Elgan stated that she avoided direct answers to questions asked by FDA which caused her to be uncomfortable. This was in reference to Sturgis' positive environmental *Cronobacter* swab, the results of which were in the Environmental Monitoring Program ("EMP") data and withheld from FDA.

**(ii) Sturgis 2021 Inspection.**

241. Another example of Abbott altering records at Sturgis occurred during a 2021 FDA inspection. FDA visited Sturgis and requested Alimentum batch records. The QS staff was instructed to find Alimentum batch records within the last 30 days. Many of the records were described internally as not "clean," meaning that they contained documentation of problems including reworks, blending/bag pairing, or significant documentation errors. Adam Takace, Abbott's Quality System Supervisor, told the QS staff that Elgan only wanted clean batch records provided to FDA. Elgan personally oversaw the progress of the batch records retrieval and review. QS staff told Elgan that the "cleanest" Alimentum batch records still contained evidence of OOS blending bag pairings, and all of the batches had problems. Elgan said those records were "not ideal" but could be used.

242. QS compiled the batches with the least number of issues, which were sent to the Back Room on a cart. The QS team, as they had been instructed, pulled the purple folders with the problematic documentation for each batch, placed the batch records on top of the cart and the corresponding purple folders on bottom. The cart was taken to the Back Room where the records were reviewed again. The batch records without the purple folders were provided to FDA. As FDA reviewed the batch records in the Front Room, the purple folders remained in the Back Room.

**(iii) Casa Grande June 24, 2022 Falsified Batch Record Production.**

243. On June 24, 2022, as detailed below, an FDA investigator appeared on-site at Casa Grande. The visit was unannounced. The investigator indicated that the FDA received a complaint of an infant being hospitalized with *Salmonella* after ingesting infant formula produced at Casa Grande from Batch 34957RE00. The FDA investigator requested the batch record and samples. As the FDA investigator waited for more than an hour for the record to be retrieved (something that normally takes a brief period of time), Casa Grande management and staff rapidly took steps to review and alter the batch record.

244. When the batch record was requested, Ciara Gonzales, QS Front Line Leader, asked one of the QS Auditors to pull the batch record and bring it to the Back Room. The batch was produced in October 2021 and released on December 15, 2021. The batch tested out-of-specification, and Abbott had to rework the batch.

245. Three QS employees reviewed the batch record prior to bringing it to the Back Room. The three QS employees were Yanira Barreto-Barreto, Senior Batch Auditor,[46] Alexis Leos, Batch Auditor,[47] and Griselda Medel, Rework Coordinator.

246. Barreto-Barreto previously audited the batch record in 2021, including the rework packet. Following the FDA investigator's demand for Batch 34957RE00, Similac Sensitive 20k Cal with Inositol, Barreto-Barreto identified problems with the rework. Based on her observations, the batch record was delayed getting to the Back Room. Due to the long delay, Gonzales called for the batch record. Medel and Leos eventually took the batch record to the Back Room. They stated to Casa Grande Site Quality Director Arlene Rivera Contreras that there were serious defects

[46] Barreto-Barreto became PCQI-qualified in spring 2022, although prior to that she was releasing batches.
[47] Leos is the daughter of Debbie Tebaqui, Casa Grande IQA Front Line Lead.

with the rework. Specifically, only 1,317 cases of the infant formula had been destroyed, even though the rework required 1,336 cases to be destroyed. In response, Contreras told Medel and Leos that the plan was to remove the rework and sampling records from the batch record so that FDA would not detect the problems. Contreras stated that if the FDA investigator wanted to see the rework packets, the investigator "would need to figure that out herself" by asking for the records specifically. An additional review was completed in the Back Room by Gonzales, which further delayed Abbott providing FDA the requested batch record. Approximately one hour after the batch record was requested, it was provided to the FDA investigator by Abbott without the rework and sampling records which were physically removed.

247. The Back Room employees that participated in and/or knew that Abbott removed records from the batch record demanded by the FDA investigator include but are not limited to: Jeanette Carlson, Microbiology Front Line Leader ("FLL"); Stefanie Crum, QS Manager; Ciara Gonzales, Quality Systems FLL for Documentation and NPI; Eric Hammerstrom, Quality Engineer; Tais Lacerda Bezerra, Analytical Lab FLL;[48] Maureen Leslie, NPI Coordinator; Will Strauss, Microbiology Senior FLL; Debbie Tebaqui, Incoming Quality Assurance ("IQA") FLL; and Debra Waffle, Analytical Lab Manager. Among these individuals, one is appointed Back Room Manager for each session. Following this inspection, Waffle assumed the responsibilities of Gonzales as Back Room Manager.

248. After the FDA investigator left with the falsified, incomplete batch record, Casa Grande employees in the Back Room expressed relief that the investigator had not specifically asked for the rework and sampling records. They expressed concern that FDA may figure out that the records provided by Abbott were incomplete.

[48] Tais Lacerda Bezerra changed her name to Tais Lind.

249. Gonzales stated that there were "near misses" regarding the batch, as well as Batches 34956RE00 and 34958RE00. The Back Room white board contained extensive notations of these problems identified by the functional departments that reviewed the batch records while the FDA investigator waited. For example, the batch record for 34956RE00 had no analytical lab data projections. Tais Lacerda Bezerra created this analytical data when the batch record was in the Back Room.[49] A batch never should be released without analytical projections because this data determines whether the infant formula contains certain nutrients or if additional testing is required.

250. According to Stefanie Crum, all three batches needed Quality Assessments, although it was decided to not use Quality Assessments to avoid documenting the problems.

251. Contreras prepared the Back Room and QS department for emergent work during the weekend because of the concern that FDA might return the following week to question them on the incomplete batch record, request more records, or take swabs. She stated that this is the "2022 FDA" in reference to FDA's focus on FDCA compliance and unpredictability for on-site visits following FDA's detection of the long-hidden problems at Sturgis.

252. Christian Lee, Abbott's Director of Regional Quality Operations and Senior Director of Post-Market Surveillance, requested a report due the following Monday, June 27, regarding the FDA visit. The report covered numerous topics. A portion of the report was titled "Post Release Agglomerator Bracket Review." Contreras informed Lee "this is why I don't like doing time code removals."

---

[49] Batch 34956RE00 had been reworked three times because Abbott failed to properly perform the rework, in part because of a lack of qualifications of the rework team. Even with these failures, there was no microbiological testing done following the powdered infant formula reworks.

253. Abbott created a bracket consisting of 15 batches of affected infant formula. During the weekend of June 25-26, 2022, the batches in the bracket, including Batch 34957RE00, were re-reviewed by QS. Additionally, Christopher Stark, Complaint Coordinator, reviewed all associated complaints with the batches in the bracket in preparation for the anticipated return of FDA.

254. That same weekend, and as part of the review, Abbott employees at Casa Grande removed content from specific infant formula batches similar to what occurred in the Back Room for the batch requested by FDA on-site on June 24, 2022. For example, for Batches 34957RE00 and 34956RE00, Abbott removed the rework and sampling records from the batch records and placed them into separate folders as illustrated in the following picture:




255. Abbott removed the rework and sampling records to create the false impression, if questioned by FDA about the batch record provided to the FDA investigator, that these records were separate from the batch records in the regular course of Abbott's records management. In fact, Abbott maintained those records as part of the complete batch record. The rework and "time code removal" documentation withheld from FDA are detailed below.

### C. Releasing Inadequately Tested Infant Formula and Nutritional Therapy Products Based on Use of "Time Code Removals" and Failure to Appropriately Bracket.

#### i) Time Code Removals in General.

256. Abbott's withholding of documents and falsifying records is illustrated by Abbott's long-standing use of "time code removal" practices to release infant formula and nutritional therapy products with known positive contamination results or exposure to the contamination.

257. "Time code removal" is a flawed and non-validated practice widely used by Abbott when a batch of infant formula, nutritional therapy products, or equipment tests positive for contamination. "Time code removal" involves (i) identifying where in the batch the testing revealed the presence of microorganisms, (ii) blocking a period of time around the confirmed contamination test (*e.g.*, 15 minutes before and after) using the manufacturing date and time code imprinted on the cans, (iii) destroying product within the limited time code range, and (iv) releasing the remainder of the batch without confirming that the released product meets specifications.

258. When an infant formula or nutritional therapy product tests positive for contamination or is exposed to environmental contamination, the product should not be released because it is adulterated. Abbott documentation states that additional testing is required to verify the acceptability of the infant formula or nutritional therapy products following an event investigation. For example, Abbott's Global Microbiological Standards states that, for infant formula lots that are adjacent to the adulterated infant formula due to a health hazard microorganism contamination:

> [b]racketed, adjacent lots verified as acceptable could be released pending division Quality Assurance Director or designate approval provided the following criteria are met: The event investigation has been completed[;] The decision matrix allows acceptance[;] Additional testing verifies acceptance[;] and There is documented evidence supporting the product release decision.

Abbott – Abbott Nutrition Global Microbiological Standards, ID: AN06-99-004, approved Jan 28, 2020, effective Apr. 27, 2020, Section 5.5.7.4.

259. Notwithstanding clear FDCA and implementing regulations, as well as Abbott's Global Microbiological Standards, it was routine at the facilities to use "time code removal" to release batches of product with confirmed contamination without testing to verify the acceptability of the adjacent products.[50] This practice was directed and implemented with the knowledge of the Directors of Quality Assurance at Sturgis and Casa Grande, Susan Elgan and Arlene Rivera Contreras, among others. Elgan and Rivera Contreras both reported to Lesa Scott, former Director, North America Quality Assurance Operations at Abbott Nutrition. Scott knew of and participated in "time code removal" practices. For example, Scott was involved in calibrating the "time code removal" range to block during one sizable "time code removal" event.

260. "Time code removal" is not scientifically validated. It is not done with testing rigor to identify the root cause and full scope of confirmed microbiological or other contamination. It fails to prevent known contaminated products from being released. For example, product outside the designated "time code removal" range of a batch with a positive contaminant test result (from FP or contact) is commercially released by Abbott without adequate testing verifying the product's safety. Sturgis improperly implemented the practice when Quality Assurance employees used pallet placement for "time code removal" even though the pallets contained product with non-sequential time codes.

---

[50] Abbott Global Microbiological Standards states that for any disposition made for products that have been bracketed due to positive final product or environmental results "[j]ustification for product acceptance is determined based on no impact to the adjacent batches and assurance that the microbial contamination was isolated and eliminated." Abbott – Abbott Nutrition Global Microbiological Standards, ID: AN06-99-004, approved Jan 28, 2020, effective Apr. 27, 2020, Section 5.5.7.3.2.

261. Even further, when a positive contamination test results in "time code removal" of product, Abbott wrongfully limits testing to unreleased products when products from the same batch with a confirmed contamination or exposure already are released. Samples from products commercially released by Abbott and later determined to be part of a "bracket" of contaminated products are not tested by Abbott. Susan Elgan (Sturgis), Megan Fry (Sturgis), Arlene Rivera Contreras (Casa Grande), and Stefanie Crum (Casa Grande), among other Abbott employees, engaged in these practices.

**ii) Bracketing Contaminated Batches.**

262. Abbott creates a "bracket" around a group of batches of infant formula or nutritional therapy products that are OOS or otherwise fail to comply with the FDCA and its implementing regulations due to, for example, a confirmed contamination. In the context of microbiological and environmental contamination, a bracket typically contains a large number of batches manufactured between equipment cleanings, including CIPs at the dryer or between wet cleans in powder filling. When the OOS event traces to a commodity or seamer, for example, the bracket would be defined by batches using that commodity or equipment.

263. According to Abbott's Global Microbiological Standards,

> [t]he following actions are required in case of unsatisfactory results...Product Safety Indicators: The tests in this category are required to be tested prior to release for each batch. If a batch is found to be defective, a complete investigation is required to determine the root cause of the contamination. If the product has been released to market, Supply Chain management should be notified immediately in order to assess the need for bracketing, containment, and recall of potentially affected products.[51]

[51] Abbott – Abbott Nutrition Global Microbiological Standards, ID: AN06-99-004, approved Jan 28, 2020, effective Apr. 27, 2020, Section 5.5.5.1.

264. Microbiological brackets are created following a positive microbiological contaminant or environmental test. Thereafter a microbiological testing schedule, a result data tracker, and a risk assessment spreadsheet are generated for the bracket.

265. Abbott manipulates brackets for time code removals, and at other times, Abbott fails to even initiate brackets. Since April 2022 (*see* Section IX.C.iv.c), Relators have not seen large brackets created for EMP results showing contamination at Casa Grande. Following an EMP contamination result at Casa Grande, the dryer was shut down and cleaned/sanitized three times followed by swabbing after each cleaning with no bracket created. As of December 2022, Relator K. Cooper was assigned to create Deployment Reports, which focus on why any aging brackets have not been released. Due to this responsibility, Relator K. Cooper had direct visibility into aging batches at all Abbott manufacturing sites, including batches held at Sturgis due to EMP brackets. She noted that following the Consent Decree, Casa Grande, unlike other Abbott facilities, stopped bracketing based on EMP results. There is no manufacturing justification for Casa Grande discontinuing bracketing batches with EMP issues.

**iii) Implementation of the "Time Code Removal" Scheme.**

266. Following a presumptive positive contamination test result, Abbott selectively performs microbiological testing on the powder in the cans. This is called 3x5 testing, which is testing three times the number of samples and five times the volume. These tests are ***only*** performed on unreleased batches. If any portion of a batch is released, no tests are performed on it. Therefore, if a batch is implicated in a bracket (meaning the batch has been determined to have been potentially exposed to contamination), and any portion of that batch is released, Abbott ***will not*** test samples or parts of that batch still within Abbott's control because they do not want to notify FDA and issue a recall.

267. Further, this 3x5 process for microbiological testing is ***only*** performed on batches immediately adjacent to the positive test. Even then the microbiological testing is performed on an extremely small, non-representative sampling of the thousands of cans within each batch.

268. On every can produced, the Julian date and the time the can was produced is printed on the bottom of the can. Using the Julian date and time printed on the bottom of the can, cans to be removed are identified if within the coded range. The remaining product is commercially released.

269. Casa Grande visibly examines the time code on every can produced within the bracket to identify cans within the "time code removal" range. Rework pallets are sent to a rework location at the facility. After "time code removals" are performed and in-range cans removed, cases are backfilled onto pallets to form rework pallets. The rework pallet is returned to the warehouse when full, which invariably comingles time-coded products. This results in internal product traceability problems.

270. "Time code removal" practices at Sturgis also resulted in systemic product traceability problems. Sturgis did not visibly inspect all cans within a batch designated for "time code removal." Instead, employees only inspected cans from pallets identified as having been produced and received by the warehouse, based on pallet reports, within or around the time needed for the "time code removal."

271. Each pallet at Sturgis receives its own time code when it enters the warehouse. However, pallets are not formed based on the consecutive production time of the cans. Conducting a rework review by pallet time code renders it virtually impossible to adequately trace the product produced during the "time code removal" range. Thus, using pallet time codes to identify product with confirmed contamination or exposure that was required to be destroyed was inherently

defective. Substandard, adulterated, and non-compliant infant formula and nutritional therapy products that should have been destroyed were released. At the end of the "time code removal", Sturgis could not verify that all time code designated product was detected and destroyed.

272. The ineffectiveness of "time code removal" based on pallet time codes is made worse by the various ways cans get out of order and mixed during the packaging process. Product packaging machines often experience stoppages or downtime. If equipment downstream of the filler/seamer is down, the equipment is programmed nevertheless to continuing filling the cans. As cans come out of the seamer, they are automatically moved to an accumulation table until a sensor tells the filler there is no more room. At that point, depending on the production line, the machine stops filling or cans are pushed to the other side by a conveyor belt. The effect, however, is that the cans no longer are in order by their time codes.

273. The situation is often made worse when cans are moved to a temporary pallet by a Whalon, which is a large magnetizer used to move large groups of cans from one area to another. In this situation, cans are moved to a temporary pallet, back to the accumulation table when there is room, and ultimately packed and re-palletized, resulting in pallets with mixed time codes.

274. Relators also note that in Sturgis once a pallet is designated for "rework" it is "shot out" of or, in other words, removed from the system and cannot return as the same pallet. Once these pallets are returned to the warehouse, they are assigned a new pallet ID, resulting in virtually no possibility of internal-Abbott traceability.

### iv) Bracket And "Time Code Removal" Examples.

#### a. Casa Grande – Examples of Post Release Events.

275. In August 2022, Casa Grande investigated 3,089 cases of Similac Advance Infant Formula released on April 8, 2022, that failed to have any FP microbiological testing. The FP batch in question is Batch 39932RE00 that filled from Batch 39930RE00.

276. During the filling of Batch 39932RE00, the line stopped working. It did not return to production until eight hours later. The line failed to resume within eight hours and therefore was deemed to be expired. Once a production line is expired, the product must be segregated, and the equipment must be cleaned prior to restarting. Abbott policy requires that when the batch resumes production, the batch is to be filled as a holdover, which became Batch 39932RE10.

277. When the batch was scheduled, it was planned that two processing/dryer batches would be filled consecutively to produce one FP batch – this is known as an Extended-Fill Batch ("EFB"). In this scenario, processing/dryer Batch 39930RE00 and Batch 39931RE00 would fill consecutively and form Batch 39932RE00 with an A and B portion representing each processing/dryer batch. Due to the unexpected downtime, only two hours' worth of 39930RE00 was filled into 39932RE00. Once the line resumed production, the remainder of 39930RE00 (forming the A portion of 39932RE10) and 39931RE00 in its entirety (forming the B portion of 39932RE10) were filled as FP Batch 39932RE10.

278. In June 2022, Abbott received a complaint of mold on the holdover (tested) portion of Batch 39932RE10. When the Complaint Coordinator was performing the batch record review in August, he discovered the original portion (39932RE00) was missing the FP microbiological testing. Representative samples were pulled for testing from the holdover (A & B) portions, but no samples had been taken from the pre-down time product from 39932RE00.

279. The mold complaint traced to the holdover portion, which was produced after the line was cleaned. The two hours of earlier untested production from 39932RE00 consisted of more than 3,000 cases which were commercially released without FP microbiological testing. Approximately 1,008 cases were in Abbott control at the time of this discovery, of which 144 cases were at the Bethlehem, PA distribution center. The remaining 864 cases were at the Columbus, OH Hi-rise distribution center in CD status.

280. A PowerPoint presentation was prepared by Casa Grande management to present to Abbott Division in mid-August titled "Sim Adv 39932RE00 Missing Testing Post-Release Event". The PPT explained that in August 2022, Abbott discovered that FP testing was not performed on Batch 39932RE00 prior to its commercial release. Complaints were made about the batch from June 20 – August 10, 2022 and included, for example, the following issues: stability problems, mold, foreign substance(s) in the product, an insect in the product, and other issues.

281. Ultimately Abbott released 1,992 cases without FP microbiological testing. Abbott has not notified FDA or issued recalls.

282. Casa Grande had another significant event in August 2022 due to systemic equipment calibration issues. On July 19, 2022, there was an inaccurate ROSES calibration. This calibration relates to the equipment that does teardown checks. Teardowns are critical to support proper seams and are criteria for release. The calibration was determined to be calibrated incorrectly. A review of all batches produced after the incorrect calibration was completed. Abbott determined that at least two batches that were released should not have been released due to the incorrect calibration, specifically a failing bodyhook result. Abbott has not informed FDA or issued a recall for these batches.

283. On August 25, 2022, QS personnel were notified that a second inaccurate ROSES calibration occurred on August 17, 2022, only this time the failed calibration was on the IQA ROSES machine, the machine currently being used to perform teardowns on production batches. Almost all batches produced since the last accurate calibration are impacted and several batches produced in that time frame failed teardowns. Casa Grande together with Abbott Division conducted an evaluation on this teardown failure as it applies to the August batches. That evaluation was completed August 26, 2022, and all batches were released.

284. A December 2021 software update assigned both ROSES machines the same ID, which resulted in both machines having their parameters in sync. During the investigation of this second teardown calibration failure, it was discovered that the synching of these machines resulted in one machine falling out of calibration when the other machine was calibrated. Instead, this was discovered eight months later. And though approximately a month after that the machine IDs were corrected, no analysis was done on the eight months of product released while the calibration was incorrect.

285. Notably, the teardown calibration issue spanned from July 19, 2022, to August 4, 2022, and Casa Grande was aware of the issue on July 28, 2022, yet nothing was done to stop using the equipment, hold batches, alert FDA, or to issue a recall. In addition to teardowns, the calibration issues also affect Retort Temperature, RPB Filler Check Weigher, and Flow Calibration issues. These are critical calibrations because, for example, they ensure product is processed for the correct amount of time and temperature to destroy contaminants.

286. ROSES Teardown Calibration is critical because teardowns support seal integrity on powdered product and is measured to the 1,000th of an inch. Retort Temperature Calibration is a critical factor of an acceptable thermal process, which in this case affected RPB, and is measured

to the tenth of a degree. RPB Check Weigher is critical because if any RPB containers exceed the fill weight it impacts the headspace, which affects product movement during the agitation process and can result in under processing by failing to expose the product to the proper amount of heat. Flow Calibration is critical on thermal process because it ensures product is processed for the correct amount of time and at the correct temperature to remove all contaminants. If the flow is too high, the time the product is exposed to the critical heat treatment is reduced and can result in under processing.

287. These critical calibrations are done to ensure that the accuracy of critical process parameters is maintained for process control and food safety. Such critical parameters include seams measurements, temperatures, and flow meters, among others.

288. In the current situation, RPB Retort 5 where the temperature calibration for the temperature was off by 1.84 degrees implicates the critical process parameters for all batches back to the last acceptable calibration. The temperature indicating and the temperature recording devices must be within 1.0 degrees of each other. In this situation, the temperatures variance was almost double the permissible limit. Casa Grande has not gone back to the last calibration, but only looked back two weeks. Even then, the look back period implicated up to 30 batches of infant formula currently on the market that were not processed correctly due to the failure in temperature calibration leading to quality and safety issues.

289. Calibrations require a properly trained technician and are done infrequently at the facilities. They are not documented properly, and many pieces of equipment lack calibration tags or have expired calibrations. At Casa Grande, there is one instrument technician ("IT") who monitors flow meters. According to the IT, calibrations will only be performed if the flow meters are off or inoperable. If not, the IT just falsely signs forms that the calibration was performed.

**b. Casa Grande –Infant Formula Brackets for 2022.**

290. Casa Grande had six brackets in just the first six months of 2022.[52] The first four brackets occurred between January and April. Casa Grande created a chart identifying batches in each bracket, the event timeline, and the purported cause of the bracket. In addition, Casa Grande has had repeat issues with Tetra Pak product spoilage. Casa Grande repeatedly claimed the root cause of the spoilage was package integrity, but the packaging was tested and determined not to be the root cause of the deficient product.

291. In many of these events, Abbott (i) commercially released product that failed to comply with the FDCA and its implementing regulations, (ii) failed to inform the FDA and instead affirmatively concealed the violations, and (iii) failed to issue recalls to prevent consumers from ingesting known substandard, adulterated, and non-compliant products. To illustrate these problems, Relators describe two of the 2022 bracketed events:[53]

292. A report dated May 18, 2022, by the Casa Grande CAPA Coordinator, explained that based on a positive result of an environmental contaminant from Dryer Building Level 3 Sifter Room B, 26 finished infant formula batches were placed on hold creating a bracket. Yet, "[f]ollowing our established processes and procedures, the following batches were the nine (9) batches that were released and could not be fully contained prior to being bracketed with this QR (with total amount not contained)." The released cases from within the bracket totaled 105,409 cases. Abbott did not inform FDA or issue a recall. In fact, it appears that Abbott subsequently released an additional five batches from within the bracket.

---

[52] Casa Grande had other microbiological infected brackets. Multiple "time code removals" were performed for several timeframes.

[53] *See* Exhibit A for information about Abbott products included in the current brackets.

293. Explaining another bracket, on June 23, 2022, Arlene Rivera Contreras informed Christian Lee that Casa Grande had "3 batches with OOS results for SPC & EB. All from same campaign. Total 14 FP batches (17 In-Process). Event Management started today. 1st Internal report out is tomorrow w midday." The bracket included batches with SAP Dates ranging from June 24, 2022, to July 6, 2022. The three batches with OOS results are Batches 42338RE00, 42339RE00, and 42524RE00. The OOS results noted in the email refer to a presumptive *Salmonella* and presumptive *Cronobacter sakazakii* results.

294. Abbott performed 3x5 testing on 7 of the 17 batches in the bracket and resulted in multiple elevated SPC results. Certain batches were then submitted for *B. cereus* follow-up testing. On July 27, 2022, four batches were designated for release – Batches 42529RE00, 42532RE00, 42336RE00 and 42337RE00.[54] Abbott released these batches on the basis that the air dryers did not have any alarms during these batches, however, Abbott's own CAPA Coordinator directly observed that this was a weak basis to support the release of batches with multiple elevated SPC results.

295. Further, the 2022 Casa Grande brackets began in January 2022 with a bracket, which was later split into two sub-brackets based on two separate entries for contamination. The first sub-bracket spanned from January 19-February 21, 2022. It comprised 23 batches including Similac Pro Sensitive, Similac Pro-Advance, Similac Advantage Stage 1, Similac Advantage Stage 2, Neo Advance, NeoSure, Similac Soy Isomil, Similac Sensitive, Similac Pro-Total Comfort, Similac Pro, Similac Advance, and Similac Go & Grow. All the batches were released.

[54] Sometimes two dryer batches make one finished product batch. It is called an Extended Fill Batch ("EFB"). In this bracket, Batches 42527RE00 and 42528RE00 made the EFB 42529RE00; and 42530RE00 and 42531RE00 made EFB 42532RE00.

**c. Casa Grande – Tetra Pak Spoilage Brackets November 2021-April 2022.**

296. Tetra Pak is a liquid product, which Abbott mainly sells to institutional customers. Examples of Abbott's Tetra Pak products include Osmolite, Jevity, Ensure, and Glucerna (diabetics).

297. FP tanks are used as a preventive control of contamination. As such both the temperature of the holding tanks as well as the hold times (maximum of 5 days) must be well-controlled to comply with FDCA and its implementing regulations to prevent contamination. The review and verification of the temperature and hold times are clearly enumerated in the Hazard Analysis and Critical Control Point ("HACCP") Food Safety Plan. Additionally, Abbott's Global Microbiological Biological Standards describe the storage requirements for minimization of growth of micro-organisms and instructs that

> [t]he conditions and duration of holding products during the manufacturing process can influence the quality of the finished product. All products must be held under such conditions necessary to minimize the growth of organisms of health concern…During product transfer to cold storage, temperature spikes are not counted as cumulative time until fluid product makes contact with temperature probe. Hold times and temperatures should be verified to maintain appropriate quality. Holding of products beyond the verified hold time increases the risk of outgrowth that will influence the final product quality. Extending hold times beyond five (5) days requires studies to support the recommended hold time.[55]

298. The QS team is required to review the VPRs, yet Casa Grande only reviews VPRs for infant formula. It does not review VPRs for Tetra Pak and RPB products. Casa Grande has not complied with the VPRs for Tetra Pak and RPB products for years. Instead, Casa Grande only performs checks every four hours, which fails to fulfill temperature hold time verification

---

[55] Abbott – Abbott Nutrition Global Microbiological Standards, ID: AN06-99-004, approved Jan 28, 2020, effective Apr. 27, 2020, Sections 5.4.4.2-3.

requirements. The batch records are signed off for release without the required review. Further, not only are the records falsified as to the required review, but Abbott knows that Casa Grande FP tank thermometers are unreliable because they often fail to record temperatures thereby creating gaps in temperature data. The FP tanks, therefore, are not maintained under conditions necessary to minimize the growth of contamination and micro-organisms.

299. Out of specification Tetra Pak products due to microbiological contamination have resulted in brackets and "time code removals" at least as far back as November 2021. "Time code removals" for Tetra Pak, as recent as June 13, 2022, have included the following batches due to spoilage and dilution: 35098TZ00; 36315TZ00; 36269TZ20; 37396TZ10; 37540TZ00; and 37617TZ00.

300. The "time code removals" for liquid Tetra Pak products have amounted to little more than a visual inspection of cartons. As microorganism contamination grows within the enclosed liquid product, it causes the Tetra Pak container to expand or bulge. Abbott performs "time code removals" for liquid Tetra Paks by looking for a bulge in the packaging after 21 days based on an assumed seven-day incubation period for microorganisms.

**d. Casa Grande – October 2021 Bracket (34597RE00).**

301. As previously explained in Section IX.B.ix.d.iii., on June 24, 2022, an FDA investigator made an unannounced visit to Casa Grande and asked for the batch record for 34957RE00 regarding a complaint for an infant hospitalized with *Salmonella*. The information contained in that batch and provided to the FDA investigator is summarized below as are the actions taken by Abbott at Casa Grande in October 2021.

302. Batch 34957RE00 was Similac Sensitive 20k Cal with Inositol, a powdered infant formula, that was a part of a bracket initiated due to FP microbiological results. After the initial

bracket was created, the bracket was expanded to include 32 batches, and then was decreased to only 15 batches, including 34957RE00. The container identified in the complaint was dried and agglomerated on October 17, 2021. On October 15, 16, 17, and 18, 2021, samples of the agglomerator water failed *Enterobacteriaceae* ("EB") Testing, with an isolated positive *Salmonella* test result on October 15, 2021. There were also SPC water sample failures for the agglomerator on October 15, 17, and 18, 2021. The infant formula can that prompted the request for the batch record by the FDA investigator along with others that came from the agglomerator during the contamination time frame were commercially released by Abbott despite these confirmed results. Abbott did not notify FDA and issued no recall.

303. The October 15 results were attributed to agglomerator water contamination.[56] The case of infant formula that was a part of the complaint and other cases that were released following a "time code removal" were based on the separate positive microbiological test that was not addressed by the "time code removal." Based on Relator K. Cooper's knowledge of the events, it is believed that all batches were released whether in whole or in part.

304. The FP testing results reported the presumptive positive results for *Cronobacter*. Following the presumptive positive test results, Abbott performed 3x5 testing on certain cans. Only 25 cans out of thousands were tested. Pallets that were pulled for the limited 3x5 testing performed on Batch 34957RE00 were designated on Casa Grande Defect Forms and designated by pallet number and time stamp.

---

[56] On May 26, 2022, Arlene Rivera Contreras sent an email to Casa Grande staff informing them that there was an update to general procedures, specifically to GEN_651. This procedure, "Overhead Leaks," was developed in 2021 and was being updated in May of 2022 and renamed "Water Event Management." As Contreras wrote, "[t]he procedure aims to provide a plan for responding to water events resulting from leaks, drips, condensation, etc. It covers, for example, all moisture or water leaks related to, but not limited to the following: roof leaks, HVAC leaks, condensation leaks, leaking drains, and any other water leaks." A new form was also created, QLTYSYS.225 Water Event Alert Form.

305. The "Finished Product Powder Microbial Distribution (3x5) Follow-Up Testing" results revealed that the time frame between tested cans was up to 30 minutes, again failing to provide a validated process.

306. The FP testing for Batches 34957RE00, 34958RE00, and 34955RE00 had presumptive positive results for *Enterobacteriaceae*. Batches 34957RE00 and 34955RE00 contain a note on Abbott's internal microbiological data chart as to the "Need to Contact Global." These results were present for the same batches that had passed through the agglomerator that had the positive result for *Salmonella*, noted above.

307. The analytical tests focused on *Enterobacteriaceae* rather than specific *Salmonella* tests. Abbott has a test specific for *Salmonella*, but it elected to not perform the *Salmonella* test despite the positive result for *Salmonella*. A 3x5 for *Salmonella* would require a sample size of 180 cans. Instead, Abbott tested for *Enterobacteriaceae*, which only requires a 25 can sample size thereby reducing the number of cans that had follow-up testing performed. Nevertheless, several batches in the bracket tested positive for *Enterobacteriaceae* and SPC. A positive test for *Enterobacteriaceae* indicates the presence of several different pathogenic microbes including E. *coli*, *Cronobacter* and/or *Salmonella* as they are all in the *Enterobacteriaceae* family. Abbott created the "time code removal" range from the positive results from the limited testing sample size. Product that fell within that time frame was destroyed and the remaining product was released.

308. Based on the limited 3x5 testing, Abbott decided to use a "time code removal" range of 2122 to 2222, which was 30 minutes before and 30 minutes after the positive result for Batch 34957RE00. Instructions were provided on a Rework Form and explained that any destroyed cans should be recorded on a Defect Form and a Destruct Form. The instructions also called for

cans outside the range to be returned for release. 7,696 cases were requisitioned and 1,336 were designated as destroyed. No confirmatory testing was done after the "time code removal" to ensure the safety of the product Abbott decided to release.

309. The primary contact for the rework was the Powder Front Line Leader, and the secondary contacts were Andy Cortez and Ciara Gonzales.

310. Abbott ultimately released 6,379 cases of the total 7,696 cases in Batch 34957RE00. In other words, although the agglomerator repeatedly tested positive for contamination, and despite no cleaning of the agglomerator to separate the "time code removal" batches and the commercially released batches, Abbott falsely stated that product made within the agglomerator during this time frame did not contain the contaminants that were found.

311. The Defect Forms reflect the haphazard reality of the rework process. The forms designate the pallet number, case time stamp, amount of defects, time frame of defect, and the reviewers (J. Thomson, Abraham Romero, Frank Rodriguez, Ivan Maldonado, Emilio Victor, Ashley Jimenez, Paul Valenzuela, Lijuan Zhang, Marisol Gomez, and Maria Quinn). The five worksheets created for this "time code removal" note the review of time stamps as a substitute for testing, further highlighting the defective process at Casa Grande as each worksheet spans multiple distinct time frames found on specific pallets.

312. No validated basis was used by Abbott to make sure commercially released product was free of contamination after the detection of microbiological contamination. Of further note, the time frame of the batch was 12:45-22:31. With approximately 240 cans per minute produced, Abbott made the decision to release the final nine minutes of batch production, approximately 2,000 cans, rather than remove product that was manufactured within ten minutes of the "time code removal" range.

313. Abbott's cost analysis identified the reason for destruction of the time code removed cans as due to potential microbial growth in the infant formula and referenced the related QR.

314. The cases from Batch 34957RE00 that were not selected for "time code removal" were then shipped for sale to Walmart locations in Alabama, California, Georgia, Illinois, Kentucky, Louisiana, Maine, Nevada, Ohio, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.

315. The Plant Quality Assurance Shipping Release and Batch Release Checklist each reference the fact that there was a pNCR (794641) and identified the Open Action Plan (797359).

316. The Batch List Checklist further includes as part of the QA review the following relevant items: "Rework/Sampling completed and package audited (if applicable), "Quality Records (QRs) complete, approved, and included with batch paperwork (if applicable)," and "Deviations reviewed and included with batch paperwork (if applicable)."[57] For Batch 34957RE00, all three of the above items were checked, as was the pNCR for 794641, which indicates a Casa Grande CAPA coordinator opened a related action plan (797359). Further, the checklist indicates that two deviation plans (782892 and 784519) were "reviewed and included with batch paperwork." This documentation must be included in the batch record.

317. Of particular significance, Will Strauss, Casa Grande Senior Microbiological Front Line Leader, stated Casa Grande was no longer doing "time code removals" effective June 24, 2022, according to Arlene Rivera Contreras. However, Contreras continued to have Strauss perform 3x5 tests, which made no sense if, in fact, there was an intention by Abbott to discontinue

---

[57] To be clear, the term "deviation" as used by Abbott references a planned departure from the normal process as opposed to an unplanned change from a nonconformance. Deviation records are among the documents excluded from batch records when requested by the FDA.

the unlawful and non-FDCA compliant practice. Contreras was reported to have stated to Christian Lee in a June 24, 2022, phone call in reference to the "near miss" during the FDA: "this is why I don't like doing time code removals."

318. On June 30, 2022, Lori Randall, Division Vice President of Quality Assurance for Abbott Nutrition reportedly announced that she refused to sign off on anymore "time code removals."

**e. Sturgis – 2019 Microbiological Batches.**

319. For several years, Abbott knew that equipment used in the drying process at Sturgis, including the evaporator, was unreliable and failing. As a result of these equipment defects, a number of product flow pipes were pitting and leaving pin holes. This allowed bacteria to enter the system and led to the CIP process' failure to adequately clean out bacteria. In turn, this caused product flowing through the pipes to pick up the bacteria that was trapped in the defective areas of the pipe.

320. Prior to the 2019 FDA audit, Abbott's Lesa Scott, with the knowledge of Elgan and Fry, authorized the release of infant formula that tested positive for microbiological contamination. This bracket of "micro batches" of infant formula included the batch that had triggered the internal investigations into the product flow pipes and the spray balls.

321. Since the microbiological contaminant was discovered during the standard batch testing (30 samples pulled evenly throughout the production of the batch, including the first and last can produced),[58] 3x5 testing was performed on additional samples. Of these additional

---

[58] At the time, this was the standard microbiological sampling procedure. During the 2019 FDA audit, FDA cited Sturgis for not adequately sampling for microbiological testing. As a result, Abbott Division and Sturgis increased their microbiological sampling.

samples, multiple samples tested positive for microbiological contamination. Abbott made the decision not to destroy the entire batch. Instead, a "time code removal" was performed.

322. Abbott, with Scott's input at Abbott Division, set the time span for the "time code removal". Once the product outside the "time code removal" range was culled out, no additional testing was performed to provide evidence that all the microbiological-positive product was captured and destroyed. The infant formula outside the "time code removal" range was commercially released without supporting documentation to suggest it was compliant and safe for consumption, all based on the non-validated "time code removal" process.

**f. Sturgis – Spring 2021 Seamer Bracket.**

323. Between December 2020 and January 2021, Sturgis created a large seamer bracket based on issues resulting from the seamers on Lines 3 and 5. There were 40 batches designated in the bracket. Abbott signed off on release of the entire 40 batches based on a statistical sampling of cans at the beginning and end of the bracket. Elgan announced that she chose metabolic product batches[59] for sampling because there are less than 500 cases in those batches. In contrast, Alimentum infant formula products can include as many as 11,000 cases in a batch. Based on this non-representative sampling, Abbott released the batches for commercial consumption.

324. This seamer bracket followed years of FP can seam defects, specifically cans produced on Line 5, which was created to package value size packages for bulk retailers. Line 5 installation was completed in 2017 with a seamer from Sweden. Relator L. Cooper later learned that the seamer was made for liquid packaging and not for powdered product, which is how Abbott was employing it. Shortly after installation, during Labor Day weekend of 2018, Line 5 at Sturgis had to be shut down.

---

[59] These include Abbott products such as I-Valex, Ketonex, Phenex, Propimex, Provimin, and Tyrex.

325. Aside from the Labor Day shut down, seam integrity issues caused so many brackets and corresponding reworks that Abbott employees were flown to Sturgis from across the country to assist in the reworks to meet deadlines for Costco and Sam's Club.

326. In addition to flying in Abbott employees, Elgan hired her husband, Eric Elgan, in approximately April 2019 to lead the reworks for seam issues. Though Eric Elgan was clearly doing QA work, he is believed to have been hired through the Engineering Department to avoid the appearance of impropriety.

327. The rework process addressed numerous issues, including Abbott applied seam integrity, packaging, label issues, and excessive oxygen issues (too much oxygen causes spoilage), yet no cans were opened during the rework.

**g. Casa Grande – March 2023 Bubble Leak Time Code Removal.**

328. Casa Grande has experienced significant bubble leak problems due to defective powdered infant formula cans and ends. Released infant formula exposed to oxygen and contamination conditions was released by Abbott, which the company sought to conceal.

329. **Abbott Has Defective Ends and Defective Cans.** Sturgis and Casa Grande falsified RCAs by blaming equipment adjustments rather than acknowledging defective powdered infant formula cans and ends. An example of this is a time code removal at Casa Grande on multiple pallets of NeoSure infant formula due to bubble leak failures that Abbott blamed on a faulty seamer, among other misrepresented causes. Bubble leak testing involves filling the cans with an inch or so of water, placing the cans under the vacuum, and seeing if any bubbles form. The bubble leak test failures indicate a faulty seam allowing leakage in or out from the product container, which affects oxygen levels, particulate matter contamination, expiration dates, and other issues.

330. The bubble leak failures were not limited to the pallets subjected to the time code removal, and the root cause was not a bad seamer. The FP cans failed the bubble leak test because of defective ends and defective cans. The defective ends caused failures in the 401 mm cans and the defective cans (flange defects) caused failures in both the 401 mm and the 502 mm cans. Abbott has several can sizes for their powdered infant formula. The standard cans are 401 mm in diameter and come in multiple height variations. There are also several larger 502 mm diameter cans, which are used for larger product SKUs such as Costco and Sam's Club products. The 401 mm cans are for the WIC program.

331. When the ends do not have enough adhesive compound the seam is imperfect and the can leaks. The ends were supplied to Abbott by a vendor with a verified vendor lot number. The vendor lots contain millions of ends and are distributed across Abbott sites, including both Sturgis and Casa Grande. Upon receiving a shipment of ends, Abbott gives the shipment an internal Abbott lot number, which is recorded in each batch record and could be used to ultimately trace back to the vendor lot number to identify which batches were manufactured with which ends. As of March 2, 2023, Abbott had begun tracing the dented cans to (i) vendor lot number, (ii) Abbott lot number, and (iii) batches used.



332. In addition to defective ends, cans at Sturgis and Casa Grande were observed to have a can flange defect or bent top, as shown in the photo above of a 401 mm can, as well as delamination on the inside of the cans, which would also affect product integrity.

333. Defective ends and defective cans have been a consistent problem at Casa Grande and Sturgis for years. Due to multiple bubble leak failures, on February 8, 2023, two deviations were written for defective 502 mm cans – one by Abbott Division and one by Casa Grande.

334. Abbott Division issued a deviation stating that cans with defects are not a problem and would be used despite having failed the incoming inspection process. Eileen Hanna, an Abbott Division Senior Engineer, claimed that the visible can problems would not cause a seam defect. No official engineering study was done to support that claim. According to Hanna, Casa Grande ran a few cans and visually checked the seam, but teardowns and bubble leak tests which should have been performed were not.[60] The Casa Grande CAPA Coordinator told Hanna that he has seen a minimally damaged flange cause a seam defect, but not as often as when they observe a grossly

[60] The technical recommendation attached to the deviation stated that 18 cans were tested for bubble leak and teardowns. This is in contradiction with Hanna's verbal statement that she visually looked at the seam. Regardless, 18 cans would not comprise a statistical sampling.

defective can flange. Further, Vince Arcuri stated that the can defect rejection system is not validated to catch all types of known defects.

335. Hanna based her conclusion on an untested premise that a defective can would not cause a defective seam because the can is cardboard and not metal. She further claimed that the cardboard "does what the seamer wants" because it is more flexible. Therefore, Hanna said Abbott did not expect defective cans to cause a defect in cardboard composite cans even though it could in metal cans. The explanation ignores the fact that a cardboard can is not as rigid as metal, so if the seamer pushes down on cardboard it is harder to control how it folds or crushes, as opposed to (smaller) metal cans that hold their form better.

336. Abbott Division wrote the deviation to allow the use of the visibly defective cans after Abbott failed the cans at the incoming inspection. Division's deviation overrode the failed inspection. Casa Grande created "training aids" of examples of defective cans from Casa Grande pulled after the depalletizer on visual inspections. The Casa Grande. CAPA Coordinator told Contreras that visual line inspections were only 10-15% effective since the cans move at approximately 130 cans per minute. Nevertheless, Contreras overrode the CAPA Coordinator's concerns and tasked Relator K. Cooper with creating the "training aids," laminating them, and distributing them to Allen Bynum, Casa Grande Operations Manager for Dryer/Powder.

337. The second deviation was written on February 8, 2023, by Casa Grande, Deviation No. 871082. It was started by Relator K. Cooper and finished by Ciara Gonzales. Casa Grande's deviation affected ten FP batches and required the pulling of thirty cases to inspect for bubble leaks, which would constitute a statistical sampling. The ten affected batches comprised approximately 510,090 cans.

338. Of the ten batches, nine passed bubble leak tests, but a can from the tenth batch failed the bubble leak test. Based on Abbott's statistical sampling policy for critical defects, applicable here, if any can fails then it should prompt the failure of all batches in the sample. In this case, the failed can was overridden and Abbott stated all cans in the statistical sampling passed.

339. **Abbott Falsely Claimed Seamer Issues Caused The Bubble Leak Failures.** On February 21-22, 2023, Abbott again had a failed bubble leak test with the same product and 401 mm can size after only three hours of running the product. Relator L. Cooper responded when maintenance was called. The seamer was checked and was in specification, as was the vibrator on the filler discharge star wheel, but defective cans were observed by the scoop dropper and depalletizer.

340. On February 22, 2023, Relator K. Cooper was informed that all powder was on hold until further notice with no explanation provided. Gonzales instructed to hold all unreleased powder batches "pending further investigation" but would not provide a reason for the hold. It was clear that the hold included both the 401 mm and the 502 mm cans. Contreras decided that the batches should not be flipped into quarantine ("QT") status or isolated through paperwork. This violated protocol, which requires creating the QT record.

341. At that time, the hold affected 24 unreleased powdered infant formula batches including the bubble leak time code removed batch discussed below. As per instructions, Relator K. Cooper emailed her team to hold all powdered infant formula batches until further notice.

342. Overnight on February 22-23, 2023, the powder line was stopped for almost the entire night because FP 401 mm cans were failing bubble leak checks. Abbott changed the powder line from the smaller 401 mm cans to the larger 502 mm cans. There was no issue with the seamer

at the time the bubble leak failures were found, but areas on the Abbott-applied ends were observed to be missing compound.

343. On February 23, 2023, another deviation was written, this time by Monica Garcia from the Micro Lab, Deviation No. 874630. The deviation again was based on the use of defective cans that failed incoming inspection. The deviation noted that there were cans with slight flange[61] defects, yet Abbott refused to acknowledge that those defects could cause seam integrity issues. The impetus to claim that the larger 502 mm cans would be unaffected by defects was six hoppers full of powdered infant formula that would expire.

344. Notably, the line was stopped mid-production of Batch 50349RE00 for the second deviation to be created. The line was not restarted until after the deviation was written to require additional samples to be pulled for bubble leak testing. When the line restarted post-deviation writing, the remainder of Batch 50349RE00 was filled as holdover Batch 50349RE10 (consisting of 1,772 cases), However, the first portion of Batch 50349RE00 (consisting of 5,727 cases) was not subjected to increased sampling or testing and was commercially released despite using the same lots of cans, which were the subject of the deviation.

345. On February 24, 2023, Relator K. Cooper was instructed by Contreras to write another deviation as Abbott wanted to resume production on 401mm cans despite not yet having a root cause for the bubble leak failures. The Casa Grande CAPA Coordinator was present for the discussion and recommended a 2,300 can statistical confidence sampling across all batches that would be produced under the deviation. Contreras disagreed and decided to merely double the sample size. Deviation No. 874998 was written and Contreras later detailed the production plan in an email titled "Powder Alignment – PLEASE READ." This deviation was used to produce

[61] A flange is the flared projection around the top of a container that gives the container a "lip" shape at the top.

NeoSure and Similac Sensitive batches: 50834RE10, which had bubble leak failures; 50830RE00 which had oxygen level failures; and 50831RE00, which also had bubble leak failures.

346. Importantly, Relator L. Cooper discussed with another Casa Grande employee that the defective cans should have had tear downs performed to see if the problem could be detected, but he was told that the defective cans had not been retained. Rework packets instruct that defective cans are to be retained by the FLL. This is done so there can be an evaluation performed to determine the root cause. If the defective cans are not retained, there cannot be a proper evaluation to find a root cause.

347. **Abbott Falsely Claimed Powder In The Seams Cause Bubble Leak Failures.** On February 28, 2023, Relator L. Cooper was told that Abbott Division had now determined that powder in the seams was causing the bubble leak failures. Two maintenance technicians from Sturgis traveled to assist Casa Grande, ostensibly because Sturgis had similar issues and a related recall a few years prior.

348. The Sturgis technicians did not believe the seamer was the issue and stressed the importance of the compound on the composite can. The Sturgis visitors also relayed that Sturgis was still having droop and vee issues. They further stated that Sturgis had ends that had the same missing compound issue, but they still used them and had issues for more than a year.

349. That same day, Relator K. Cooper attended a large meeting including at least one Abbott Division representative – Phyllis Ragan, Abbott Division Packaging Engineering Manager. Ragan was on site because of the bubble leak issues, and mentioned that updates were delivered daily to Ollie McBrearty, Division Vice President North America Nutrition Manufacturing at Abbott Nutrition, and Christian Lee, Director, North America Quality Assurance Operations at Abbott Nutrition.

350. **Abbott Falsely Claimed Bumps In The Line Cause Bubble Leak Failures.** Abbott next attempted to attribute the cause of the bubble leak failures to cans bumping on the line. Abbott claimed that there were no leak issues with 502 mm cans because they are bigger so even if the cans bump on the line, they are not likely to bump powder out since they have a larger headspace. The larger cans also run slower, which would mean less force when they do bump or when they run into the seamer scroll. However, bumping was clearly not causing the bubble leak failures because neither "seamer bias" nor line speed had changed recently. What changed, however, was more sampling. Because the additional sampling caught the leaks, it was reasonable to question whether the bubble leak failures were occurring before and just not detected because of the very small not statistically significant sample size.

351. On March 1, 2023, in Contreras' office, Contreras briefed Relator K. Cooper on the status of the ongoing RCA process and the intent to start back up on the 401 mm diameter cans. Contreras said that they would need a deviation for additional sampling, but that statistical confidence levels again did not need to be attained. Contreras directed that the bubble leak and teardown testing sample sizes would be doubled and tested during production. From the RCA meeting it was decided that the start-up maintenance activities would be defined in the QR that was being written by CAPA Specialist Nichole Goodale (nee "Sheley") and their completion documented in a Demand Maintenance ("DM") Work Order by maintenance.

352. As directed by Contreras, Relator K. Cooper initiated Deviation 876187. That night when Relator L. Cooper arrived to work there was another line restart since production of powdered infant formula had been down all day once again. The deviation with increased testing was implemented and following the startup there was a bubble leak failure in the first batch. Emails

were circulated, change overs were done between cans, and the next batch also had bubble leak failures.

353. During a discussion with Relator L. Cooper, a Casa Grande employee stated that he told the quality department how to resolve the bubble leak failures by changing the ends and that Contreras was erroneously trying to blame the technical training team for causing the issues due to not properly training employees. The employee explained that he was well trained, he opened the last can that had the bubble leak failure, and confirmed that the cause was the defective ends, not training. He said management was upset with him and kept putting pressure on him to say that the failures were caused by powder in the seam. He would not do so and that made management more upset. The employee relayed that he proved that it was the ends by marking where the leak was, opened it the proper way, and found that the compound was thin. He also said that he found an end where the compound was missing altogether.

354. On March 3, 2023, Abbott Division and Contreras finally admitted the low compound on the ends was a root cause and contributing factor of the bubble leak failures. Contreras maintained a spreadsheet of the 42 powder batches on hold at Casa Grande, manufactured between January 26, 2023, and March 2023. Sturgis had its own bracket. Bubble leak sampling commenced with a few of the batches, resulting in bubble leak failures in Batches 50267RE00, 50827RE00, 50828RE00, 50829RE00, 50268RE00, and 50141RE00.

355. Based on Abbott's examination of where the defective ends were used, two batches consisting of 17,000 cases each had already been commercially released with defective ends. Batch 49044RE00 was released February 2, 2023 and Batch 48149RE00 was released January 10, 2023, one of which had a QA (864883) because it was OOS for oxygen. The supplier-caused bracket affecting both Sturgis and Casa Grande required a rework of multiple batches. A number of batches

were released before it was determined that the rework was missing required sanitation instructions. The released batches were not recalled. In the end, a large quantity of these batches in the supplier-caused bracket not yet released were destroyed, but Abbott let the batches sit and then claimed destruction was due to "short dating" rather than Abbott admitting there were faulty ends and that they were reworked under faulty rework instructions.

356. **Abbott's Failure to Declare an Accurate Root Cause is Based on its Knowing Failure to Perform Adequate Testing Reflected in a "Hush, Hush" Study.** For weeks and likely much longer, Abbott refused to acknowledge the true root cause of seam integrity issues because the defective ends and defective cans were so widespread for powdered infant formula it affected already released product.

357. A proper, timely RCA would have minimized the problem. Although Casa Grande placed a hold on product that had not shipped as of February 22, 2023, there were bubble leak failures earlier without a bracket or root cause analysis. When testing increased, so too did the detection of bubble leak failures. The earlier bubble leak failures were found when there was less testing, so it is reasonable to assume that powdered infant formula using the defective ends and defective cans also had bubble leak failures that went undetected and were commercially released.

358. The following batches had bubble leak failures:

- 49142RE00
- 49142RE00
- 50831RE10
- 50831RE00
- 50834RE10
- 50834RE00
- 50827RE00
- 50828RE00
- 50829RE00
- 50267RE00
- 50268RE00
- 50141RE00

359. Batch 49142RE00 failed bubble leak testing in January. The batch was manufactured January 28, 2023, and was subjected to three reworks, including time code removals

and further bubble leak testing. This batch was produced prior to the increased testing frequency for bubble leaks, however, it provides perspective on one time code removal. The following photos show multiple pallets that went through a time code removal for Batch 49142RE00 after failed bubble leaks. In the second photo there is a handwritten sign that says, "Bad Cans."





360. As previously noted, Batch 50830RE00 had high OOS oxygen, which can result if a seam is not formed properly, among other potential causes. Elevated oxygen in the product generally denotes slow leaking of nitrogen. Nitrogen gas is pumped into a sealed powdered infant formula can to displace oxygen, which helps to prevent oxidation, preserve nutritional value, maintain product shelf life, and inhibit microbial growth. Too much oxygen results in premature spoilage and potential contamination.

361. Notably, Abbott does not perform statistical sampling for oxygen. This came to Relator K. Cooper's attention in the context of a batch with a missed end-of-batch oxygen check. Relator K. Cooper was informed that Abbott Division previously did a "hush hush study" examining oxygen over time in the composite can. For six months product was stored in Casa

Grande's warehouse and then shipped to Abbott Division. Abbott Division tested the oxygen after the six months and found it to be unstable. Following those results, Casa Grande was told that they would not do statistical sampling for oxygen.

362. In addition to not performing statistical sampling for oxygen, Abbott has known at least since May 12, 2020, that Casa Grande is deficient in its testing in many areas, including bubble leaks, teardowns, and visual seam checks for powdered infant formula. Abbott performed a Gap Assessment related to a Global Impact Assessment Review in 2020. The assessment was evaluated by AQ13 QS Owner Fred Chonkan, Abbott Program Manager based in Abbott Park, Illinois. It was also signed off on by Casa Grande's Eric Hamerstrom, Gonzales, Gwen Geraci (former Casa Grande compliance manager), Chris Wooten, and Contreras.

363. Based on these findings, Eric Hamerstrom, Casa Grande Compliance Specialist, initiated a pNCR on June 29, 2021. An action plan was initiated in July 2021 and the underlying action plans initiated almost a year later in June 2022 with an effective date of December 27, 2022. Then Casa Grande asked for extension, which Abbott Division granted, to January 27, 2023.

364. Abbott knew of these known, persistent deficiencies and sampling size inadequacies for years. Abbott chose to continue production for three years knowing the testing was not sufficient.

**h. Casa Grande – March Bracketing for Dec. 2022-Feb. 2023 OOTL for SPC.**

365. In January 2023 Casa Grande had confirmed positive environmental *Cronobacter* and *Salmonella* results and also an in-process trend of out of trend limit ("OOTL") testing for SPC in powdered infant formula. SPC is a general count of bacterial density. A high SPC result indicates an increased number of bacteria.

366. At first, the bracket for OOTL SPC in powdered infant formula was created with ten batches. Then the bracket was expanded after additional batches resulted in elevated SPC, one of which yielded FP results that were OOS. Results were compiled in an Excel spreadsheet titled "Micro Powder Bracket 1.24.2023." The spreadsheet contained microcontamination results for batches dating to December 9, 2022.

367. In addition to the FP SPC OOTL and OOS results during this time, Abbott also had low-level SPC and *Enterobacter* results coming from their processing samples ("P samples"). These low-level SPC results often are referred to as "noise" or "signals." Regardless, "noise" indicates the presence of bacteria. Several batches in this timeframe also had P samples that tested over-action-level ("OAL") for *Enterobacter*. OAL occurs when the results of the test for a sample are above the established limit. In this case, the "noise" was found both pre- and post-heat treatment for both processing and dryer P samples. Abbott chooses to not perform follow up testing on FP SPC "noise" unless the SPC tests above 100 colony-forming units per gram ("cfu/g") triggering an OOTL, or if there is an OOS finding based on two SPC results above 500 cfu/g or a single OOS finding above 5,000 cfu/g.

368. Despite these batches all being produced close in time, Abbott declared the two elevated SPC results to be unrelated and, therefore, two separate brackets were created.

369. The following batches of Similac 3TC Advance infant formula had OAL test results for *Enterobacter* in-process:

- Dryer date December 10, 2022: Batch 48880RE00
- Dryer date December 11, 2022: Batch 48882RE00
- Dryer date December 12, 2022: Batch 48117RE00

370. Notably, Batch 49874RE00 resulted in elevated SPC at FP from the first can produced and that can directly followed a CIP and wet wash. Further, the FP "noise" in the other

batches reflected a close to OOS SPC level. These results alone would not normally trigger follow up testing on that finished product unless there was an OOTL, as indicated above.

371. An important example of "noise" not triggering extra testing is Batch 48884RE00. This batch had a P3 sample OAL for *Enterobacter* (QA #859709). All five cans tested at FP had low-level SPC results with no follow up testing performed. The batch also recorded low-level SPC in-process and was produced immediately following Batch 48882RE00 (above) that had OAL *Enterobacter* in-process. Batch 48884RE00 which had no additional testing was reported as one of three cans involved in an infant hospitalized with *Cronobacter*.

372. On February 2, 2023, Abbott released the "first" OOTL SPC micro bracket. There was no further testing done on the December batches indicating "noise." Of the ten batches included in the first bracket and isolated, only the five batches that tested OOTL at FP were included in the pNCR. The batches that were produced between the OOTL batches with only "noise" at FP were not listed in the pNCR despite being bracketed. No batches in this bracket were tested further.

373. In the "second" OOTL SPC bracket, Batch 49076RE00 tested OOS for SPC. This prompted Abbott to begin limited 3x5 testing. Abbott uses 3x5 testing results to determine how to save parts of batches or brackets from destruction regardless of the fact that no CIP or corrective action is taken to protect that product from known contamination.

374. In this example, Abbott performed 3x5 testing on the previously produced Batch 49042RE00, the OOS subject Batch 49076RE00, and the two subsequently produced Batches 49077RE00 and 49078RE00. Batches 49042RE00, 49077RE00 and 49078RE00 all had low-level SPC contamination results during routine FP testing, however, these results were within specification and would not normally trigger follow-up testing or investigation.

375. Due to the investigation of 49076RE00, 3x5 testing revealed that two previously in-specification batches had several OOTL results. The 3x5 testing on 49077RE00 revealed 11 OOTL results while the 3x5 testing on 49078RE00 revealed 13 OOTL results. Due to the OOTL results, Abbott performed follow-up testing which revealed OOS results for *B. cereus*, a known foodborne pathogen, on Batch 49078RE00 – a batch that would not normally have been subject to 3x5 testing based on its SPC results.

376. Significantly, as noted above, when Abbott's initial FP testing results in "noise," this does not normally lead to further testing. There are numerous batches that result in SPC "noise" but are within Abbott's specifications and, therefore, no further testing is performed and the batches are released. The batches discussed above reveal that Abbott's routine testing to specification as opposed to following up on "noise" fails to capture potential contamination. Stated differently, Abbott uses testing to appear specification compliant, rather than testing to ensure formula quality and safety.

**i. Casa Grande – May 2023 Microcontamination Events and Brackets.**

377. Based on communications with FDA's consumer complaint section, Abbott anticipated and prepared for an FDA visit to Casa Grande on April 4, 2025, by reviewing records and instituting non-routine "unscheduled" site cleanings to give the appearance of better regular sanitation conditions at Casa Grande than everyday facility conditions. Not only did management work to hide the plant's unsanitary environment, but upon FDA's departure intense cleanings ceased. This resulted in Casa Grande's "normal" positive microcontamination events returning and the plant experienced pest events that led to substandard, adulterated, and non-compliant product.

378. FDA closed out the inspection on May 2, 2023, and Casa Grande returned to "normal" operations, which resulted in multiple environmental and product positive tests for

microcontamination, OOS, and OAL. In response to these events, Casa Grande manipulated bracketing and documentation.

379. In mid-May 2023, there were three batches that tested for elevated *Enterobacter* during 3x5 testing, each of which had initially tested negative during routine FP testing. Additional testing, prompted by a positive *Enterobacter* result in Batch 52520RE00 led to bracketing and isolation of batches from dryer CIP to CIP and included 13 batches.

380. During confirmation testing, all *Enterobacter* isolates reportedly "died" after the Micro Lab plated the samples on Tryptic Soy Agar ("TSA") or Tryptic Soy Broth ("TSB") and based on that, Abbott concluded that the result was negative. A Micro Lab tech, expressed their discomfort with these batches and stated Debra Waffle would have to sign off on the work orders for those batches. After concluding that the results were negative, Contreras, with the support of Abbott Director of North America Quality Operations Christian Lee, directed the release of the batches without completing a QR. This decision was justified by Contreras who stated that the Global Microbiological Standards policy allowed for two *Enterobacter* results to be positive. Ciara Gonzales even expressed discomfort with this decision and asked Contreras to write a memo to be included in batch records for the 13 affected batches. Gonzales stated that senior leadership was involved in the decision and Relator K. Cooper and others were present for a call between Contreras and Lee, during which Contreras explained that she planned on releasing the batches; Lee said he was aligned.

381. Additionally, RPB production was stopped because of a microcontamination result in the RPB filling area and on May 8, 2023, 10 powder filler heads were swabbed and tested OOS for SPC. Bracketing was completed and contained 16 batches from powder filling wet wash to wet wash. During routine FP testing, Batch 53662RE00, one of the bracketed batches, tested OOS for

SPC. Abbott then completed 3x5 testing on all batches in the bracket. Between routine FP testing (5 cans) and 3x5 testing (25 cans), all batches in the bracket tested elevated for SPC. Some batches had one can test elevated while others had every can test elevated for SPC. Since Batch 53662RE00 tested OOS for SPC during 3x5, Abbott tested that batch for *B. cereus*, which confirmed the presence of *B. cereus*. Abbott did not complete *B. cereus* testing for the other batches in the bracket that had elevated SPC.

382. In the same time frame, there was an ongoing trend of *Enterobacter* OAL at P3 and P4. Due to the number of batches being held for P3 and P4 *Enterobacter* OAL investigations, Abbott created a deviation to discontinue creating QRs for these batches. This deviation remains open more than two years later to avoid investigating P3 and P4 SPC and Enterobacter OAL results. Instead, Manufacturing Operations Site Director Douglas Taylor stated, during a July 18, 2023, leader meeting, that Abbott was looking into raising its P sample specifications.

383. Further, on May 25, 2023, Casa Grande's Micro Lab communicated a presumptive positive *Cronobacter* swab result from a swab taken on May 22, 2023, at 19:04 in the powder filling room. Bracketing commenced and 18 batches were isolated (wet wash to wet wash). Later that morning, Stefanie Crum directed a change to the bracketing to only encompass dry clean to dry clean, which limited the bracket to five batches instead of the original 18. Of course, a dry clean does not have the benefit of a chemical sanitation step. This questionable new bracketing procedure was approved by Abbott Director of North America Quality Operations Christian Lee, according to Stefanie Crum, who developed the bracketing based on conversations she stated she had with Abbott Director of Quality Assurance at Sturgis Keenan Gale. Due to the change in

bracketing, Stefanie Crum provided a memo to include in the batch record for the 13 now unbracketed batches.[62]

384. This cluster of events following the FDA inspection sheds light on Abbott's implementation of extraordinary steps to prepare the site prior to and throughout FDA's inspection to avoid the typical positive swabbing that has plagued the site, as well the reality of Casa Grande.

**j. Casa Grande – May-July 2023 Pest Events and Document Manipulation.**

385. Another example of Abbott's failure to maintain a sanitary facility can be found in the more than 24 separate batches in which insects were detected in formula cans at Casa Grande between May and July 2023. The insects were found in empty cans at the depalletizer and at the empty can air rinser. Abbott attempted to blame transport for the insects, but trailers are inspected on receipt and except for one instance, no insects were reported to be found in the trailers or in the incoming inspection for can lots.

386. By early June, the insects were identified as flour beetles, which are stored product pests, meaning they need food to survive and it therefore does not make sense that they were arriving in empty trailers. By late June, Ciara Gonzales had confirmed that Incoming Quality Assurance ("IQA") did not find insects during their incoming inspections of cans, which were increased due to a deviation for damaged cans. Therefore, the insects were not coming from the supplier, transportation, or the trailer, but rather they were coming from the plant. Sticky pads were placed between pallets in the receiving warehouse and caught insects, which indicated that these insects were active in the plant. An insect was also reportedly found in a "sealed" raw ingredient.

---

[62] During this time, Crum was filling in for Arlene Rivera Contreras who was out of office so Crum had signature authority for Contreras.

387. Abbott instructed employees not to document these events using the word "pest" but rather only to refer to them as Extraneous Material ("EM"). Stefanie Crum gave specific instructions to be sure not to use "pest" on isolation reports and instead to use "EM."

388. Relator K. Cooper spoke with an employee from powder filling who showed pictures and videos of insects on his phone that were found in cans in powder. The employee reported that it was more than just beetles. They found gnats, flies, spiders and one video that appeared to contain larva.

389. Relator L. Cooper was present numerous times when insects were detected at the depalletizer. Upon detection, the line was shut down, cleared, the batch isolated, and then the equipment was run again sometimes without even cleaning. In mid-June, Abbott used pesticide fogging in the dryer/powder filler and processing area, but did not fog the depalletizer where many insects we observed. This is because fogging the depalletizer would require a plant shutdown, which was unacceptable to Abbott when it was millions of bottles behind on RPB production. The RPB production would need to be shut down if the powdered infant formula depalletizer were shut down and fogged because they are in the same room. Unsurprisingly, after limited fogging, insects continued to be detected at the depalletizer.

390. Relator K. Cooper reviewed documents in a work order for increased visual checks at the air rinser and depalletizer around May 27, which indicated that Abbott management was aware of the insects and chose to put cans on the line regardless.

391. In mid-June, two weeks after the initial reports of insects, Abbott began lot tracing to identify batches with the impacted supplier lots, but did not hold, sample, or include the batches in QRs. In July, Abbott began sampling the "EM" batches. Batch 54145RE00 was not included in the bracket because only a wing of an insect was found, therefore, Abbott deemed the observation

to be less than a "full signal" and that batch was excluded from the bracket, which informs what was required to be observed for the batches that were included in the bracket.

392. For each batch sampled, 3,000 cans were dumped into drums, re-liquified in the processing standardizing tank, and then run through a 250 micro cheese cloth. The cloth was then visually inspected by the analytical lab, but the lab had been instructed not to add the information they normally would, such as the size of the EM because people might "jump to conclusions." Further, even though EM was observed following the re-liquification process, Abbott canceled the remaining EM samplings for insects, but then restarted in July when Abbott began sampling for EM only when it was discovered at the air rinser.

393. According to Abbott's Physical Contaminants policy, if EM is detected, it must be characterized and identified, and if the on-site lab lacks the ability to complete the identification, then the EM should be sent to a third-party lab that can. After raising concern over the lack of information on the inspection documentation, the lab started adding the size of the EM and Casa Grande Lab Manager Tais Lind (formerly Lacerda-Bezerra) added comments to the inspection document to state that the lab identified the EM as scorched particles. This made no sense however, since (1) scorched particles are over-cooked product, which typically dissolve in water and the powder had been reliquefied; and (2) on Batch 53977RE10, one of the supposed scorched particles was recorded as 6.19 mm x 8.95mm which would have never fit through the final sifter after the dryer. The sifter screen is an 8 mesh screen with openings that are approximately 2-3 mm.

394. On July 11, 2023, a miscommunication with the lab resulted in the re-inspection of the filter for Batch 54096RE10. The material on the filter was confirmed to be EM. Allen Bynum, Operations Manager, then decided that the EM was simply cheese cloth material and pallet material that was introduced into the product by the sampling/reliquification process, though Bynum was

not qualified to make this assertion. Nevertheless, Lind added the comment to the documentation and the batch was released without properly identifying the EM.

395. Consequently, the EM was never properly identified, documentation characterizing the events was manipulated, and Abbott closed the action plan claiming all EM inspections were acceptable, releasing multiple batches based on that unsubstantiated conclusion. Importantly, though the action plan was closed, the QR was not closed, as of July 1, yet batches within the open parent QR were released. Notably, when Relator K. Cooper released affected batches as she was directed, she had her supervisor sign the isolations and Relator K. Cooper wrote a comment into the release page for the pNCR, which stated, "Approval not needed per Quality Management." In summary, Abbott failed to follow policy and did not properly assess the product for adulteration risk, yet released the product.

**k. Casa Grande – December 2023 Contaminated Metal Shavings Bracket.**

396. Relator K. Cooper and her supervisor spent weeks exerting pressure to block Abbott from releasing batches of infant formula that Abbott knew to contain stainless steel shavings (the "Contaminated Metal Batches"). The Contaminated Metal Batches were manufactured following Casa Grande's annual shutdown. Samples of the Contaminated Metal Batches were sent to Abbott Division for evaluation. That evaluation apparently determined that the particles were 70% iron and similar to previously observed stainless steel shavings from the Casa Grande filler.

397. The following photographs show contaminant collected at the filler which is in the powdered infant formula. It is clear when the magnet is run around the plastic container that the shavings are metal.







398. CAPA and Production asserted that the Contaminated Metal Batches could be released because the metal shavings are small and allegedly comply with Abbott's Physical Containment Policy.

399. Casa Grande Plant Manager, Douglas Taylor, tried to rush the Contaminated Metal Batches through the review and to commercial release. It is not clear whether Abbott Division, who was involved in the review of the contaminated product, instructed Taylor to move up the release date.

400. Relator K. Cooper and her supervisor refused to shorten the release date to December 11, based on their concerns with the contamination of the product known by Abbott to

contain metal shavings. The concerns of Relator K. Cooper and her supervisor were so significant that the supervisor put her concerns in writing to Abbott. Due to the continued pressure of Relator K. Cooper and her supervisor, the batches were moved to IM status, which means that they are in material review. However, Taylor continued to press to release the batches and Relator K. Cooper and her supervisor continued to push back on release.

401. In their February 2024 visit to Casa Grande, FDA requested any infant formula batches on hold, which at that time included, but was not limited to the metal shavings, bubble leak, and validation hold for system A. Only after FDA's February 12, 2024, request did Abbott issue an official destruct for the Contaminated Metal Batches, on February 27, 2024.

**D. Abbott Failed to Respond to Ongoing Serious Medical Complaints and Issued Only Partial Recalls If Any.**

402. In addition to two medical complaints FDA received regarding Casa Grande products and reported to Abbott, Abbott received complaints directly regarding additional Casa Grande products resulting in infant injuries. It is unclear if Abbott reported these to FDA. Between July 2022 and October 2022, Abbott received five (5) *Salmonella* complaints about Casa Grande powdered infant formula, yet no action was taken. An internal Abbott email stated that Abbott had been informed of a medical complaint trend for *Salmonella* related to Similac Sensitive 12.05 oz. Powder and identified that these complaints exceeded the upper control limit for *Salmonella* complaints. The five (5) subject complaints were reported against the following batches: 40945RE00; 41280RE00; 41282RE00; 41587RE00; and 44865RE00.

403. Four batches related to March 2023 consumer complaints were produced by Casa Grande between August 2022 and March 2023. Additional known consumer complaints expand this time period to Batch 23714RE00 known to Abbott and Batch 39756RE00 known to FDA,

both of which were produced prior to August 2022. Examples of known complaints and related untested microcontamination events at Casa Grande from Fall 2021 to April 2023 include:

- October 2021 FDA reported complaint for infant hospitalized with *Salmonella*: affected batches include 34957RE00;
- June 2022 FDA reported complaint for infant hospitalized with *Salmonella*: affected batches include 42338RE00; 42339RE00; and 42524RE00;
- August 2022 mold complaint (plus three other complaints for the batch) reported directly to Abbott: affected batches include 39932RE10; 39932RE00;
- October 2022 FDA reported complaint for *Cronobacter sakazakii* in 2 week old preemie, which likely led to *meningitis*: affected batches include 41236RE00;
- October 2022 FDA reported complaint for 10 day old infant with *meningitis*: affected batches include 43625RE00;
- October 2022 two *Salmonella* complaints reported directly to Abbott: affected batches include 39756RE00; 43629RE00; 30190RE00; 37565RE00; 30189RE00; 23714RE00; 36357RE; 37608RE;
- November 2022 Abbott notified of medical complaint trend, five *Salmonella* complaints July-October 2022: affected batches include 40945RE00; 41280RE00; 41282RE00; 41587RE00; 44865RE00;
- March 2023 FDA reported infant hospitalized with *Cronobacter*: affected batches include 48884RE00; 44904RE00; 48999RE00; and
- March 2023 FDA reported sick infant: affected batches include 48117RE00.

404. In a separate issue regarding packaging defects, Abbott issued a recall for defective packaging manufactured in Columbus, yet failed to issue a recall for Casa Grande-manufactured product with the same defective packaging issues. The Columbus recall was issued August 16, 2022, and announced by FDA on September 7, 2022.[63] There was no Abbott press release. The recall affected 720 recloseable Alimentum bottles (2 oz nursettes) from 120 cases sold in Michigan

[63] https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=195689; https://bgr.com/lifestyle/new-abbott-baby-formula-recall-covers-bottles-sold-in-2-states/

and Ohio. The basis for the recall was described as "only caused by a packaging defect" which was an issue with the bottle cap. Casa Grande had similar issues with bad caps and bottles. The cap was not seating properly and, therefore, not sealing properly, which could affect the product safety. In September 2022, Casa Grande had a new bracket related to these packaging issues with 8oz RPB bottles leading to four batches being sent for inspection. The inspection consisted of squeezing the bottles. If there was no visible leak then they were released. Abbott did nothing to review packaging on several other 8oz RPB batches that had previously been released and were still in Abbott control.

### E. Abbott Concealed Violations from FDA and Other Regulators at Sturgis and Casa Grande.

405. Abbott implemented changes at Casa Grande aimed at hiding problems similar to conditions uncovered at Sturgis. Due to FDA questioning at Sturgis, Casa Grande particularly changed certain terminology and protocols to disguise the continued problems.

406. **Rework.** It was announced in a September 14, 2022, CAPA Event Review meeting that Abbott would be changing its terminology. A rework will no longer be called a rework because FDA and Abbott do not view rework the same. Casa Grande quality employees were told that the change was due to FDA viewing a "rework" as taking powder out of cans, liquifying it, and correcting it while Abbott calls that "reprocessing." Going forward, Abbott will now call a rework an inspection or correction. Abbott is not changing the process to correctly perform "reworks" they just are changing terminology to not be bound to perform this type of check.

407. "Rework means clean, unadulterated food that has been removed from processing for reasons other than insanitary conditions or that has been successfully reconditioned by reprocessing and that is suitable for use as food." 21 C.F.R. § 117.3 There was no discrepancy in the meaning of the term or any change to the implementation of the flawed Abbott rework process.

Instead, Abbott used a name change to attempt to disguise their continued use of this unvalidated process.

408. **Medical Complaint Testing.** Additionally, FDA identified Sturgis' failure to follow Abbott policy that cans are to be tested for medical illness complaints. Rather than ensuring that cans are tested once a medical illness is reported, Abbott changed its internal policy regarding medical illness reporting. Abbott ended the requirement to test product following medical complaints and made testing at Abbott's discretion.

409. **Environmental Pathogen Instead of *Cronobacter*.** In late 2022, Casa Grande had multiple confirmed *Cronobacter* and *Salmonella* results and attempted to hide those results and thwart follow-up investigations. On January 17, 2023, three potential nonconformances ("pNCRs") were initiated based on three separate confirmed *Cronobacter* results at Casa Grande. This is notable not only because of the multiple confirmed *Cronobacter* results at Casa Grande, but also because these pNCRs were created on December 6, 2022 – six weeks after the swabs were taken. This lengthy delay not only impairs the effectiveness of any investigation to ensure product safety, but also violates Abbott policy of opening a pNCR within seven days of confirmatory testing.

410. The pNCRs indicated that *Cronobacter* was confirmed in the energy center,[64] the dryer or powder packaging areas, and the RPB filling or packaging area. In addition to delaying the investigations, in an apparent attempt to hide or minimize such results, Abbott began putting "Environmental Pathogen" in the short description of QRs instead of saying confirmed *Cronobacter* or confirmed *Salmonella.*

---

[64] The energy center is the department that ensures the plant utilities are operational.

411. **Delayed and Restricted Root Cause Analyses.** On January 24, 2023, several additional pNCRs were opened retrospectively and belatedly for additional findings of confirmed *Cronobacter* results at Casa Grande. These pNCRs were first initiated and entered into ABTRAQ between January 24-26, 2023, although they referenced confirmed *Cronobacter* results from October 28, 2022, November 2, 2022, December 22, 2022, and December 28, 2022. The extreme delay in initiating pNCRs for confirmed events occurring four months prior reflects a pattern of conduct by Abbott to not diligently and timely conduct root cause analyses, if not a larger pattern to hide the multiple positive *Cronobacter* and *Salmonella* findings.

412. Moreover, Contreras applied pressure to delay initiating the QRs and spoke to the need to "find an alternate root cause" for issues related to product quality and production. For example, one partial root cause finding was condensate/moisture, but Contreras refused to permit that to be a finding because it would have major implications, in her words. In effect, Contreras pressured CAPA employees to change conclusions about the root causes of product quality failures by requiring identification of alternate root causes.

413. **EMP Results.** In addition to delaying reporting and investigation into environmental results of *Cronobacter* and *Salmonella*, Abbott also attempted to hide EMP results from the plant at large. Relator K. Cooper was present in a plant-wide meeting at which Casa Grande Director of Operations Douglas Taylor stated that Casa Grande had not had environmental hits since May 2022, implying Casa Grande had not had an environment hit in almost a year.

414. **LIR Manipulation.** Another change made by Abbott to hide information from regulators, was Abbott's change of its use of NCRs, pNCRs, and Quality Assessments in late-2022. As of mid-2025, Abbott was no longer using Quality Assessments and instead is hiding a number of Micro Lab-related events through Laboratory Investigation Reports ("LIRs").

Importantly, LIRs are also no longer subject to the CAPA process. This was done to avoid producing information when FDA requests pNCs or NCs as they normally do during investigations. Now if FDA asks for pNCs or NCs, they will not get Micro Lab-related events.

415. **Record Maintenance.** Abbott also implemented a strategy to misrepresent to FDA the company's microcontamination testing and record maintenance. A Casa Grande session of Abbott's Food Safety Fair in January 2023 was led by Wendy Fox, Abbott Division Manager Global Microbiology QA, R&D QA, who was accompanied by Nick Cellar, Abbott Director Global Analytical & Food Safety.

416. Wendy Fox, who was identified as Abbott Division's microcontamination subject matter expert discussed genome sequencing and how that can be used to trace bacteria. Fox explained that Abbott wanted to be careful with their data storage following FDA's action at Blue Bell Creameries ("Blue Bell"). In that case, FDA sequenced bacteria in Blue Bell ice cream that Blue Bell had also sequenced and maintained related records for approximately 10 years. According to Fox, those records constituted sufficient evidence for FDA to hold Blue Bell accountable as the source of contamination. The Blue Bell story was a cautionary tale, relayed as an explanation for why Abbott wants to be careful how they keep that kind of data and for how long.

417. Fox went on to describe Abbott's FDA-defense strategy. Fox explained a situation in which FDA enriched (a.k.a. added water) to infant powder, incubated the product, and found bacteria (potentially *Salmonella*). Fox instructed that the bacterial contaminant was not at detectable levels in the powder "as produced" insinuating that the reason the product tested positive for contamination was due to the water FDA added, as opposed to an issue with the

powdered infant formula. Of course, to use the powdered infant formula product, a consumer must add water.

418. **Selective Information Provided.** Abbott provided misleading information during a National Sanitation Foundation Institute Safe Quality Foods ("SQF") visit to Casa Grande for its plant certification between February 20-23, 2023. SQF specifically made a written request for the most recently released batches of three fluid codes. As instructed, Relator K. Cooper pulled the most recently released batches and management sent two of them back because they had QRs that they did not want to show to the SQF auditor. Instead Abbott showed SQF the batches they wanted to show them, as opposed to what was requested.

419. At the same time, the SQF auditor also asked for them to trace a cotton candy flavoring used in a batch. There were two lots used in the batch and Abbott asked from which SQF wanted to see the trace. SQF requested to review the lot that used the greater quantity of the cotton candy flavoring. Gonzales performed the trace on the lot in which the cotton candy flavoring was used the most and the lot did not reconcile. So, she traced the other lot (the one SQF did not want). It reconciled, and that one was provided to SQF instead.

420. Further, in March 2024, Abbott actively blocked accurate root cause analysis from being recorded in a positive swab QR that FDA inquired about during their visit. In at least one instance, a root cause was internally provided and management decided that could not be the root cause identified in the QR which would be provided to FDA.

421. Also during FDA's February-March 2024 inspection at Casa Grande, Abbott took certain unusual steps to mitigate FDA's detection of violations, including a complete halt on micro testing of batches while FDA was on-site. On February 28, 2024, Abbott instructed Casa Grande

to stop micro testing powdered infant formula. Abbott additionally stopped releasing batches while FDA was onsite.

422. The issues at Casa Grande persist in 2025, and Abbott continues to try to conceal the violations contributing to the substandard product. For example, the Casa Grande dryer has flooded several times in mid-2025 and Abbott manipulated the QR to not accurately reflect the water event. The flooding resulted in CIP water pouring down several floors of the dryer, backing up floor drains, and exposing hoppers 2027 and 2028 to water as the water traveled down the outside of the hoppers and surrounding equipment from one floor to the next. The powder in hopper 2027 was destroyed while the powder from hopper 2028 was filled into FP and then 3x5ed. However, the plan was for the QR to not clearly explain the extent of the water pouring down hoppers.

423. Further, Casa Grande in mid-2025 was in a very bad state. Due to extraneous matter ("EM") and microcontamination issues, the plant was unable to release almost any product. There were major brackets due to EM and some micro issues due to the dryer flooding with what may have been leaking CIP fluid. If something did not change to alleviate warehouse capacity, production would have had to shut down. The instruction came from Abbott Division, pushing Casa Grande to release product regardless of the contamination issues. A July 31, 2025, email, written by Alvaro Carvalheira, Abbott Director North American Logistics, subject "Urgent!!! RE: Casa Capacity Elevation – 07/31/2025" reflects this, stating if the capacity issues could not be resolved promptly, the potential production impact needed to be escalated to ANSC leadership in advance.

424. The main cause of Casa Grande's continuous warehouse capacity issues was the RPB EM situation which continued to unfold and in August 2025, appeared to affect both product

in Abbott control and on the market. Partial batches of product currently on market could have been placed on hold and should have been placed on hold based on Abbott's repeated sampling, which consistently resulted in finding EM in sampled batches throughout the bracket. Abbott does not sample anything that is on market—to the extent that Abbott will not test released batches with product both on market and in Abbott control. So batches that were split between being on market and in Abbott control ***and*** in the bracket were not sampled, even though based on sampling of surrounding batches in the bracket it was assumed the batches on market in the bracket would fail EM sampling for the same EM that led to the bracket. Batches fully in Abbott control that were sampled and contained EM were set to be destroyed.

425. On August 7, 2025, Abbott held a meeting via phone with the on market event team, including Abbott Division medical and regulatory teams, Division Vice President of North America Quality Operations Abbott Nutrition Christian Lee, and Casa Grande personnel. Purportedly, everyone except for Lee agreed that the bracketed batches should be destroyed because there is no justification based on sampling data to re-release product from the batches partially on hold and partially on market, all contained in the EM bracket. Lee purportedly disagreed with destroying the batches and in the meeting told regulatory that he does not need anyone to complete a task, nor does he need a QR to remove product from Abbott Division hold because he could release the product and the information already in the QR could be removed. Casa Grande Director of Quality Operations Stefanie Crum ended the call by stating that the next action was to remove the EM information from the QR.

426. Abbott Division medical and regulatory teams reportedly did not agree that there was sufficient justification to release the partially on hold batches, but Lee was the one demanding that the QR be changed. To that end, Crum instructed the QR to be altered, as per Lee's demand.

427. Based on the sampling data resulting in EM, the data led to the informed conclusion that the product on market from the bracket likely also contains EM, therefore, there is no justification to release portions of those bracketed batches still in Abbott control. Further, on market batches may very well contain EM. Regardless of this data-based approach, Lee's directive was supported by both Casa Grande Directors, Crum and Casa Grande then-interim Site Director Jason Szymonik.

## X. RETALIATION.

428. In violation of the FCA's anti-retaliation prohibitions, Abbott retaliated against Relators during the course of employment.

429. Despite the palpable fear of retaliation that pervaded the Sturgis facility, with increasing frequency Relator Millard raised concerns with management. His concerns were addressed to Fry, his immediate supervisor, and to Elgan, as well as others at Sturgis, and ultimately a few individuals at Abbott Division. Relator Millard's frequent efforts to raise concerns were well known to Abbott's QS staff.

430. Among the concerns raised by Millard and the practices to which he objected included:

- *Questionable Clean-in-Place (CIP) Practices.* Inadequate training and experience of individuals conducting CIP chart audits and, despite representations to the FDA, no regularized review of CIP charts prior to a release of a batch.

- *Spot Cleaning Instead of Entire Area Cleaning.* Positive environmental swab tests led only to re-cleaning and re-swabbing of a localized area as opposed to an entire area.

- *Refusal to Falsely Certify Verifications.* Monthly and, at times, more frequently Millard refused to sign verifications based on the word of others.

- *The Release of Inadequately Tested Infant Formula.* The release of untested product outside of a "time code removal."

- *Performing Seam Checks on Empty Cans.* Failing to disclose in batch records the practice of performing seam checks on empty cans.

- *Shuffling the Deck to Conceal Low-Fill Weights.* Cases of under-filled product were spread among pallets to avoid detection based on weight.

- *The Lack of Traceability of Products.* The frequency of mislabeled or unlabeled pallets due to repeated failures of the automated labeler.

- *Inadequate Training to Interact with Third-Party Labs.* Putting an inadequately trained person in charge interacting with third-party labs.

- *Overriding Quality Assessments to Meet Metrics.* Directing staff to apply codes to justify adverse events being deemed acceptable for releasing product.

- *Failing to Recall Suspect Product in the Marketplace.* Failing to recall product after product within its control derived from the same batches were destroyed.

- *The Lack of Accountability.* Ongoing practices that were tolerated despite being in violation of FDA record-keeping practices.

431. Fry's animus toward Relator Millard knew no bounds. Increasingly over time, Elgan and Fry's retaliation toward him manifested itself in various ways. Opportunities for professional development were blocked; less qualified employees were promoted over him; and his efforts to become a salaried employee were delayed. Despite his multiple recognitions in past years, Relator Millard's evaluations began to suffer. In February 2020, he was written up for an incident involving a testing procedure that was known to cause mistakes.

432. Just months later in July 2020, Fry contrived to make a second incident the basis for prompting an "independent" investigation into Relator Millard's actions by Abbott's Employee Relations ("ER") unit. Fry falsely claimed that Relator Millard was responsible for releasing an out-of-specification product. Fry later admitted re-writing the report that cited the three incidents relied on to justify Relator Millard's termination. As Relator K. Cooper can attest, the February

and July incidents were identical to similar incidents for which she and others received no discipline of any kind.

433. As to the third incident, any oversight on Relator Millard's part was caught, corrected, and disclosed by him. In re-writing the ER report, Fry failed to disclose that what occurred was caused by false certifications of projection pages by staff subject to Elgan and her oversight. Projection pages were repeatedly falsified as being complete by four individuals on nine separate batches. None of the responsible individuals were ever cited or otherwise disciplined for their violations.

434. Abbott's pattern of retaliation only continued. After Relator Millard's 34-page redacted confidential disclosure to the FDA was placed in the Congressional Record, on April 28, 2022, making it public, Abbott immediately responded with the issuance of a false, derogatory, and irrelevant press statement. It claimed that the "former employee was dismissed due to serious violations of Abbott's food safety policies." To this day, that press statement remains on Abbott's website and Abbott continues to repeat the false claim in response to press inquiries.[65]

435. Further, attributable to their relationship with Relator Millard, the Coopers suffered retaliation at the Sturgis facility. It prompted their relocation to Casa Grande. It also led to Relator K. Cooper's annual raise being reduced and unsubstantiated low performance evaluation percentages. Prior to this, Relator K. Cooper received multiple Abbott Excellence Awards and never failed to achieve expectations in annual reviews. Before their relocation, Relator K. Cooper was outed by Abbott management for cooperating with a Michigan OSHA investigation.

---

[65]It should be noted that the two complaints that Millard filed under the Food Safety and Modernization Act ("FSMA"), 21 U.S.C. § 399d, were recently withdrawn. As opposed to the merits, protecting the Coopers, the other Relators, from certain retaliation prompted the withdrawals. Relator K. Cooper is an essential witness to corroborating Relator Millard's claims.

436. Retaliation against Relator K. Cooper continued and became more overt. In early July 2023, Relator K. Cooper's new supervisor, Candace McGowan, informed Relator K. Cooper that "Arlene is on the war path and wants to write you up. She tried to get me to write you up the first week I was here." Contreras' purported basis for having Relator K. Cooper written up was for a lack of completed reviews. At the time, Relator K. Cooper and Andy Cortez were the sole two staff members responsible for release reviews, a responsibility that was previously assigned to a team of 4-5 individuals supporting release. Contreras told McGowan to write Relator K. Cooper up during a conversation also witnessed by Relator K. Cooper's peers, Ciara Gonzales and Mrinalini Kanyal, CAPA Coordinator.

437. Contreras then resorted to pretextual reasons to give Relator K. Cooper bad reports because she had no basis to do so regarding actual performance. Months prior, when Relator K. Cooper had tried to move from Abbott QS to Validation Engineering, Contreras denied Relator K. Cooper's transfer and by way of explanation noted that she had spoken to Susan Elgan at Abbott's Sturgis plant.

438. In mid-June 2023, Contreras again approached Relator K. Cooper in the presence of McGowan and admonished her for a lack of reviews completed. McGowan defended Relator K. Cooper and reinforced that Relator K. Cooper was hindered by a lack of support. Following a promise by Contreras and Taylor to Abbott management to get batches released during Father's Day weekend, at first Relator K. Cooper was asked to sign the "approved product for release" line with a footnote saying "pending micro" for Ciara Gonzales to finish the review and release, a plan with which Relator K. Cooper was not comfortable since it is her responsibility to release batches and her name would be on the batch regardless of the micro results. Relator K. Cooper would not sign the "approved" line when items are pending because if anything is pending, then the batch is

not approved for release, so it would be wrong to sign off with approval, as Contreras was asking her to do.

439. Relator K. Cooper and Andy Cortez offered to work during the weekend to review the complete documentation, but Contreras said they were not permitted to be on-site during the weekend. In light of Contreras' push to write up Relator K. Cooper for lack of reviews completed, Relator K. Cooper was forced to sign the incomplete batches and leave them as Ciara Gonzales' responsibility.

440. When Relator K. Cooper inquired of her supervisor how she was banned from working for the weekend, as an exempt non-hourly employee, something that had never happened before and was during a timeframe when Contreras was complaining about Relator K. Cooper's lack of reviews, there was no plausible reason.

441. In late June 2023, McGowan informed Relator K. Cooper that Contreras was forcing McGowan to write a record of discussion ("ROD") for Relator K. Cooper because she was on a list that she has a training due in 8 days. Relator K. Cooper notes that there are numerous employees on the same list and did not hear that Contreras was writing any of the others up for this. In fact, Contreras herself was on 8-day the list that year numerous times. McGowan further reported that in discussions with Contreras, Contreras informed McGowan that Relator K. Cooper was friends with "the whistleblower."

442. Contreras, and then Crum when she took over Contreras' role, continued to side-line Relator K. Cooper from meetings in which she should be included and from performing her job functions. For example, Contreras would avoid contact with Relator K. Cooper and refuse to ask Relator K. Cooper about her direct report employees, instead asking Relator K. Cooper's co-workers, creating a strained work environment because it seemed Relator K. Cooper had done

something wrong. This went on with Contreras for months before August 2023. Following Contreras's departure from Casa Grande, Crum took up the role and the continued retaliation against Relator K. Cooper. In one instance, in December 2024, Relator K. Cooper's direct supervisor, McGowan, told Relator that McGowan had told Crum that Relator K. Cooper was her backup and Crum made it very clear to McGowan that "you have two backups, Mrinalini and Chris Wooten." Crum went as far as to tell McGowan she needed to "start training Mrinalini on the people leader tasks", circumventing Relator K. Cooper. When Relator K. Cooper remarked to McGowan in substance that "they're never going to let me out of my role", McGowan replied in substance, "no, they're not", confirming Relator K. Cooper's fear that she was blacklisted by management and being blocked from moving up in her career.

443. In addition to affecting Relator K. Cooper's ability to perform her job functions, Abbott additionally retaliated against Relator K. Cooper by limiting her salary and providing negative performance reviews. In 2023, when McGowan independently reviewed K. Cooper's annual performance, Relator K. Cooper received a 5% raise—the highest she was ever given. That review did not include input from Contreras who was on leave at the time. In 2024, Relator K. Cooper's assessment is believed to have incorporated Crum's feedback, and Relator K. Cooper received a 3.5% raise. At the time Relator K. Cooper pulled data showing that her employees had the best performance rates based on error data tracked by Abbott. In fact, in the 2023 review, McGowan complimented Relator K. Cooper for holding people accountable, as opposed to the 2024 assessment reviewed by Crum that claimed Relator K. Cooper's interactions with her employees were inappropriate because she treated them as peers.

444. In April 2025, Relator K. Cooper was inappropriately put on a performance review plan ("PIP"). Relator K. Cooper was the only supervisor from the end of September 2024 to March

2025, meaning Relator K. Cooper was put in a position to do the work of two or more employees. Crum repeatedly admonished McGowan during this time for not holding Relator K. Cooper accountable. Crum was pressuring Relator K. Cooper's supervisor to have Relator K. Cooper step down from her supervisory position as an FLL before she went out on medical leave, which Relator K. Cooper refused and explained that she prioritized assignments as the only FLL and her stepping down would not solve any problems.

445. Relator L. Cooper also has faced retaliation. The position he was promised at Casa Grande was as a Multicraft Maintenance Technician, salary grade 8. Upon his arrival, Abbott attempted to make his corporate move a lateral one, rather than a promotion. He was told that he would be a Mechanic 2, salary grade 7. Relator L. Cooper spent months dealing with Abbott to give him what he had been promised as far as title, as well as pay grade. Abbott further withheld Relator L. Cooper's annual merit raise – a raise that is given annually to all employees that becomes effective on April 1 of each year. Relator L. Cooper again had to fight to get this annual merit increase. On April 28, 2022, the day a particular news article was published detailing additional deficiencies within Sturgis, Relator L. Cooper finally received verbal notification from Human Resources that he would receive his merit and back pay. The back pay he was due was finally paid out in mid-June 2022, which was two and a half months after all other employees received their raises.

## XI. DAMAGES.

446. Abbott has fraudulently concealed a systemic practice of knowingly releasing, to the most vulnerable of our population, substandard, adulterated, and non-compliant infant formula and nutritional therapy products that have been exposed or that pose undue risk of being exposed to microbiological contaminants. The extensive efforts to intentionally conceal these and other questionable practices not only deceived vulnerable consumers and caregivers, but also extended

to FDA, HHS, CMS, and other federal and state authorities. The conduct continues to this day and continues to expose this population to serious medical concerns, including death. Relators therefore see an urgency in bringing their evidence.

447. Relators allege that each and every claim submitted to the federal and state programs in violation of the clear conditions of payment for reimbursement for the use of Abbott product is a false and fraudulent claim for payment under the FCA.

448. The United States and the states of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Utah, Vermont, Washington, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, Doe States 1-19, Doe Territories 1-5, and Doe Indian Tribal Organizations 1-33 have suffered damages as a result of the acts and practices of Defendant, as described herein, in presenting, causing to be presented, and conspiring to present false and fraudulent claims, statements, and records to the United States for adulterated, substandard, and non-compliant infant formula and nutritional therapy products for which Defendant was not entitled to payment.

449. Defendant's false statements were material to the decision of the United States to pay for the adulterated, substandard, and non-compliant infant formula and nutritional therapy products.

450. Defendant profited unlawfully from the payment of the false and fraudulent claims by the United States, the States, the Territories, and the Indian Tribal Organizations.

451. Damages to the United States, the States, the Territories, the Indian Tribal Organizations, and the Federal Payer Programs are substantial.

452. The States of California and Illinois have also suffered damage as a result of the acts and practices of Defendant, as described herein, in presenting or causing to be presented and conspiring to present false and fraudulent claims, statements, and records to private insurance companies.

**COUNT I**
**VIOLATIONS OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(A)**

453. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

454. The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

455. By virtue of the acts described herein, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

456. Each claim for payment presented or caused to be presented for reimbursement of adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

457. Unaware that Defendant submitted false statements to conceal its misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein. These claims would not have been paid but for Defendant's fraud and false statements.

458. In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendant.

**COUNT II**
**VIOLATIONS OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(B)**

459. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

460. The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

461. By virtue of the acts described herein, Defendant knowingly presented, or caused to be presented, false or fraudulent records or statements material to false or fraudulent claims for payment of adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that the records and statements were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the records and statements, or acted in reckless disregard for whether the records and statements were true or false.

462. Each false or fraudulent record or statement material to a false or fraudulent claim for payment or reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

463. Unaware that Defendant submitted false records or statements to conceal its misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid the false claims submitted for Defendant's adulterated, substandard, and non-compliant infant formula and nutritional therapy products. These claims would not have been paid but for Defendant's fraud and false statements.

464. In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendant.

**COUNT III**
**VIOLATIONS OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(C)**

465. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

466. The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), provides in relevant part that any person who:

> conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

467. By virtue of the acts described herein, Defendant conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. Defendant knew that these claims were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

468. Unaware of the conspiracy to submit false records and/or statements to conceal its misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid the false claims submitted for Defendant's adulterated, substandard, and non-compliant infant formula and nutritional therapy products. These claims would not have been paid but for Defendant's fraud and false statements.

469. In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States have paid said claims and have suffered financial losses as a result of these acts by Defendant.

**PRAYER AS TO COUNTS I-III**

WHEREFORE, Relators pray that this Court enter judgment on behalf of Relators and against Defendant in Counts I-III, respectively, as follows:

(1) Damages in the amount of three times the actual damages suffered by the United States Government as a result of Defendant's conduct;

(2) Civil penalties against Defendant equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

(3) The fair and reasonable sum to which Relators are entitled under 31 U.S.C. § 3730(b); additionally, Relators are entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from any Defendant) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from Defendant;

(4) All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

(5) Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

(6) Relators' individual damages, if any, which may be alleged; and

(7) All other relief on behalf of Relators or the United States Government to which they may be justly entitled, under law or in equity, and the Court deems just and proper.

## COUNT IV
## VIOLATIONS OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3730(h)

470. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

471. The False Claims Act, 31 U.S.C. § 3730(h), prohibits employers from taking adverse actions against any employee, contractor or agent who is:

> discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

> Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

472. Relators reported Abbott's continuous and systemic violations of federal and state laws to their superiors. When no remedial actions were taken, Relators continued to report to their superiors and additionally reported to federal agencies, among others.

473. Following Relators' reporting to management, Relators received sub-par evaluations and reduced annual bonuses, among other retaliatory acts. Relator Millard additionally was terminated due to retaliation.

**PRAYER AS TO COUNT IV**

WHEREFORE, Relators pray that this Court enter judgment on behalf of Relators and against Defendant in Count V, respectively, as follows:

(1) Damages in the amount of three times the actual damages suffered by the Relators as a result of Defendant's conduct;

(2) All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

(3) Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law; and

(4) All other relief to which Relators may be justly entitled, under law or in equity, and the Court deems just and proper.

**COUNT V**
**UNJUST ENRICHMENT**

474. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

475. Relators, on behalf of the United States, claim the recovery of all monies by which Defendant has been unjustly enriched, including profits earned by Defendant because of overcharging Medicare, Medicaid, and other Federal Payer Programs for adulterated, substandard, and non-compliant infant formula and nutritional therapy products.

476. By obtaining monies as a result of its violations of federal and state law, Defendant was unjustly enriched, and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

**PRAYER AS TO COUNT V**

WHEREFORE, Relators pray that this Court enter judgment on behalf of Relators and against Defendant in Count IV as follows:

(1) Damages sustained by the United States, including the amounts Defendant unlawfully obtained;

(2) All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

(1) Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

(2) Relators' individual damages, if any, which may be alleged; and

(3) All other relief on behalf of Relators or the United States Government to which they may be justly entitled, under law or in equity, and the Court deems just and proper.

**COUNT VI**
**VIOLATIONS OF THE ARKANSAS MEDICAID FCA**
**ARK. CODE ANN. § 20-77-902**

477. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

478. This is a *qui tam* action brought by Relators and the State of Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid False Claims Act, ARK. CODE ANN. § 20-77-902.

479. ARK. CODE ANN. § 20-77-902 provides liability for any person who-

> (1) Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;
>
> (2) At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment; or
>
> (3) Having knowledge of the occurrence of any event affecting his or her initial or continued right to any benefit or payment or the initial or continued right to any benefit or payment of any other individual in whose behalf he or she has applied for or is receiving a benefit or payment knowingly conceals or fails to disclose that event with an intent fraudulently to secure the benefit or payment either in a greater amount or quantity than is due or when no benefit or payment is authorized.

480. Defendant violated ARK. CODE ANN. § 20-77-902 and knowingly caused false claims to be made, used and presented to the State of Arkansas by its violations of federal and state laws, including false or fraudulent claims for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

481. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

482. The State of Arkansas, by and through the Arkansas Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

483. Compliance with applicable Medicaid and various other federal and state laws was a condition of payment of claims submitted to the State of Arkansas. Had the State of Arkansas known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

484. As a result of Defendant's violations of ARK. CODE ANN. § 20-77-902, the State of Arkansas has been damaged.

485. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to ARK. CODE ANN. § 20-77-902 on behalf of themselves and the State of Arkansas.

486. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Arkansas in the operation of the Medicaid program.

**PRAYER AS TO COUNT VI**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF ARKANSAS:

i. Three times the amount of actual damages which the State of Arkansas has sustained as a result of Defendant's fraudulent and illegal practices;

ii. A civil penalty of not less than $5,000 and not more than $10,000 for false claim which Defendant presented or caused to be presented to the State of Arkansas;

iii. Prejudgment interest; and

iv. All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to ARK. CODE ANN. § 20-77-911 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) Such further relief as this Court deems equitable and just.

**<u>COUNT VII</u>**
**VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT**
**CAL. GOV'T CODE § 12651(a)**

487. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

488. This is a *qui tam* action brought by Relators and the State of California to recover treble damages and civil penalties under the California False Claims Act, CAL. GOV'T CODE § 12650 *et. seq*.

489. CAL. GOV'T CODE § 12651(a) provides liability for any person who-

(1) Knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

490. Defendant violated CAL. GOV'T CODE § 12651(a)(1)-(3) and knowingly caused false claims to be made, used and presented to the State of California by its violations of federal and state laws and submitted false or fraudulent claims for payment for adulterated, substandard,

and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

491. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

492. The State of California, by and through the California Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

493. Compliance with applicable Medicaid and various other federal and state laws was a condition of payment of claims submitted to the State of California. Had the State of California known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

494. As a result of Defendant's violations of CAL. GOV'T CODE §12651(a), the State of California has been damaged.

495. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to CAL. GOV'T CODE § 12652(c) on behalf of themselves and the State of California.

496. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of the Medicaid program.

**PRAYER AS TO COUNT VII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively,

To the STATE OF CALIFORNIA:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to CAL. GOV'T CODE § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT VIII**
**VIOLATIONS OF THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT**
**CAL. INS. CODE § 1871.7(b)**

497. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

498. This is a *qui tam* action brought by Relators and the State of California to recover treble damages and civil penalties under the California Insurance Frauds Prevention Act, CAL. INS. CODE § 1871 *et. seq.*

499. CAL. INS. CODE § 1871.7(b) provides liability for any person who violates any provision of Section 1871.7 or Section 549, 550, or 551 of the California Penal Code. Violators shall be subject, in addition to any other penalties prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation.

500. CAL. PENAL CODE § 550(b) makes it unlawful to do, knowingly assist or conspire with any person to do, *inter alia*:

> (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
>
> (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
>
> (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.
>
> (4) Prepare or make any written or oral statement, intended to be presented to any insurer or producer for the purpose of obtaining a motor vehicle insurance policy, that the person to be the insured resides or is domiciled in this state when, in fact, that person resides or is domiciled in a state other than this state.

501. Defendant violated CAL. PENAL CODE § 550(b) and CAL. INS. CODE § 1871.7(b) when it knowingly caused false claims to be made, used and presented to private insurance companies, false or fraudulent claims for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

502. Had the private insurance companies known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

503. As a result of Defendant's violations of CAL. PENAL CODE § 550(b) and CAL. INS. CODE § 1871.7(b), the State of California has been damaged.

504. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to CAL. INS. CODE § 1871 *et. seq*. on behalf of themselves and the State of California.

505. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California under the California Insurance Frauds Prevention Act.

**PRAYER AS TO COUNT VIII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF CALIFORNIA:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for false claim which Defendant presented or caused to be presented to private insurance companies or pharmacy benefit managers;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to CAL. INS. CODE § 1871.7(g) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT IX**
**VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT**
**COLO. REV. STAT. ANN. § 25.5-4-303.5 *et seq.***

506. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

507. This is a *qui tam* action brought by Relators and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, COLO. REV. STAT. ANN. § 25.5-4-303.5 *et seq*.

508. COLO. REV. STAT. ANN § 25.5-4-305 provides liability for any person who, *inter alia*:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

> (3) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"
>
> (4) Conspires to commit a violation…

509. Defendant violated COLO. REV. STAT. ANN. § 25.5-4-305 and knowingly caused false claims to be made, used and presented to the State of Colorado by its violations of federal and state laws when it caused false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

510. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

511. The State of Colorado, by and through the Colorado Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

512. Compliance with applicable Medicaid and various other federal and state laws was a condition of payment of claims submitted to the State of Colorado. Had the State of Colorado known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

513. As a result of Defendant's violations of COLO. REV. STAT. ANN. § 25.5-4-305, the State of Colorado has been damaged.

514. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to COLO. REV. STAT. ANN. § 25.5-4-305 on behalf of themselves and the State of Colorado.

515. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Colorado in the operation of the Medicaid program.

**PRAYER AS TO COUNT IX**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF COLORADO:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Colorado;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to COLO. REV. STAT. ANN. § 25.5-4-306(3) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT X**
**VIOLATIONS OF THE CONNECTICUT FALSE CLAIMS ACT FOR MEDICAL ASSISTANCE PROGRAMS**
**CONN. GEN. STAT. ANN. § 17b-301a *et seq.***

516. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

517. This is a *qui tam* action brought by Relators and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act for Medical Assistance Programs, CONN. GEN. STAT. ANN. § 17b-301 *et seq.*

518. CONN. GEN. STAT. ANN. § 17b-301b(a) provides liability for any person who, *inter alia*:

> (1) Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;
>
> (2) Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;
>
> (3) Conspire to commit a violation of this section . . . .

519. Defendant violated CONN. GEN. STAT. ANN. § 17b-301b(a) and knowingly caused false claims to be made, used and presented to the State of Connecticut by its violations of federal and state laws, when it caused false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent,

or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

520. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

521. The State of Connecticut, by and through the Connecticut Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

522. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Connecticut. Had the State of Connecticut known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

523. As a result of Defendant's violations of CONN. GEN. STAT. ANN. § 17b-301b(a), the State of Connecticut has been damaged.

524. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to CONN. GEN. STAT. ANN. § 17b-301d(a) on behalf of themselves and the State of Connecticut.

525. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Connecticut in the operation of the Medicaid program.

**PRAYER AS TO COUNT X**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF CONNECTICUT:

(1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Connecticut;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to CONN. GEN. STAT. ANN. § 17b-301e(e) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XI**
**VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT**
**6 DEL. CODE ANN. § 1201 *et seq.***

526. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

527. This is a *qui tam* action brought by Relators and the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 DEL. CODE ANN. § 1201 *et seq.*

528. 6 DEL. CODE ANN. § 1201(a) provides liability for any person who, *inter alia*:

> (1) Knowingly presents, or causes to be presented to an officer or employee of the Government a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

529. Defendant violated 6 DEL. CODE ANN. § 1201(a) and knowingly caused false claims to be made, used and presented to the State of Delaware by its violations of federal and state laws when it caused false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

530. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

531. The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

532. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Delaware. Had the State of Delaware known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

533. As a result of Defendant's violations of 6 DEL. CODE ANN. § 1201(a), the State of Delaware has been damaged.

534. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to 6 DEL. CODE ANN. § 1203(b) on behalf of themselves and the State of Delaware.

535. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Delaware in the operation of the Medicaid program.

**PRAYER AS TO COUNT XI**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF DELAWARE:

(1) Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Delaware;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to 6 DEL. CODE ANN. § 1205 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XII
## VIOLATIONS OF THE DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT
## D.C. CODE ANN. § 2-381.01 *et seq.* [formerly D.C. CODE ANN. §2-308.13 *et seq.*]

536. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

537. This is a *qui tam* action brought by Relators and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. CODE ANN. § 2-381.01 *et seq.*

538. D.C. CODE ANN. § 2-381.02 provides liability for any person who, *inter alia*:

i. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

ii. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

iii. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District;

iv. Conspires to commit a violation of [the above] paragraph[s].

539. Defendant violated D.C. CODE ANN. § 2-381.02 and knowingly caused false claims to be made, used and presented to the District by its violations of federal and state laws, including by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was

deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

540. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

541. The District, by and through the District's Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

542. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the District. Had the District known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

543. As a result of Defendant's violations of D.C. CODE ANN. § 2-381.02 the District has been damaged.

544. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to D.C. CODE ANN. § 2-381.03 on behalf of themselves and the District.

545. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the District in the operation of the Medicaid program.

**PRAYER AS TO COUNT XII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the DISTRICT OF COLUMBIA:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the District;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to D.C. CODE ANN. § 2-381-03 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XIII**
**VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT**
**FLA. STAT. ANN. § 68.081 *et seq.***

546. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

547. This is a *qui tam* action brought by Relators and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, FLA. STAT. ANN. § 68.081 *et seq*.

548. FLA. STAT. ANN. § 68.082(2) provides liability for any person who, *inter alia*:

i. Knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

ii. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

iii. Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

549. Defendant violated FLA. STAT. ANN. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by its violations of federal and state laws, including by causing false or fraudulent claims to be submitted for infant formula and nutritional therapy to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

550. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

551. The State of Florida, by and through the Florida Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

552. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Florida. Had the State of Florida known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

553. As a result of Defendant's violations of FLA. STAT. ANN. § 68.082(2) the State of Florida has been damaged.

554. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to FLA. STAT. ANN. § 68.083(2) on behalf of themselves and the State of Florida.

555. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Florida in the operation of the Medicaid program.

**PRAYER AS TO COUNT XIII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF FLORIDA:

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Florida;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to FLA. STAT. ANN. § 68.085 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XIV**
**VIOLATIONS OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT**
**GA. CODE ANN. § 49-4-168 *et seq.***

556. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

557. This is a *qui tam* action brought by Relators and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, GA. CODE ANN. §§ 49-4-168 to 168.6.

558. GA. CODE ANN. § 49-4-168.1 provides liability for any person who, *inter alia*:

> (1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;
>
> (3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

559. Defendant violated GA. CODE ANN. § 49-4-168.1 and knowingly caused false claims to be made, used and presented to the State of Georgia by its violations of federal and state laws, including by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

560. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

561. The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

562. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Georgia. Had the State of Georgia known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

563. As a result of Defendant's violations of GA. CODE ANN. § 49-4-168.1 the State of Georgia has been damaged.

564. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to GA. CODE ANN. § 49-4-168.2(b) on behalf of themselves and the State of Georgia.

565. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Georgia in the operation of the Medicaid program.

**PRAYER AS TO COUNT XIV**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF GEORGIA:

(1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendant's fraudulent and

illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Georgia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to GA. CODE ANN. § 49-4-168.2(I) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XV
## VIOLATIONS OF THE HAWAII FALSE CLAIMS ACT
## HAW. REV. STAT. § 661-21 *et seq.*

566. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

567. This is a *qui tam* action brought by Relators and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, HAW. REV. STAT. § 661-21 *et seq*.

568. HAW. REV. STAT. § 661-21 provides liability for any person who, *inter alia*:

(1) Knowingly presents or causes to be presented to an officer or employee of the State a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

569. Defendant violated HAW. REV. STAT. § 661-21 and knowingly caused false claims to be made, used and presented to the State of Hawaii by its violations of federal and state laws, including by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

570. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

571. The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

572. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Hawaii. Had the State of Hawaii known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

573. As a result of Defendant's violations of HAW. REV. STAT. § 661-21, the State of Hawaii has been damaged.

574. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to HAW. REV. STAT. § 661-25 on behalf of themselves and the State of Hawaii.

575. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Hawaii in the operation of the Medicaid program.

**PRAYER AS TO COUNT XV**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF HAWAII:

(1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Hawaii;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to HAW. REV. STAT. § 661-27 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XVI**
**VIOLATIONS OF THE ILLINOIS FALSE CLAIMS ACT**
**740 ILL. COMP. STAT. § 175 *et seq.***

576. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

577. This is a *qui tam* action brought by Relators and the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS § 175 *et seq*.

578. 740 ILCS § 175/3 provides liability for any person who, *inter alia*:

> (1) Knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;
>
> (3) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

579. Defendant violated 740 ILCS § 175/3 and knowingly caused false claims to be made, used and presented to the State of Illinois by its violations of federal and state laws, including 305 ILCS 5/8A-3(b), and by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

580. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

581. The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

582. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Illinois. Had the State of Illinois known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

583. As a result of Defendant's violations of 740 ILCS § 175/3, the State of Illinois has been damaged.

584. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to 740 ILCS § 175/4(b) on behalf of themselves and the State of Illinois.

585. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Illinois in the operation of the Medicaid program.

**PRAYER AS TO COUNT XVI**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF ILLINOIS:

(1) Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Illinois;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to 740 ILCS § 175/4(d) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XVII**
**VIOLATIONS OF THE ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT**
**740 ILL. COMP. STAT. 92/1 *et seq.***

586. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

587. This is a *qui tam* action brought by Relators and the State of Illinois to recover treble damages and civil penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq*.

588. 740 ILCS 92/1 provides liability for any person who violates any provision of Section 92/1 or Section 17-8.5 or 10.5 of the Criminal Code of 1961 or 2012, or Article 46 of the Criminal Code of 1961. Violators shall be subject, in addition to any other penalties prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation.

589. ILL. CRIM. CODE § 17-10.5(a) states:

(1) A person commits insurance fraud when he or she

knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property

(2) A person commits health care benefits fraud against a provider, other than a governmental unit or agency, when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider.

590. "Deception" means knowingly to:

(1) Create or confirm another's impression which is false and which the offender does not believe to be true; or

(2) Fail to correct a false impression which the offender previously has created or confirmed; or

(3) Prevent another from acquiring information pertinent to the disposition of the property involved; or

(4) Sell or otherwise transfer or encumber property, failing to disclose a lien, adverse claim, or other legal impediment to the enjoyment of the property, whether such impediment is or is not valid, or is or is not a matter of official record; or

(5) Promise performance which the offender does not intend to perform or knows will not be performed. Failure to perform standing alone is not evidence that the offender did not intend to perform.

591. Defendant violated 740 ILCS § 92/1 and ILL. CRIM. CODE § 17-10.5(a) when it knowingly caused false claims to be made, used and presented to private insurance companies or PBMs, false or fraudulent claims for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the

truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

592. Had the private insurance companies and PBMs known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

593. As a result of Defendant's violations of 740 ILCS 92/1 and ILL. CRIM. CODE § 17-10.5(a), the State of Illinois has been damaged.

594. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to 740 ILCS § 92/15 on behalf of themselves and the State of Illinois.

595. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Illinois under the Illinois Insurance Claims Fraud Prevention Act.

**PRAYER AS TO COUNT XVII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF ILLINOIS:

(1) Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to private insurance companies or pharmacy benefit managers;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to 740 ILCS 92/25 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVIII
## VIOLATIONS OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
## IND. CODE ANN. § 5-11-5.5-1 *et seq.*

596. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

597. This is a *qui tam* action brought by Relators and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IND. CODE ANN. § 5-11-5.5-1 *et seq*.

598. IND. CODE ANN. § 5-11-5.5-1 provides liability for any person who, *inter alia*, knowingly or intentionally:

(1) presents a false claim to the state for payment or approval;

(2) Makes or uses a false record or statement to obtain payment or approval of a false claim from the State;

* * *

(7) Conspires with another person to perform an act described in subdivisions (1) through (6); or

(8) Causes or induces another person to perform an act described in subdivisions (1) through (6). . . .

599. Defendant violated IND. CODE ANN. § 5-11-5.5-1 and knowingly caused false claims to be made, used and presented to the State of Indiana by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

600. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

601. The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

602. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Indiana. Had the State of Indiana known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

603. As a result of Defendant's violations of IND. CODE ANN. § 5-11-5.5-1, the State of Indiana has been damaged.

604. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to IND. CODE ANN. § 5-11-5.5-4 on behalf of themselves and the State of Indiana.

605. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Indiana in the operation of the Medicaid program.

## PRAYER AS TO COUNT XVIII

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF INDIANA:

(1) Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of at least $5,000 for each false claim which Defendant presented or caused to be presented to the State of Indiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(5) A fair and reasonable amount allowed pursuant to IND. CODE ANN. § 5-11-5.5-6 and/or any other applicable provision of law;

(6) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(7) An award of statutory attorneys' fees and costs; and

(8) Such further relief as this Court deems equitable and just.

## COUNT XIX
## VIOLATIONS OF THE IOWA FALSE CLAIMS ACT
## IOWA CODE ANN. § 685.2 *et seq.*

606. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

607. This is a *qui tam* action brought by Relators and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, IOWA CODE ANN. § 685.2 *et seq*.

608. IOWA CODE ANN. § 685.2 provides liability for any person who, *inter alia*:

i. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

ii. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

iii. Conspires to commit a violation of…

609. Defendant violated IOWA CODE ANN. § 685.2 and knowingly caused false claims to be made, used and presented to the State of Iowa by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

610. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

611. The State of Iowa, by and through the Iowa Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

612. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Iowa. Had the State of Iowa known

that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

613. As a result of Defendant's violations of IOWA CODE ANN. § 685.2, the State of Iowa has been damaged.

614. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to IOWA CODE ANN. § 685.3(2) on behalf of themselves and the State of Iowa.

615. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Iowa in the operation of the Medicaid program.

**PRAYER AS TO COUNT XIX**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF IOWA:

(1) Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendant's fraudulent and illegal practices;

(2) Civil penalties against the Defendant, respectively, equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729, as prescribed by IOWA CODE ANN. § 685.2(1);

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to IOWA CODE ANN. § 685.3(4) and/or any other applicable provision of law;

> (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;
>
> (3) An award of statutory attorneys' fees and costs; and
>
> (4) Such further relief as this Court deems equitable and just.

**COUNT XX**
**VIOLATIONS OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW**
**LA. REV. STAT. § 46:437.1 *et seq.***

616. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

617. This is a *qui tam* action brought by Relators and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. § 46:437.1 *et seq.*

618. LA. REV. STAT. § 46:437.3 provides *inter alia*:

> (1) No person shall knowingly present or cause to be presented a false or fraudulent claim;
>
> (2) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;
>
> (3) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim. . . .

619. Defendant violated LA. REV. STAT. § 46:437.3 when it knowingly caused false claims to be made, used and presented to the State of Louisiana by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was

not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

620. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

621. The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

622. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Louisiana. Had the State of Louisiana known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

623. As a result of Defendant's violations of violated LA. REV. STAT. § 46:437.3, the State of Louisiana has been damaged.

624. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to LA. REV. STAT. § 46:439.1(A) on behalf of themselves and the State of Louisiana.

625. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Louisiana in the operation of the Medicaid program.

**PRAYER AS TO COUNT XX**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF LOUISIANA:

(1) Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to the State of Louisiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to LA. REV. STAT. § 439.4(A) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXI**
**VIOLATIONS OF THE MARYLAND FALSE HEALTH CLAIMS ACT**
**MD. HEALTH-GEN. CODE ANN. § 2-601 *et seq.***

626. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

627. This is a *qui tam* action brought by Relators and the State of Maryland to recover treble damages and civil penalties under the Maryland False Health Claims Act, MD. HEALTH-GEN. CODE ANN. § 2-601 *et seq*.

628. MD. HEALTH-GEN. CODE ANN. § 2-602 provides that a person may not, *inter alia*:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspire to commit a violation under this subtitle;

(4) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

629. Defendant violated MD. HEALTH-GEN. CODE ANN. § 2-602 when it knowingly caused false claims to be made, used and presented to the State of Maryland by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

630. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

631. The State of Maryland, by and through the Maryland Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

632. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Maryland. Had the State of Maryland known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

633. As a result of Defendant's violations of violated MD. HEALTH-GEN. CODE ANN. § 2-602, the State of Maryland has been damaged.

634. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to MD. HEALTH-GEN. CODE ANN. § 2-604(a) on behalf of themselves and the State of Maryland.

635. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Maryland in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXI**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF MARYLAND:

(1) Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to the State of Maryland;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to MD. HEALTH-GEN. CODE ANN. § 2-605 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXII
## VIOLATIONS OF THE MASSACHUSETTS FALSE CLAIMS ACT
## MASS. GEN. LAWS ANN. ch. 12 § 5A *et seq.*

636. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

637. This is a *qui tam* action brought by Relators and the Commonwealth of Massachusetts to recover treble damages and civil penalties under the Massachusetts False Claims Law, MASS. GEN. LAWS ANN. ch. 12 § 5A *et seq.*

638. MASS. GEN. LAWS ANN. ch. 12 § 5B provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

(3) Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(4) Is a beneficiary of an inadvertent submission of a false claim to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

639. Defendant violated MASS. GEN. LAWS ANN. ch. 12 § 5B when it knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

640. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

641. The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

642. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the Commonwealth of Massachusetts. Had the Commonwealth of Massachusetts known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

643. As a result of Defendant's violations of MASS. GEN. LAWS ANN. ch. 12 § 5B the Commonwealth of Massachusetts has been damaged.

644. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to MASS. GEN. LAWS ANN. ch. 12 § 5C(2) on behalf of themselves and the Commonwealth of Massachusetts.

645. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the Commonwealth of Massachusetts in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the COMMONWEALTH OF MASSACHUSETTS:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Massachusetts;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to MASS. GEN. LAWS ANN. ch. 12 § 5F and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXIII**
**VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT**
**MICH. COMP. LAWS § 400.601 *et seq.***

646. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

647. This is a *qui tam* action brought by Relators and the State of Michigan to recover treble damages and civil penalties under the Michigan Medicaid False Claims Act, MICH. COMP. LAW § 400.601 *et seq.*

648. MICH. COMP. LAW § 400.603 states:

> i. A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits.
>
> ii. A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.
>
> iii. A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled.

649. MICH. COMP. LAW § 400.606 states:

> (1) A person shall not enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws.

650. MICH. COMP. LAW § 400.607 states:

> (1) A person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false.

651. Defendant violated MICH. COMP. LAW §§ 400.603, 400.604, 400.606, and 400.607 when it knowingly caused false claims to be made, used and presented to the State of Michigan by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

652. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

653. The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

654. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Michigan. Had the State of Michigan known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

655. As a result of Defendant's violations of MICH. COMP. LAW §§ 400.603, 400.604, 400.606, and 400.607, the State of Michigan has been damaged.

656. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to MICH. COMP. LAW § 400.610a on behalf of themselves and the State of Michigan.

657. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Michigan in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXIII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF MICHIGAN:

(1) Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to the State of Michigan;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to MICH. COMP. LAW § 400.610a and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXIV**
**VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT**
**MINN. STAT. § 15C.01 *et seq.***

658. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

659. This is a *qui tam* action brought by Relators and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, MINN. STAT. § 15C.01 *et seq*.

660. MINN. STAT. § 15C.02 creates liability for any person who, *inter alia*:

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (3) knowingly conspires to commit a violation of [this section] . . .

661. Defendant violated MINN. STAT. § 15C.02 when it knowingly caused false claims to be made, used and presented to the State of Minnesota by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

662. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

663. The State of Minnesota, by and through the Minnesota Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

664. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Minnesota. Had the State of Minnesota known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

665. As a result of Defendant's violations of MINN. STAT. § 15C.02, the State of Minnesota has been damaged.

666. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to MINN. STAT. § 15C.05 on behalf of themselves and the State of Minnesota.

667. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Minnesota in the operation of the Medicaid program.

**PRAYER AS TO COUNT XIV**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF MINNESOTA:

(1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of each Defendant's fraudulent

and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Minnesota;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to MINN. STAT. § 15C.05 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXV**
**VIOLATIONS OF THE MONTANA FALSE CLAIMS ACT**
**MONT. CODE. ANN. § 17-8-401 *et seq.***

668. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

669. This is a *qui tam* action brought by Relators and the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MONT. CODE. ANN. § 17-8-401 *et seq.*

670. Mont. Code Ann. § 17-8-403(1) creates liability for any person who, *inter alia*:

i. knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

ii. knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

iii. conspires to commit a violation of this subsection (1)

iv. knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity

671. Defendant violated MONT. CODE ANN. § 17-8-403(1) and MONT. CODE. ANN. § 45-6-313 when it knowingly caused false claims to be made, used and presented to the State of Montana by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

672. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

673. The State of Montana, by and through the Montana Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

674. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Montana. Had the State of Montana known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

675. As a result of Defendant's violations of MONT. CODE ANN. § 17-8-403(1), the State of Montana has been damaged.

676. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to MONT. CODE ANN. § 17-8-406 on behalf of themselves and the State of Montana.

677. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Montana in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXV**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF MONTANA:

(1) Three times the amount of actual damages which the State of Montana has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Montana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to MONT. CODE ANN. § 17-8-410 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**<u>COUNT XXVI</u>**
**VIOLATIONS OF THE NEVADA FALSE CLAIMS ACT**
**NEV. REV. STAT. ANN. § 357.010 *et seq.***
***as amended by* 2013 Nev. Laws Ch. 245 (S.B. 437) effective July 1, 2013**

678. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

679. This is a *qui tam* action brought by Relators and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. STAT. ANN. § 357.010 *et seq*.

680. Nev. Rev. STAT. ANN. § 357.040 provides liability for any person who, *inter alia*:

i. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

ii. Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim;

iii. Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the state or a political subdivision;

iv. Conspires to commit any acts set forth in this subsection.

681. In addition, NEV. REV. STAT. ANN. § 422.560 prohibits any person from selling or leasing to or for use of a provider goods, services, materials, or supplies for which payment may be made under the Nevada Medicaid program, and offer, transfer, or pay anything of value in return for or in connection with the purchase or lease.

682. Defendant violated NEV. REV. STAT. ANN. §§ 357.040 and 422.560 when it knowingly caused false claims to be made, used and presented to the State of Nevada by its violations of federal and state laws by causing false or fraudulent claims to be submitted for

payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

683. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

684. The State of Nevada, by and through the Nevada Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

685. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Nevada. Had the State of Nevada known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

686. As a result of Defendant's violations of NEV. REV. STAT. ANN. § 357.040 and Nev. Rev. Stat. Ann. § 422.560, the State of Nevada has been damaged.

687. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to NEV. REV. STAT. ANN. § 357.080 on behalf of themselves and the State of Nevada.

688. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Nevada in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXVI**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NEVADA:

(1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Nevada;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to NEV. REV. STAT. ANN. § 357.180 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXVII**
**VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT**
**N.J. STAT. ANN. § 2A:32C-1 *et seq.***

689. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

690. This is a *qui tam* action brought by Relators and the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-1 *et seq.*

691. N.J. STAT. ANN. § 2A:32C-3 states no person shall:

> (1) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;
>
> (3) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

692. Defendant violated N.J. STAT. ANN. § 2A:32C-3 when it knowingly caused false claims to be made, used and presented to the State of New Jersey by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

693. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

694. The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

695. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of New Jersey. Had the State of New Jersey known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

696. As a result of Defendant's violations of N.J. STAT. ANN. § 2A:32C-3, the State of New Jersey has been damaged.

697. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to N.J. STAT. ANN. § 2A:32C-5 on behalf of themselves and the State of New Jersey.

698. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of New Jersey in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXVII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NEW JERSEY:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000, adjusted for inflation according to N.J. STAT. ANN. § 2A:32C-3, for each false claim which Defendant presented or caused to be presented to the State of New Jersey;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to N.J. STAT. ANN. § 2A:32C-7 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**<u>COUNT XXVIII</u>**
**VIOLATIONS OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT**
**N.M. STAT. ANN. § 27-14-1 *et seq.***

699. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

700. This is a *qui tam* action brought by Relators and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-1 *et seq*.

701. N.M. STAT. ANN. § 27-14-4 provides liability for any person who, *inter alia*:

(1) Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;

(2) Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

(3) Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

702. N.M. STAT. ANN. § 44-9-3 makes it illegal to, *inter alia*:

(1) Knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor,

grantee or other recipient of state funds a false or fraudulent claim for payment or approval;

(2) Knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

(3) Conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim;

(4) Conspire to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state;

(5) As a beneficiary of an inadvertent submission of a false claim and having subsequently discovered the falsity of the claim, fail to disclose the false claim to the state within a reasonable time after discovery.

703. Defendant violated N.M. STAT. ANN. § 27-14-4 and § 44-9-3 when it knowingly caused false claims to be made, used and presented to the State of New Mexico by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

704. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

705. The State of New Mexico, by and through the New Mexico Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

706. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of New Mexico. Had the State of New Mexico known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

707. As a result of Defendant's violations of N.M. STAT. ANN. § 27-14-4 and § 44-9-3, the State of New Mexico has been damaged.

708. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to N.M. STAT. ANN. § 27-14-7 and § 44-9-5 on behalf of themselves and the State of New Mexico.

709. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of New Mexico in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXVIII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NEW MEXICO:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of each Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000, for false claim which Defendant presented or caused to be presented to the State of New Mexico;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to N.M. STAT. ANN. § 27-14-9, 44-9-7 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXIX**
**VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT**
**N.Y. STATE FIN. § 187 *et seq.***

710. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

711. This is a *qui tam* action brought by Relators and the State of New York to recover treble damages and civil penalties under the New York False Claims Act, N.Y. STATE FIN. § 187 *et seq.*

712. N.Y. STATE FIN. § 189 provides liability for any person who, *inter alia*:

(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of . . . this subdivision . . .

713. Defendant violated N.Y. STATE FIN. § 189 when it knowingly caused false claims to be made, used and presented to the State of New York by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was

deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

714. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

715. The State of New York, by and through the New York Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

716. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of New York. Had the State of New York known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

717. As a result of Defendant's violations of N.Y. STATE FIN. § 189, the State of New York has been damaged.

718. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to N.Y. STATE FIN. § 190(2) on behalf of themselves and the State of New York.

719. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of New York in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXIX**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NEW YORK:

(1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $6,000 and not more than $12,000, for each false claim which Defendant presented or caused to be presented to the State of New York;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to N.Y. STATE FIN. § 190 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXX**
**VIOLATIONS OF THE NORTH CAROLINA FALSE CLAIMS ACT**
**N.C. GEN. STAT. § 1-605 *et seq.***

720. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

721. This is a *qui tam* action brought by Relators and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq*.

722. N.C. GEN. STAT. § 1-607 provides liability for any person who, *inter alia*:

(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval.

> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.
>
> (3) Conspires to commit a violation of . . . this section.

723. Defendant violated N.C. GEN. STAT. § 1-607 when it knowingly caused false claims to be made, used and presented to the State of North Carolina by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

724. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

725. The State of North Carolina, by and through the North Carolina Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

726. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of North Carolina. Had the State of North Carolina known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

727. As a result of Defendant's violations of N.C. GEN. STAT. § 1-607, the State of North Carolina has been damaged.

728. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to N.C. GEN. STAT. § 1-608(b) on behalf of themselves and the State of North Carolina.

729. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of North Carolina in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXX**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NORTH CAROLINA:

(1) Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000, for each false claim which Defendant presented or caused to be presented to the State of North Carolina;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to N.C. GEN. STAT. § 1-610 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXXI**
**VIOLATIONS OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT**
**63 OKL. ST. ANN. § 5053 *et seq.***

730. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

731. This is a *qui tam* action brought by Relators and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma False Claims Act, 63 OKL. STAT. ANN. § 5053 *et seq*.

732. OKL. STAT. ANN. § 5053.1 provides liability for any person who, *inter alia*:

> (1) Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;
>
> (3) Conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

733. The Oklahoma Medicaid Program Integrity Act, 56 OKL. STAT. ANN. § 1005 makes it unlawful to willfully and knowingly, *inter alia*:

> (1) Make or cause to be made a claim, knowing the claim to be false, in whole or in part, by commission or omission;
>
> (2) Make or cause to be made a statement or representation for use in obtaining or seeking to obtain authorization to provide a good or a service knowing the statement or representation to be false, in whole or in part, by commission or omission;
>
> (3) Make or cause to be made a statement or representation for use by another in obtaining a good or a service under the Oklahoma Medicaid Program, knowing the statement or representation to be false, in whole or in part, by commission or omission;

> (4) Make or cause to be made a statement or representation for use in qualifying as a provider of a good or a service under the Oklahoma Medicaid Program, knowing the statement or representation to be false, in whole or in part, by commission or omission;
>
> (5) Charge any recipient or person acting on behalf of a recipient, money or other consideration in addition to or in excess of rates of remuneration established under the Oklahoma Medicaid Program;
>
> (6) Solicit or accept a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program; or
>
> (7) Having submitted a claim for or received payment for a good or a service under the Oklahoma Medicaid Program, fail to maintain or destroy such records as required by law or the rules of the Oklahoma Health Care Authority for a period of at least six (6) years following the date on which payment was received.

734. Defendant violated 63 OKL. STAT. ANN. § 5053.1 and 56 OKL. STAT. ANN. § 1005 when it knowingly caused false claims to be made, used and presented to the State of Oklahoma by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

735. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

736. The State of Oklahoma, by and through the Oklahoma Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

737. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Oklahoma. Had the State of Oklahoma known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

738. As a result of Defendant's violations of 63 OKL. STAT. ANN. § 5053.1 and 56 OKL. STAT. ANN. § 1005, the State of Oklahoma has been damaged.

739. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to 63 OKL. STAT. ANN. § 5053.2 on behalf of themselves and the State of Oklahoma.

740. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Oklahoma in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXI**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF OKLAHOMA:

(1) Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000, for each false claim which Defendant presented or caused to be presented to the State of Oklahoma;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to 63 OKL. STAT. ANN. § 5053.4 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXXII**
**VIOLATIONS OF THE RHODE ISLAND STATE FALSE CLAIMS ACT**
**R.I. GEN. LAWS § 9-1.1-1 *et seq.***

741. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

742. This is a *qui tam* action brought by Relators and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. GEN. LAWS § 9-1.1-1 *et seq.*

743. R.I. GEN. LAW § 9-1.1-3 provides liability for any person who, *inter alia*:

(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of [this section] . . .

744. Defendant violated R.I. GEN. LAW § 9-1.1-3 when it knowingly caused false claims to be made, used and presented to the State of Rhode Island by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated,

substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

745. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

746. The State of Rhode Island, by and through the Rhode Island Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

747. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Rhode Island. Had the State of Rhode Island known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

748. As a result of Defendant's violations of R.I. GEN. LAW § 9-1.1-3 the State of Rhode Island has been damaged.

749. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to R.I. GEN. LAW § 9-1.1-4(b) on behalf of themselves and the State of Rhode Island.

750. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Rhode Island in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF RHODE ISLAND:

(1) Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000, for each false claim which Defendant presented or caused to be presented to the State of Rhode Island;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to R.I. GEN. LAW § 9-1.1-4(d) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXXIII**
**VIOLATIONS OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT**
**TENN. CODE ANN. § 71-5-181 *et seq.***

751. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

752. This is a *qui tam* action brought by Relators and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181 *et seq.*

753. TENN. CODE ANN. § 71-5-182(a)(1) provides liability for any person who, *inter alia*:

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;
>
> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program;
>
> (3) Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D); or
>
> (4) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program.

754. Defendant violated TENN. CODE ANN. § 71-5-182(a)(1) when it knowingly caused false claims to be made, used and presented to the State of Tennessee by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

755. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

756. The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

757. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Tennessee. Had the State of Tennessee known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

758. As a result of Defendant's violations of TENN. CODE ANN. § 71-5-182(a)(1), the State of Tennessee has been damaged.

759. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to TENN. CODE ANN. § 71-5-183(a)(1) on behalf of themselves and the State of Tennessee.

760. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Tennessee in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXIII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF TENNESSEE:

(1) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $25,000, adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, in accordance with TENN. CODE ANN. § 71-5-182(a), for each false claim which Defendant presented or caused to be presented to

the State of Tennessee;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to TENN. CODE ANN. § 71-5-183(c) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXIV
## VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
## TEX. HUM. RES. CODE ANN. § 36.001 *et seq.*

761. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

762. This is a *qui tam* action brought by Relators and the State of Texas to recover treble damages and civil penalties under the Texas Medicaid Fraud Prevention Law, TEX. HUM. RES. CODE ANN. § 36.001 *et seq.*

763. TEX. HUM. RES. CODE ANN. § 36.002 provides liability for any person who, *inter alia*:

> (1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> (2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the

Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

(4) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(5) conspires to commit a violation of [this section].

764. Defendant violated TEX. HUM. RES. CODE ANN. § 36.002 when it knowingly caused false claims to be made, used and presented to the State of Texas by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

765. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

766. The State of Texas, by and through the Texas Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

767. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Texas. Had the State of Texas known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

768. As a result of Defendant's violations of TEX. HUM. RES. CODE ANN. § 36.002, the State of Texas has been damaged.

769. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to TEX. HUM. RES. CODE ANN. § 36.101 on behalf of themselves and the State of Texas.

770. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Texas in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXIV**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF TEXAS:

(1) Three times the amount of actual damages which the State of Texas has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty as described in TEX. HUM. RES. CODE ANN. § 36.025(a)(3), for each false claim which Defendant presented or caused to be presented to the State of Texas;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

> (1) A fair and reasonable amount allowed pursuant to TEX. HUM. RES. CODE ANN. § 36.110 and/or any other applicable provision of law;
>
> (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;
>
> (3) An award of statutory attorneys' fees and costs; and
>
> (4) Such further relief as this Court deems equitable and just.

**COUNT XXXV**
**VIOLATIONS OF THE UTAH FALSE CLAIMS ACT**
**UTAH CODE § 26-20 *et seq.***

771. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

772. This is a *qui tam* action brought by Relators and the State of Utah to recover treble damages and civil penalties under the Utah False Claims Act, UTAH CODE § 26-20 *et seq.*

773. UTAH CODE § 26-20-3 states, *inter alia*:

> (1) A person may not make or cause to be made a false statement or false representation of a material fact in an application for medical benefits;
>
> (2) A person may not make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medical benefit…

774. UTAH CODE § 26-20-6 provides that "[a] person may not enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false, fictitious, or fraudulent claim for a medical benefit."

775. UTAH CODE § 26-20-7 states:

> (1) A person may not make or present or cause to be made or presented to an employee or officer of the state a claim for a medical benefit:
>
> > (a) which is wholly or partially false, fictitious, or fraudulent;

(b) for services which were not rendered or for items or materials which were not delivered;

(c) which misrepresents the type, quality, or quantity of items or services rendered;

(d) representing charges at a higher rate than those charged by the provider to the general public;

(e) for items or services which the person or the provider knew were not medically necessary in accordance with professionally recognized standards;

(f) which has previously been paid;

(g) for services also covered by one or more private sources when the person or provider knew of the private sources without disclosing those sources on the claim; or

(h) where a provider:

(i) unbundles a product, procedure, or group of procedures usually and customarily provided or performed as a single billable product or procedure into artificial components or separate procedures; and

(ii) bills for each component of the product, procedure, or group of procedures:

(A) as if they had been provided or performed independently and at separate times; and

(B) the aggregate billing for the components exceeds the amount otherwise billable for the usual and customary single product or procedure.

(2) In addition to the prohibitions of Subsection (1), a person may not:

(a) fail to credit the state for payments received from other sources;

(b) recover or attempt to recover payment in violation of the provider agreement from:

(i) a recipient under a medical benefit program; or (ii) the recipient's family;

> (c) falsify or alter with the intent to deceive, any report or document required by state or federal law, rule, or Medicaid provider agreement;
>
> (d) retain any unauthorized payment as a result of acts described by this section; or
>
> (e) aid or abet the commission of any act prohibited by this section.

776. Defendant violated UTAH CODE § 26-20 when it knowingly caused false claims to be made, used and presented to the State of Utah by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

777. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

778. The State of Utah by and through the Utah Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

779. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Utah. Had the State of Utah known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

780. As a result of Defendant's violations of UTAH CODE § 26-20, the State of Utah has been damaged.

781. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to UTAH CODE § 26-20 on behalf of themselves and the State of Utah.

782. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Utah in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXV**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF UTAH:

(1) Three times the amount of actual damages which the State of Utah has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to the State of Utah;

(3) Full and complete restitution to the state of all damages that the state sustained;

(4) Any civil penalties as part of criminal and civil judgments;

(5) Prejudgment interest; and

(6) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to UTAH CODE § 26-20A-606 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in

connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXXVI**
**VIOLATIONS OF THE VERMONT FALSE CLAIMS ACT**
**VERMONT FALSE CLAIMS ACT 32 V.S.A. § 630 *et seq.***

783. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

784. This is a *qui tam* action brought by Relators and the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, 32 V.S.A. § 630 *et seq*.

785. 32 V.S.A. § 631 states, *inter alia*, that "(a) No person shall:"

> (1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;
>
> (2) knowingly make, use, or cause to be used, a false record or statement material to a false or fraudulent claim;
>
> (3) knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 or section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;
>
> (4) knowingly present, or cause to be presented, a claim that includes items or services for which the State could not receive payment from the federal government due to the operation of 42 U.S.C. § 1396b(s) because the claim includes designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) furnished to an individual on the basis of a referral that would result in the denial of payment under 42 U.S.C. chapter 7, subchapter XVIII (the "Medicare Program"), due to a violation of 42 U.S.C. § 1395nn;...
>
> (8) enter into a written agreement or contract with an official of the State or its agent knowing the information contained therein is false;

(5) knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;...

(6) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

(7) as a beneficiary of an inadvertent submission of a false claim to the State, or as a beneficiary of an overpayment from the State, and who subsequently discovers the falsity of the claim or the receipt of overpayment, fail to disclose the false claim or receipt of overpayment to the State by the later of: (A) a date which is 120 days after the date on which the false claim or receipt of overpayment was identified; or (B) the date any corresponding cost report is due, if applicable; or

(8) conspire to commit a violation of this subsection.

786. Defendant violated 32 V.S.A. § 631 when it knowingly caused false claims to be made, used and presented to the State of Vermont by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

787. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

788. The State of Vermont by and through the Vermont Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

789. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Vermont. Had the State of Vermont known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

790. As a result of Defendant's violations of 32 V.S.A. § 631, the State of Vermont has been damaged.

791. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to 32 V.S.A. § 633 on behalf of themselves and the State of Vermont.

792. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Vermont in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXVI**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF VERMONT:

i. A civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of subsection (a) of this section, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461);

ii. three times the amount of damages that the State sustains because of the act of that person; and

iii. the costs of the investigation and prosecution of such violation;

iv. Prejudgment interest; and

v. All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to 32 V.S.A. § 635

and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXXVII**
**VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT**
**VA. CODE ANN. § 8.01-216.1 *et seq.***

793. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

794. This is a *qui tam* action brought by Relators and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Medicaid Fraud Prevention Law, VA. CODE ANN. § 8.01-216.1 *et seq.*

795. VA. CODE ANN. § 8.01-216.3 provides liability for any person who, *inter alia*:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of [this section]

796. Defendant violated VA. CODE ANN. § 8.01-216.3 when it knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or

was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

797. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

798. The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

799. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the Commonwealth of Virginia. Had the Commonwealth of Virginia known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

800. As a result of Defendant's violations of VA. CODE ANN. § 8.01-216.3, the Commonwealth of Virginia has been damaged.

801. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to VA. CODE ANN. § 8.01-216.5 on behalf of themselves and the Commonwealth of Virginia.

802. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the Commonwealth of Virginia in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXVII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the COMMONWEALTH OF VIRGINIA:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the Commonwealth of Virginia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to VA. CODE ANN. § 8.01-216.7 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXXVIII**

**VIOLATIONS OF THE WASHINGTON STATE MEDICAID FRAUD FALSE CLAIMS ACT**
**WASH. REV. CODE ANN. § 74.66.010 *et seq.***

803. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

804. This is a *qui tam* action brought by Relators and the State of Washington to recover treble damages and civil penalties under the Washington State Medicaid Fraud False Claims Act, WASH. REV. CODE ANN. § 74.66.010 *et seq.*

805. WASH. REV. CODE ANN. § 74.66.020 provides liability for any person who, *inter alia*:

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (3) Conspires to commit one or more of the violations in this subsection.

806. Defendant violated WASH. REV. CODE ANN. § 74.66.020 when it knowingly caused false claims to be made, used and presented to the State of Washington by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

807. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

808. The State of Washington, by and through the Washington Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

809. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Washington. Had the State of Washington known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

810. As a result of Defendant's violations of WASH. REV. CODE ANN. § 74.66.020, the State of Washington has been damaged.

811. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to WASH. REV. CODE ANN. § 74.66.050 on behalf of themselves and the State of Washington.

812. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Washington in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXVIII**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF WASHINGTON:

(1) Three times the amount of actual damages which the State of Washington has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of Washington;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to WASH. REV. CODE ANN. § 74.66.070 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXXIX**

**VIOLATIONS OF THE WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT**

**WIS. STAT. ANN. § 20.931 *et seq.***

813. Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

814. This is a *qui tam* action brought by Relators and the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin State Medicaid Fraud False Claims Act, WIS. STAT. ANN. § 20.931 *et seq.*

815. WIS. STAT. ANN. § 20.931(2) provides liability for any person who, *inter alia*:

> (1) Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.
>
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.
>
> (3) Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.

816. Defendant violated WIS. STAT. ANN. § 20.931(2) when it knowingly caused false claims to be made, used and presented to the State of Wisconsin by its violations of federal and state laws by causing false or fraudulent claims to be submitted for payment for adulterated, substandard, and non-compliant infant formula and nutritional therapy products to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or

was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

817. Each claim presented or caused to be presented for reimbursement for adulterated, substandard, and non-compliant infant formula and nutritional therapy products challenged herein represents a false or fraudulent claim for payment under the FCA.

818. The State of Wisconsin, by and through the Wisconsin Medicaid program and other state health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant in connection therewith.

819. Compliance with applicable Medicaid, and various other federal and state laws was a condition of payment of claims submitted to the State of Wisconsin. Had the State of Wisconsin known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant.

820. As a result of Defendant's violations of WIS. STAT. ANN. § 20.931(2), the State of Wisconsin has been damaged.

821. Relators are private persons with direct and independent knowledge of the allegations of the First Amended Complaint, who have brought this action pursuant to WIS. STAT. ANN. § 20.931(5) on behalf of themselves and the State of Wisconsin.

822. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Wisconsin in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXIX**

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF WISCONSIN:

(1) Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to the State of Wisconsin;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to WIS. STAT. ANN. § 20.931(11) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**DEMAND FOR JURY TRIAL**

Relators demand trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution.

Dated: November 12, 2025

Respectfully submitted,

Andrew M. Beato
Melissa S. Fox
**STEIN MITCHELL BEATO & MISSNER LLP**
2000 K Street N.W., Suite 600
Washington, D.C. 20006
Telephone: (202) 737-7777
abeato@steinmitchell.com
mfox@steinmitchell.com

Stuart H. Deming
**DEMING PLLC**
535 South Burdick Street. Suite 115
Kalamazoo, MI 49007
Telephone: (202) 349-1470
Stuart.Deming@deminggroup.com

***Counsel for Relators***

**CERTIFICATE OF SERVICE**

I certify that on this ____ day of November 2025, a true and correct copy of the foregoing Complaint was filed under seal with the Clerk of Court. Service of this Complaint shall be made to the following parties listed below by U.S. Certified Mail, Return Receipt Requested:

| | |
|---|---|
| The Honorable Pamela Bondi<br>United States Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 | Timothy VerHey<br>United States Attorney for the Western District of Michigan<br>United States Attorney's Office<br>330 Ionia Avenue, N.W., Suite 501<br>Grand Rapids, MI 49503 |
| Tim Griffin<br>Attorney General of Arkansas<br>101 West Capitol Avenue<br>Little Rock, AR 72201 | Tamela Harrelson<br>Director, Medicaid Fraud Control Unit of Arkansas<br>Office of the Attorney General<br>101 West Capitol Avenue<br>Little Rock, AR 72201 |
| Rob Bonta<br>Attorney General of California<br>California Department of Justice<br>Attn: False Claims Unit<br>P.O. Box 944255<br>Sacramento, CA 94244-2550 | Jennifer Euler<br>Director, Bureau of Medi-Cal Fraud and Elder Abuse<br>Office of the Attorney General<br>P.O. Box 944255<br>Sacramento, CA 94244-2550 |
| Phil Weiser<br>Attorney General of Colorado<br>Colorado Department of Law<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 | Rebecca Weber<br>Director, Medicaid Fraud Control Unit<br>Office of the Attorney General<br>Colorado Department of Law<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 9th Floor<br>Denver, CO 80203 |
| William Tong<br>Attorney General of Connecticut<br>165 Capitol Avenue<br>Hartford, CT 06106 | Marjorie Sozanski<br>Director, Medicaid Fraud Control Unit of Connecticut<br>Office of the Chief State's Attorney<br>300 Corporate Place<br>Rocky Hill, CT 06067 |

| | |
|---|---|
| Kathy Jennings<br>Attorney General of Delaware<br>Delaware Department of Justice<br>Carvel State Office Bldg.<br>820 N. French St.<br>Wilmington, DE 19801 | Stephen McDonald<br>Director, Medicaid Fraud Control Unit of Delaware<br>Office of the Attorney General<br>820 N. French St., 5th Floor<br>Wilmington, DE 19801 |
| Brian Schwalb<br>Attorney General for the District of Columbia<br>400 6th Street NW<br>Washington, DC 20001 | LaVan Griffith<br>Director, MFCU<br>Medicaid Fraud Control Unit of D.C.<br>Office of D.C. Inspector General<br>100 M Street, Suite 1000<br>Washington, DC 20003 |
| James Uthmeier<br>Attorney General of Florida<br>PL-01, The Capitol<br>Tallahassee, FL 32399-1050<br><br>Jimmy Patronis, Chief Financial Officer<br>Florida Department of Financial Services<br>200 East Gaines Street<br>Tallahassee, FL 32399 | Kathleen Von Hoene<br>Director, Medicaid Fraud Control Unit of Florida<br>Office of the Attorney General<br>PL-01, The Capitol<br>Tallahassee, FL 32399 |
| Christopher Carr<br>Attorney General of Georgia<br>40 Capitol Square SW<br>Atlanta, GA 30334 | Jim Mooney<br>Medicaid Fraud Control Unit<br>Office of the Attorney General<br>Georgia Department of Law<br>600 West Peachtree Street, NW, 20th Floor<br>Atlanta, GA 30308 |
| Anne E. Lopez<br>Attorney General of Hawaii<br>Department of the Attorney General<br>425 Queen Street<br>Honolulu, HI 96813 | Landon Murata<br>Director, Medicaid Fraud Control Unit of Hawaii<br>Department of the Attorney General<br>707 Richards Street, Suite 402<br>Honolulu, HI 96813 |
| Kwame Raoul<br>Attorney General for the State of Illinois<br>James R. Thompson Center<br>100 W. Randolph Street<br>Chicago, IL 60601 | Heather D'Orazio<br>Office of the Illinois Attorney General<br>Medicaid Fraud Bureau<br>100 W Randolph Street, 13th Floor<br>Chicago, IL 60601 |

| | |
|---|---|
| Theodore E. Rokita<br>Attorney General of Indiana<br>Office of the Indiana Attorney General<br>Indiana Government Center South<br>302 W. Washington St., 5th Floor<br>Indianapolis, IN 46204<br><br>David Cook<br>Inspector General<br>Office of the Inspector General<br>315 West Ohio Street, Room 104<br>Indianapolis, Indiana 46202 | Matthew Whitmire<br>Director, Medicaid Fraud Control Unit of Indiana<br>Office of the Attorney General<br>8720 Castle Creek Parkway East Drive, Suite 250<br>Indianapolis, IN 46250 |
| Brenna Bird<br>Attorney General of Iowa<br>Office of the Attorney General of Iowa<br>Hoover Building<br>1305 E. Walnut Street<br>Des Moines, IA 50319 | Jeremy Ingrim<br>Director, Medicaid Fraud Control Unit of Iowa<br>Department of Inspections and Appeals<br>3rd Floor, Lucas State Office Building<br>321 E. 12th Street<br>Des Moines, IA 50319 |
| Elizabeth Murrill<br>Attorney General of Louisiana<br>P.O. Box 94095<br>Baton Rouge, LA 70804 | Matthew Stafford<br>Medicaid Fraud Control Unit<br>Louisiana Department of Justice<br>P.O. Box 94095<br>Baton Rouge, LA 70804 |
| Anthony G. Brown<br>Attorney General of Maryland<br>200 St. Paul Place<br>Baltimore, MD 21202-2202 | William "Zak" Shirley<br>Director, Medicaid Fraud Control Unit of Maryland<br>Office of the Attorney General<br>200 St. Paul Place, 18th Floor<br>Baltimore, MD 21202 |
| Andrea Campbell<br>Attorney General for the Commonwealth of Massachusetts<br>One Ashburton Place, 20th Floor<br>Boston, MA 02108-1698 | Kevin Lownds<br>Director, Medicaid Fraud Control Unit of Massachusetts<br>Office of the Attorney General<br>One Ashburton Place<br>Boston, MA 02108 |
| Dana Nessel<br>Attorney General of Michigan<br>G. Mennen Williams Building, 7th Floor<br>525 W. Ottawa Street<br>P.O. Box 30212<br>Lansing, MI 48909 | David Tanay<br>Director, Health Care Fraud Division<br>Office of the Attorney General<br>2860 Eyde Parkway<br>East Lansing, MI 48823 |

| | |
|---|---|
| Keith Ellison<br>Attorney General of Minnesota<br>Bremer Tower, Suite 600<br>445 Minnesota Street<br>St. Paul, MN 55101-2131 | Nicholas Wanka<br>Director, Office of the Attorney General of Minnesota<br>Bremer Tower, Suite 900<br>445 Minnesota Street<br>St. Paul, MN 55101 |
| Austin Knudsen<br>Attorney General of Montana<br>215 N. Sanders, Third Floor<br>P.O. Box 201401<br>Helena, MT 59620-1401 | Jake Griffith<br>Director, Medicaid Fraud Control Unit of Montana<br>Division of Criminal Investigation<br>2225 11th Avenue<br>P.O. Box 201417<br>Helena, MT 59620-1417 |
| Aaron Ford<br>Attorney General of Nevada<br>Office of the Attorney General<br>100 N. Carson St.<br>Carson City, NV 89701 | Andrew Schulke<br>Medicaid Fraud Control Unit<br>Office of the Attorney General<br>100 N. Carson St.<br>Carson City, NV 89701 |
| Matthew J. Platkin<br>Attorney General of New Jersey<br>RJ Hughes Justice Complex<br>8th Floor, West Wing<br>25 Market Street Box 080<br>Trenton, NJ 08625-0080 | Heather Hadley<br>Richard J. Hughes Justice Complex<br>Medicaid Fraud Control Unit of New Jersey<br>Office of the Attorney General<br>25 Market Street<br>Trenton, NJ 08625-0080 |
| Raul Torrez<br>Attorney General of New Mexico<br>New Mexico Office of the Attorney General<br>408 Galisteo Street<br>Villagra Building<br>Santa Fe, NM 87501 | Joseph Martinez<br>Medicaid Fraud Control Unit<br>Office of the Attorney General<br>201 Third St. NW, Suite 300<br>Albuquerque, New Mexico 87102 |
| Letitia James<br>Attorney General of New York<br>Managing Attorney's Office<br>Office of the New York State Attorney General<br>28 Liberty Street, 16th Floor<br>New York NY 10005 | Amy Held<br>Director, Medicaid Fraud Control Unit of New York<br>Office of the Attorney General<br>28 Liberty Street, 13th Floor<br>New York, NY 10005 |

| | |
|---|---|
| Jeffrey Jackson<br>Attorney General of North Carolina<br>9001 Mail Service Center<br>Raleigh, NC 27699-9001 | F. Edward Kirby, Jr.<br>Medicaid Investigations Division, North Carolina Department of Justice<br>Office of the Attorney General<br>5505 Creedmoor Road, Suite 300<br>Raleigh, NC 27612 |
| Gentner Drummond<br>Attorney General of Oklahoma<br>313 N.E. 21st Street<br>Oklahoma City, OK 73105 | Charles Dickson<br>Director, Medicaid Fraud Control Unit of Oklahoma<br>Office of the Attorney General<br>313 N.E. 21st Street<br>Oklahoma City, OK 73105 |
| Peter Neronha<br>Attorney General of Rhode Island<br>Office of the Attorney General<br>150 South Main Street<br>Providence, RI 02903 | Andrea Mauro<br>Director, Medicaid Fraud Control Unit of Rhode Island<br>Office of the Attorney General<br>150 South Main Street<br>Providence, RI 02903 |
| Jonathan Skrmetti<br>Attorney General and Reporter for Tennessee<br>Office of the Attorney General of Tennessee<br>P.O. Box 20207<br>Nashville, TN 37202-0207 | Gene Stegall<br>Director, Medicaid Fraud Control Division<br>Tennessee Bureau of Investigation<br>901 R.S. Gass Boulevard<br>Nashville, TN 37216-2639 |
| Ken Paxton<br>Attorney General of Texas<br>ATTN: Susan Miller<br>P.O. Box 12548<br>Austin, TX 78711 | William Marlowe<br>Director, Medicaid Fraud Control Unit of Texas<br>Office of the Attorney General<br>6330 E. Highway 290, Suite 250<br>Austin, TX 78723 |
| Derek Brown<br>Attorney General of Utah<br>Office of the Attorney General<br>350 N State Street, Suite 230<br>Utah Capitol Building<br>Salt Lake City, UT 84114 | Kaye Lynn Wootton<br>Director, Medicaid Fraud Control Unit of Utah<br>Office of the Attorney General<br>5272 College Drive, Suite 300<br>Salt Lake City, UT 84123 |
| Charity Clark<br>Attorney General of Vermont<br>Office of the Vermont Attorney General<br>109 State St.<br>Montpelier, VT 05609 | Betsy Anderson<br>Director, Medicaid Fraud and Residential Abuse Unit<br>Office of the Vermont Attorney General<br>109 State Street<br>Montpelier, VT 05609-1001 |

| | |
|---|---|
| Jason Miyares<br>Attorney General of Virginia<br>Office of the Attorney General<br>202 North 9th Street<br>Richmond, VA 23219 | Jill Costen<br>Director, Medicaid Fraud Control Unit of Virginia<br>Office of the Attorney General<br>202 North 9th Street<br>Richmond, VA 23219 |
| Nick Brown<br>Attorney General of Washington<br>1125 Washington St. SE<br>P.O. Box 40100<br>Olympia, WA 98504-0100 | Larissa Payne<br>Director, Medicaid Fraud Control Unit of Washington<br>Office of the Attorney General<br>800 5th Avenue, Suite 2000<br>Seattle, WA 98104 |
| Josh Kaul<br>Attorney General of Wisconsin<br>Wisconsin Department of Justice<br>P.O. Box 7857<br>Madison, WI 53707-7857 | Daniel R. Hess<br>Division of Legal Services<br>ATTN: Medicaid Fraud Unit<br>PO Box 7857<br>Madison, Wisconsin 53707 |

Andrew M. Beato