**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, *et al.,* | ) | |
| *ex rel.* SCOTT MILLARD, KRISTINE COOPER, | ) | |
| and LOREN COOPER, | ) | |
| | ) | No. 1:22-cv-994 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Hon. Hala Y Jarbou |
| | ) | Chief United States District Judge |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT**
**ABBOTT'S MOTION TO DISMISS WITH PREJUDICE**
**UNITED STATES' COMPLAINT IN INTERVENTION**

1

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 3

LEGAL BACKGROUND ......................................................................................................... 5

I.       FEDERAL REGULATION OF INFANT FORMULA AND THE WIC PROGRAM ..... 5

         A.       USDA and the WIC Program ........................................................................ 5

         B.       Statutory and Regulatory Requirements for WIC Formula ........................... 6

II.      THE FALSE CLAIMS ACT ............................................................................................ 7

FACTUAL BACKGROUND ..................................................................................................... 8

I.       ABBOTT DID NOT PRODUCE INFANT FORMULA THAT COMPLIED WITH ITS
         STATUTORY, REGULATORY, AND CONTRACTUAL OBLIGATIONS AS A
         MANUFACTURER OF WIC FORMULA ........................................................................ 8

II.      ABBOTT FALSELY CERTIFIED COMPLIANCE WITH STATUTORY,
         REGULATORY, AND CONTRACTUAL REQUIREMENTS FOR WIC POWDER
         INFANT FORMULA ........................................................................................................ 10

ARGUMENT ............................................................................................................................ 11

I.       THE COMPLAINT PLEADED ALL ELEMENTS OF AN FCA VIOLATION ............ 11

         A.       The Complaint Alleged with Particularity that the False Statements Included Abbott's
                  Certifications of Compliance in its WIC Bid Submissions and Contracts with State
                  Agencies ...................................................................................................... 13

         B.       The Complaint Alleged with Particularity that the False Certifications Were Tied to
                  Specific Claims for the Purchase of Abbott Infant Formula Using USDA Funds ..... 15

         C.       The Complaint Adequately Pleaded Materiality .......................................... 16

         D.       The Complaint Adequately Pleaded Falsity ............................................... 25

         E.       The Complaint Adequately Pleaded Scienter ............................................. 28

II.      THE COMPLAINT SUFFICIENTLY PLEADED ALL ELEMENTS OF AN UNJUST
         ENRICHMENT CLAIM ................................................................................................. 31

**INTRODUCTION**

Abbott repeatedly lied to the U.S. Department of Agriculture's ("USDA") and State agencies when it represented that it produced powder infant formula under conditions that complied with U.S. Food and Drug Administration ("FDA") rules.  None of the misplaced arguments in Abbott's motion can turn a years-long and widespread failure to manufacture compliant powder infant formula into a "regulatory disagreement" or "record-keeping" error.  Indeed, it was Abbott that got the only windfall in this case because it has not paid back a single dollar to USDA for the non-compliant, recalled powder infant formula manufactured at the Sturgis facility between October 1, 2020 and June 4, 2022 and purchased with USDA funds.

One of the fundamental goals of the USDA Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") program is to provide healthy and *safe* food and infant formula to one of the United States' most vulnerable populations.  To advance this goal, USDA implemented statutory, regulatory, and contractual requirements that infant formula purchased through the WIC program using USDA funds must be manufactured in compliance with the Federal Food Drug and Cosmetic Act ("FDCA") and its implementing regulations, known as current good manufacturing practices ("cGMP"), which require that the formula be manufactured under clean and sanitary conditions.  In other words, WIC infant formula must **not** put the infants who consume it at risk of serious adverse health consequences or death.

Abbott knew that its old equipment in disrepair and endless unaddressed water leaks that resulted in uncontrolled moisture in and around the manufacturing areas put the company's powder infant formula at risk of dangerous contamination.  Abbott paired these conditions with an explicit effort to avoid detection of contamination and then made material misrepresentations to FDA about test results that showed contamination in the manufacturing environment and

3

powder infant formula product.  Despite widespread awareness of the pervasive cGMP issues and ongoing risk to powder infant formula, between 2019 and 2022, Abbott falsely certified its compliance with the FDCA, including cGMP, in its bid submissions to and contracts with State agencies.  This caused State agencies to award bids to and execute contracts with Abbott for the purchase of powder infant formula using USDA funds.  During this period, Abbott executives and Sturgis leadership were aware that at least some of the formula that Abbott sold to retailers would be purchased by WIC participants using USDA funds and, therefore, had to be manufactured in compliance with the FDCA.

Abbott's dangerous course of conduct culminated in February 2022 when it voluntarily recalled powder infant formula manufactured at Sturgis over a period of more than two years spanning 2020 through 2022, a significant portion of which was purchased by WIC recipients using USDA funds.  Abbott's Class I recall meant there was a reasonable probability that the use of the recalled product would cause serious adverse health consequences or death.

The United States' legal theory is neither vague nor convoluted, as Abbott suggests. Rather, this is the quintessential False Claims Act ("FCA") case.  USDA and State agencies "bargained" for compliant infant formula manufactured consistent with all statutory, regulatory, and contractual requirements, most notably compliance with FDCA and cGMP requirements. Instead, as the United States alleged, families participating in the WIC program were provided with formula that Abbott knew was non-compliant and failed to adhere to FDCA and cGMP requirements and, therefore, presented a reasonably probable risk of serious health consequences because it was manufactured in a way that put it at increased and unnecessary risk of contamination.  The United States seeks to hold Abbott accountable and recover damages and penalties arising from USDA funds spent on recalled, non-compliant infant formula that failed to

meet the statutory, regulatory, and contractual requirements for infant formula purchased through the WIC program.

Abbott's motion devotes pages to irrelevant arguments about purported "public pressure" that influenced FDA's 2022 regulatory activity, the profit Abbott yields from its participation in the WIC program, and the regulatory history of other infant formula manufacturers not involved in this lawsuit.  It also asserts that the United States is required to allege – or prove – actual contamination of the infant formula, a causal connection between the infant formula and illness, and violations of the FDA Consent Decree.  None of these arguments is relevant to or required for the United States to adequately plead FCA violations.  The Complaint in Intervention ("Complaint") alleges with particularity the specific false statements that Abbott made in contract certifications with State agencies and sample claims where WIC participants used USDA funds to purchase recalled, non-compliant powder infant formula.  The Complaint further alleges that Abbott knew the conditions of the Sturgis manufacturing facility did not comport with Abbott's express and implied certifications that its powder infant formula met the statutory, regulatory, and contractual requirements of the WIC program.  Abbott's false certifications ultimately caused the submission of false claims for payment of USDA funds to purchase powder infant formula, in violation of the FCA.

## LEGAL BACKGROUND

### I.    Federal Regulation of Infant Formula and the WIC Program

### A.    USDA and the WIC Program

USDA's Food and Nutrition Service establishes the rules and regulations for WIC at the federal level.  The Child Nutrition Act requires that infant formula manufacturers that supply infant formula to WIC participants certify with State agencies that the formula complies with the FDCA and its implementing regulations.  42 U.S.C. § 1786(f)(15).  USDA regulations define "WIC

formula" to include three types of products: "infant formula, exempt infant formula, or WIC-eligible nutritionals." 7 C.F.R § 246.10(e)(12).  "Infant formula" is a food that meets the definition of infant formula in section 201(z) of the FDCA (21 U.S.C. § 321(z)), the requirements for infant formula in section 412 of the FDCA (21 U.S.C. § 350a), and the regulations at 21 CFR parts 106 and 107.  7 C.F.R. § 246.2.  21 CFR parts 106 and 107 are specific sets of FDA regulations that address requirements for infant formula, including cGMP for manufacturing infant formula. "Standard" infant formula, such as Abbott's Similac Advance®, is for healthy, full-term babies without specific dietary needs.

WIC benefits also cover "exempt infant formula," such as Abbott's Similac Alimentum® and EleCare®.  USDA regulations define "exempt infant formula" as "an infant formula that meets the requirements for an exempt infant formula under section 412(h) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 350a(h)) and the regulations at 21 CFR parts 106 and 107."  7 C.F.R. § 246.2.  Under the FDCA, "exempt infant formula" is infant formula specifically formulated and labeled for infants with unusual medical or dietary needs, such as inborn errors of metabolism or low birth weight.  21 U.S.C. § 350a(h)(1).  "Exempt infant formulas" are exempt from select regulations governing the manufacture of infant formulas specifically but are not exempt from regulations applying to food.  *Id*.  Thus, any infant formula that is obtained through the redemption of WIC benefits must meet the USDA requirements for WIC formula, including compliance with the FDCA and cGMP.

**B.       Statutory and Regulatory Requirements for WIC Formula**

As mentioned above, the FDCA requires that "infant formula" comply with FDA's cGMP regulations for both food (21 C.F.R. Part 106, Subpart B) and infant formula (21 C.F.R. Part 117, Subpart B).  The cGMP regulations for infant formula specify the "minimum current good

6

manufacturing practices that are to be used in, and the facilities or controls that are to be used for, the manufacture, processing, packing, or holding of an infant formula." 21 C.F.R. § 106.5(a). Similarly, the cGMP regulations for food require, among other things, that manufacturing conditions and practices protect against contamination of food and food-contact surfaces from any source. 21 C.F.R. § 117.1. The FDCA also requires that "exempt infant formula" comply with the cGMP regulations for food. 21 C.F.R. Part 110, Subparts A and B; 21 C.F.R. Part 117, Subpart B. Under cGMP regulations, "[i]nfant formula, including an infant formula powder, shall be deemed to be adulterated if…the processing of such infant formula is not in compliance with the good manufacturing practices and the quality control procedures prescribed by the Secretary under subsection (b)(2)." 21 U.S.C. § 350a(a)(3). Similarly, "food shall be deemed to be adulterated— if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health…" 21 U.S.C. § 342(a)(4). The failure to comply with applicable cGMP renders infant formula and exempt infant formula adulterated.

## II.   The False Claims Act

The FCA provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance

of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  No proof of specific intent to defraud is required.  *Id*. at § 3729(b)(1).

The FCA defines the term "claim," in pertinent part, as

…any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that…is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]  *Id*. at § 3729(b)(2).

The statute defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id*. at § 3729(b)(4).

## FACTUAL BACKGROUND

### I.  Abbott Did Not Produce Infant Formula that Complied with Its Statutory, Regulatory, and Contractual Obligations as a Manufacturer of WIC Formula

From as early as 2018, Abbott failed to maintain the Sturgis facility in a clean and sanitary condition, operated deteriorated manufacturing equipment susceptible to microorganism ("micro") contamination, failed to investigate and prevent the presence of micro, failed to correct known cGMP deficiencies, and made material misrepresentations to FDA about its compliance and micro contamination.  By February 2022, Abbott finally suspended production at the Sturgis facility following consumer complaints and reports of potentially related infant illness and FDA's findings of insanitary conditions at the facility.  Compl., PageID.88 ¶¶ 69-70.  FDA's observations during the 2022 inspection included the presence of *Cronobacter* spp., a pathogen that can cause serious and potentially life-threatening infections in infants and a pathogen that Abbott had identified—and concealed—in the Sturgis facility since as early as 2019.  Compl., PageID.843, 864-65 ¶¶ 70, 157-164.

8

In February 2022, Abbott voluntarily recalled certain powder infant formulas manufactured at the Sturgis facility, including Similac, Similac Alimentum, and EleCare.  Compl., PageID.843 ¶ 71.  FDA classified the recall as a Class I recall, indicating a reasonable probability that the use or exposure to the recalled product could cause serious adverse health consequences or death.  Compl., PageID.843 ¶ 71.  The recall included powder infant formulas manufactured in the Sturgis facility with an expiration date of April 1, 2022 or later, which corresponded to all powder formulas manufactured at the Sturgis facility between approximately October 1, 2020 and June 4, 2022.  Compl., PageID.843 ¶ 73.  On May 16, 2022, on behalf of FDA, the United States filed a complaint against Abbott seeking to permanently enjoin Abbott from violating the FDCA relating to its manufacturing of infant formula at the Sturgis facility.  Compl., PageID.844 ¶ 74. The FDA complaint alleged that Abbott manufactured powder infant formula "under conditions and practices that failed to protect…against the risk of contamination from bacteria including, but not limited to, *[Cronobacter]* or Salmonella" and other violations of the FDCA that rendered infant formula produced at the Sturgis facility adulterated.  Compl., PageID.844 ¶¶ 74-75.

As the FDA complaint stated, Abbott's "ongoing inadequacies in manufacturing conditions and practices…demonstrate that [Abbott was] unwilling or unable to implement sustainable corrective actions to ensure the safety and quality of food manufactured for infants, a consumer group particularly vulnerable to foodborne pathogens."  Compl., PageID.844 ¶ 76.  This included, over the course of several years prior to 2022, a failure to address the presence of uncontrolled water in the manufacturing environment and a failure to address deteriorated manufacturing equipment.   Both failures constituted cGMP violations that increased the risk of micro contamination.  As alleged in the Complaint, Abbott personnel were well-aware through internal audits, FDA inspections, and personal observations of these significant risks to product safety but

9

chose not to address or resolve the issues, and, instead, prioritized profits over investments and repairs.  Abbott leaders even acknowledged in 2022, while FDA was onsite, that the company had not devoted enough resources to food safety and sanitation "for such a big and complex site" and especially "when you add in the aging infrastructure."  Compl., PageID.854-855 ¶ 120.  They also recognized that the micro contamination "could have all been avoided" if only Abbott had addressed leaks and other issues that it ignored from as early as 2018.  Compl., PageID.849 ¶ 94.

Even though the insanitary condition of the Sturgis facility increased the risk of micro contamination in both the manufacturing environment and the powder formula product, Abbott's pervasive culture of concealment led to a failure to identify, document, investigate, and prevent this contamination.  For example, Sturgis leadership requested the reclassification of test results indicating micro contamination to avoid triggering nonconformance metrics, which would require further testing and slow down production.  Compl., PageID.859 ¶ 141.  These efforts to undercount and conceal micro contamination test results directly impacted what Abbott represented to FDA.  Compl., PageID.860 ¶ 144.  In addition, as alleged, during FDA inspections in 2019 and 2022, Abbott was aware of, and failed to disclose, a positive *Cronobacter* finished product test result to FDA and significant information on micro contamination indicators and trends.  Compl., PageID.865 ¶¶ 163, 164.

## II.    Abbott Falsely Certified Compliance with Statutory, Regulatory, and Contractual Requirements for WIC Powder Infant Formula

As discussed below, the United States has adequately pleaded that claims for payment of USDA funds for powder infant formula manufactured at the Sturgis facility are false.  While Abbott knew the underlying conditions at the Sturgis facility put the product at risk of contamination and failed to test for, investigate, and report contamination, it simultaneously and falsely expressly certified its compliance with USDA's requirements for WIC infant formula in

bid submissions and State agency contracts, including compliance with the FDCA and cGMP. Compl., PageID.840-841, 866 ¶¶ 56, 168.  As a manufacturer in the WIC program, Abbott also certified that its powder infant formulas complied with statutory and regulatory requirements for WIC infant formula.  Compl., PageID.866 ¶ 167.

As alleged in the Complaint, WIC participants purchased Abbott powder formula manufactured at the Sturgis facility using USDA funds.  Compl., PageID.867 ¶ 176.  Abbott sold its powder infant formula to authorized WIC vendors knowing that at least some would be purchased by WIC participants using USDA funds and, therefore, authorized WIC vendors would seek payment from WIC participants for the purchase of Abbott's powder infant formulas that did not comply with contractual, statutory, or regulatory requirements for WIC infant formula. Compl., PageID.866 ¶ 172.  Abbott thus caused claims to be submitted that impliedly certified, falsely, that the infant formula purchased with USDA funds was manufactured in compliance with the contractual requirements as well as USDA statutory and regulatory requirements binding all WIC-participating manufacturers.

## ARGUMENT

### I.    The Complaint Pleaded All Elements of an FCA Violation

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct.  *Twombly*, 550 U.S. at 556.  In evaluating a complaint under Rule 12(b)(6), a court must accept the truth of the allegations and construe them in the plaintiff's

favor. *Nwanguma v. Trump,* 903 F.3d 604, 607 (6th Cir. 2018) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir. 2008)).

The government must plead FCA claims with particularity under Rule 9(b).  The Sixth Circuit interprets Rule 9(b)'s particularity requirement in conjunction with Rule 8(a)'s requirement for a short and plain statement.  *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 640 (6th Cir. 2003).  In doing so, the Sixth Circuit does not "require omniscience" but requires that "the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988).  Accordingly, the government "must allege the time, place, and content of the alleged misrepresentation [;] the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 407-08 (6th Cir. 2016) (citation omitted); *see also Cmty. Health Sys., Inc.*, 501 F.3d at 510. The Sixth Circuit has also imposed a "clear and unequivocal requirement that a [plaintiff] allege specific false claims when pleading a violation of" the False Claims Act.  *See, e.g.*, *Kettering Health Network*, 816 F.3d at 411.  As courts have further held, however, "plead[ing] a complex and far-reaching fraudulent scheme with particularity and provid[ing] examples of specific false claims submitted to the government pursuant to that scheme…" allows a Plaintiff to proceed to discovery on the entire fraudulent scheme. *Cmty. Health Sys., Inc.*, 501 F.3d at 493.

Contrary to Abbott's arguments, the Complaint did exactly that—tracked the elements of a False Claims Act violation while adhering to governing pleading rules by particularizing the fraudulent statements at issue and identifying the relevant period, the contracting parties, and the applicable USDA requirements.

  **A.**  **The Complaint Alleged with Particularity that the False Statements Included Abbott's Certifications of Compliance in its WIC Bid Submissions and Contracts with State Agencies**

The Complaint adequately alleged the "who, what, when, where, and how" of the fraud with particularity.  Specifically, the Complaint alleged that the false statements at issue included Abbott's express false certifications of compliance with applicable statutory, regulatory, and contractual requirements for powder infant formula in its WIC bid submissions to and executed contracts with State agencies.  The Complaint identified (i) the specific State Agencies that contracted with Abbott; (ii) the effective dates of the contracts; and (iii) the affirmative statements in a summary format certifying the company's adherence to the USDA requirements.  Compl., PageID.830, 839-841 ¶¶ 6, 9, 53, 56.  Given these details, Abbott cannot credibly claim the allegations lacked sufficient specificity to put the company on notice as to the nature of the claims at issue.

As the Complaint explained, the USDA establishes the minimum standards for State agency WIC contracts for the purchase of infant formula.  Compl., PageID.839 ¶ 53.  Therefore, as the Complaint detailed, the same minimum USDA requirements and certifications appeared in every WIC bid solicitation and contract that Abbott submitted to and executed with each relevant State agency in the period alleged.  Compl., PageID.839 ¶ 53.  Specifically, the Complaint stated that the USDA requires that every State agency contract include the following: (1) compliance with all federal, state and local laws, rules and regulations; (2) certification that infant formulas meet the definition of infant formula in FDA statutes and regulations; and (3) registration with FDA and certification that infant formulas comply with the FDCA and related regulations. Compl., PageID.830, 839 ¶¶ 6, 9, 53.  The Complaint included a table summarizing every contract

13

that Abbott executed with State agencies in the relevant period that contained these standard USDA requirements and the effective dates of each contract.  Compl., PageID.840-41 ¶ 56.

The Complaint stated that USDA regulations found at 7 C.F.R. § 246.10(b)(1)(i) allow State agencies to exceed the minimum USDA contract requirements.  Compl., PageID.839 ¶ 54. Thus, some State agency contracts surpass the minimum USDA requirements, and two specific examples were provided where the State agency included something beyond the minimum USDA requirements.  Compl., PageID.839-840 ¶¶ 54, 55.  The first example in the Complaint stated that some State agency contracts attached USDA WIC regulations located at 7 C.F.R. Part 246 that specifically define infant formula and require compliance with the FDCA for purposes of infant formula manufacturer participation in the WIC program. Compl., PageID.839-840 ¶ 55.  The second example in the Complaint was a State agency contract that required Abbott to perform "reasonable quality assurance activities and testing and correct all material deficiencies discovered during the quality assurance activities and testing."  Compl., PageID.839 ¶ 54.

Disregarding the seven exemplar claims identified in the Complaint, Abbott incorrectly suggests that the Complaint only included one example of a false certification, which was the California WIC contract.  The purpose of pleading the false statements that Abbott made related to the California WIC contract, which the company certified in 2022, was to demonstrate the egregiousness of Abbott's false statements and the company's utter disregard for truthfulness of its certifications of compliance.  In other words, it was plainly impossible that Abbott could have certified compliance with bid specifications and assurances that its products were "free from defects" in March 2022, which fell squarely within FDA's multi-month inspection at the Sturgis facility and was merely weeks after the initiation of Abbott's Class I Recall that included some of the same products covered under the California WIC contract.  What the State of California knew

or did not know is not relevant to whether Abbott falsely certified compliance to the State agency. Therefore, the Complaint more than sufficiently pleaded with particularity the false statements that Abbott made.

> **B.    The Complaint Alleged with Particularity that the False Certifications Were Tied to Specific Claims for the Purchase of Abbott Infant Formula Using USDA Funds**

Despite Defendant's insistence that the example false claims must be attached one-for-one to the false statement, no such standard applies. *See, e.g.*, *Cmty. Health Sys., Inc.*, 501 F.3d at 510 ("…for a relator [/plaintiff] to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme."). Instead, as sufficiently pleaded in the Complaint, the false statements and certifications in Abbott's contracts are plainly material to the claims for payment that Abbott caused to be false.

The Complaint stated that the USDA requires that all infant formula purchased with WIC benefits meet certain statutory, regulatory, and contractual requirements. Compl., PageID.829 ¶ 4. The Complaint also detailed how USDA funds are used by State agencies to purchase contract and non-contract powder infant formula manufactured by Abbott. Compl., PageID.837, 842-843 ¶¶ 44, 61, 67, 68. The Complaint stated that WIC participants used WIC benefits, funded through USDA, to purchase non-compliant Abbott infant formulas from authorized WIC vendors. Compl., PageID.867 ¶ 174. The Complaint provided details for seven example claims where WIC benefits, funded by USDA, were used to purchase Abbott's non-compliant powder infant formula. Compl., PageID.867 ¶ 176. The seven example claims included a substantial amount of detail, including: (i) the product name; (ii) the identity of the State agency; (iii) whether the product was contract or non-contract; (iv) the transaction date; (v) the retail price; (vi) rebate amount; and (vii) the net

15

price. Compl., PageID.867 ¶ 176. These examples were pleaded with sufficient specificity because "in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme…a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims." *Cmty. Health Sys.,* 501 F.3d at 511. Further, the Complaint stated that Abbott sold its powder infant formulas to authorized WIC vendors knowing that at least some of the formula would be purchased by WIC participants using WIC benefits, which Abbott knew were USDA funds allocated to State agencies to administer the WIC program. Compl., PageID.866 ¶ 172. The Complaint stated that the cited claims examples were paid pursuant to contracts that State agencies executed with Abbott that contained Abbott's false statements certifying compliance. Compl., PageID.867 ¶ 176. In sum, the Complaint more than sufficiently pleaded with particularity Abbott's noncompliance with material requirements, the false statements that Abbott made, example claims for individual purchases of non-compliant powder infant formula using USDA funds, and how Abbott caused State agencies using USDA funds to pay for non-compliant Abbott powder infant formulas manufactured at the Sturgis facility.

### C. The Complaint Adequately Pleaded Materiality

The Complaint also adequately pleaded that Abbott's misrepresentations were material. The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This inquiry can be made from either the perspective of a reasonable person or a particular recipient. In other words, a matter is material "(1) if a reasonable man would attach importance to it in determining his choice of action in the transaction; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, even though a reasonable person would not." *Universal Health Servs., Inc. v. United*

16

*States ex. rel. Escobar*, 579 U.S. 176, 193 (2016); *United States ex. rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831 (6th Cir. 2018).[1]  Relevant factors in this analysis include: (1) the Government's decision to expressly identify a provision as a condition of payment; (2) whether the Government consistently refuses to pay claims in similar cases; and (3) whether the noncompliance is minor or insubstantial or alternatively goes to the very essence of the bargain. *Prather*, 892 F.3d at 831; *Escobar*, 579 U.S. at 194-195.  The inquiry is holistic, and these factors are not exclusive, nor is any one single factor dispositive.  *Prather*, 892 F.3d at 832.

As the Supreme Court explained, liability "does not turn upon whether those requirements were expressly designated as conditions of payment" because "[w]hat matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Escobar*, 579 U.S. at 181.  It is beyond dispute that it is critical that infant formula be produced in an environment that detects and prevents micro contamination through compliance with cGMP requirements addressing sanitation, deteriorated equipment, and unvalidated processes.  That is especially true here where Abbott's noncompliance culminated in a Class I recall, a classification that signifies there is a reasonable probability that the use of the recalled product will cause *serious health consequences or death*.  Compl., PageID.843 ¶¶ 71-73 (emphasis added).  A reasonable person would not purchase infant formula that was produced with such flagrant and systemic cGMP violations, was affected by micro contamination, and posed a significant risk of death or other health consequences.  Moreover, Abbott knew that compliance with cGMP requirements

---

[1] Abbott cites *United States v. Postal Fleet Servs., Inc.*, No. 1:19-CV-01900, 2024 WL 1765593, (N.D. Ohio Apr. 24, 2024) when describing the materiality factors. *Postal Fleet* merely applies the binding Sixth Circuit precedent in *Prather*.

17

designed to prevent such consequences were material to the USDA-funded WIC program.  An analysis of the *Escobar* and *Prather* factors demonstrates this commonsense proposition.

Applying the first factor, Abbott's certifications of compliance with FDCA and cGMP requirements were express prerequisites to bidding on WIC contracts and were enumerated terms in such contracts.  *See* Compl., PageID.838 ¶¶ 49-51 (alleging that bids to State agencies must include certifications about FDCA and cGMP compliance); *Id.* at PageID.839, 866, 868 ¶¶ 53, 169-170, 178-180 (alleging that WIC contracts must include certifications about FDCA and cGMP compliance); *Id.* at PageID.841 ¶¶ 58-59 (detailing statutory and regulatory requirements incorporated into WIC contracts).  Abbott could not be awarded the contract, and therefore be paid, for WIC formula without making these certifications.  They are, accordingly, conditions of entering in the contract and prerequisites to payment.  *See, e.g., United States ex rel. v. Strock*, 982 F.3d 51, 61-62 (2d Cir. 2020) (holding that the payment decision relevant to the materiality analysis includes the Government's decision to award contracts in the first instance); *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022) (holding that materiality was properly pled where false certifications were central to eligibility); *United States v. Luce*, 873 F.3d 999, 1009 (7th Cir. 2017) (affirming materiality finding where defendant made false certifications as to threshold eligibility requirements that were prerequisites to obtaining contracts).  Even if Abbott is correct that these requirements are conditions of participation rather than payment, such a classification does not undermine their materiality.  *See, e.g., United States ex rel. Freedom Unlimited v. City of Pittsburgh*, 728 Fed. App'x. 101, 106 (1st Cir. 2018) ("The Court [in *Escobar*] explained that compliance with a condition of participation can be just as material to the Government's payment decision as compliance with an express condition of payment."); *United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*,

135 F.Supp.3d 944, 962 (D. Minn. 2016) (rejecting distinction between conditions of payment and conditions of participation).

The second factor, whether the Government continued to pay claims despite actual knowledge of noncompliance, also favors the United States.  When the extent of Abbott's noncompliance with cGMP became known to FDA, FDA filed a complaint for injunctive relief, requesting that the court order Abbott to cease infant formula production until compliance with the FDCA had been reestablished to FDA's satisfaction.  Compl. PageID.844 ¶ 74.  Ultimately, Abbott and FDA executed a consent decree that specified manufacturing conditions necessary for Abbott to resume production.  *Id.* at PageID.844-845 ¶ 78.  *See Luce*, 873 F.3d at 1007 (holding that the agency pursuing regulatory proceedings against defendant supported a finding of materiality).  Before FDA filed its complaint, the extent of Abbott's cGMP violations was not known to the Government due to Abbott's intentional concealment.  Compl., PageID.858-863 ¶¶ 136-156 (alleging Abbott's failure to adequately test for and document micro contamination issues); *Id.* at PageID.863-865 ¶¶ 157-164 (alleging Abbott's failure to disclose micro contamination results to FDA); *Id.* at PageID.857-858 ¶ 135 (alleging Abbott's data manipulation to make it appear positive).  After the consent decree, State agencies trusted Abbott would adhere to the consent decree when the Sturgis facility was reopened following remediation.

Moreover, even if the Government continued to contract with and/or pay Abbott after obtaining some degree of knowledge concerning violations, it would not defeat materiality given the context of the infant formula market.[2]  Prior to 2022, Abbott was the largest infant formula

---

[2] Abbott argues that the Government's actions with respect to other third-party infant formula manufacturers undermines materiality and requests that the Court take judicial notice of government documents pertaining to those manufacturers that assert "similar or arguably worse problems." Def.'s Mot. to Dismiss, ECF No. 112, Page.ID 1355. It is inappropriate at the motion

manufacturer, holding a 47% market share.  Compl., PageID.832 ¶ 22.  As stated in the Complaint, "[m]illions of American families rely *solely* on the WIC program and Abbott to feed their infants every year."  *Id.* at PageID.828 (emphasis added).  Under these circumstances, the Government was not required to simply stop paying for all Abbott formula or stop contracting with Abbott, particularly with respect to formula manufactured after the recall when Abbott was operating under a consent decree and presumably was no longer violating cGMP or its contract requirements. Courts routinely find materiality even with the Government's continued payment of claims in similar circumstances.  *See, e.g.*, *United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 517 (6th Cir. 2022) (noting that the Government's decision to continue contracting after discovering fraud is not dispositive of the materiality inquiry including because the Government may not have other feasible procurement options); *United States ex rel. Rahimi v. Rite Aid Corp.*, No. 2:11-cv-11940, 2019 WL 14216333, at *8 (E.D. Mich. Mar. 30, 2019) (holding that continued payment does not reflect a lack of materiality where the Government may have paid to avoid affecting Medicaid beneficiaries' prescription access); *United States ex rel. Hueseman v. Pro. Compounding Ctrs. of Am., Inc.*, 664 F.Supp.3d 722, 751 (W.D. Tex. 2023) (declining to endorse a theory of materiality that would require denying wound care to veterans); *United States ex rel. Bonzani v. United Techs. Corp.*, No. 3:16-CV-1730, 2019 WL 5394577, at *7 (D. Conn.,

---

to dismiss stage for the Court to compare the manufacturing practices of third parties and products not involved in this lawsuit and that are not alleged in the Complaint. Such comparisons would require a highly fact-intensive inquiry that is beyond the scope of a motion to dismiss. Along the same lines, the Government need not take the same action each time a company violates a requirement or take the strongest enforcement action available.  *See, e.g., United States ex. rel. Bibby et al. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1353 (11th Cir. 2021) (reversing grant of summary judgment to the defendant because the Government was not required to take the strongest or more severe remedies).  The question is not whether the Government could have done more, it is whether the Government's actions demonstrate that the violation *mattered.*

Oct. 22, 2019) (finding that relator adequately plead materiality where the Government continued to purchase products from defendant, its sole supplier).

With respect to the third factor, adherence to cGMP regulations designed to prevent and detect micro contamination goes to the very essence of the bargain between Abbott and the Government. USDA does not want *any* formula; it wants *compliant* formula, that is formula that complies with statutory, regulatory, and contractual requirements designed to ensure the product is manufactured in clean and sanitary conditions, with appropriate quality control testing. If the lowest cost was the only concern for the Government as Abbott suggests, then USDA would not have explicitly required compliance with the FDCA. The Government did not receive the benefit of its bargain. As mentioned above, Abbott's noncompliance led to a Class I recall, signifying a reasonable probability that the use of the recalled product would cause serious adverse health consequences or death. Compl., PageID.843 ¶¶ 71-73. When the Government purchased formula for consumption by vulnerable infants, it was critical that there not be a reasonable probability of death or serious health consequences.[3] This is akin to the example provided in *Escobar*, where the Court noted that if the Government buys guns, it is imperative that they shoot. *Escobar*, 579 U.S. at 191. Moreover, as explained above, the importance of these provisions is evidenced by the fact

---

[3] Whether such death or serious health consequences *in fact occurred* is irrelevant. *See, e.g., Prather*, 892 F.3d at 835 n.7 (noting that materiality is established even if the government was unharmed); *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 505 (8th Cir. 2016) (holding that lack of actual harm is not an element of materiality). Abbott analogizes to tort law and improperly focuses on the alleged lack of provable harm to any infants to distract from the core of the United States's claim – the sale of non-compliant product. Def.'s Mot. To Dismiss, ECF No. 112, PageID.1353-1354 (citing tort suits against Abbott where the court failed to find injury). Whether any infants were harmed is outside of the four corners of the Complaint and cannot be considered on a motion to dismiss. Regardless, this is not a tort suit, which requires plaintiffs to demonstrate such an injury. All the United States needs to prove is that Abbott knowingly falsely certified compliance with material requirements and that the Government paid money for the non-compliant product.

21

that Abbott would have been ineligible for WIC contracts had the Government known that it was

not complying with the FDCA and cGMP to the extent alleged in the Complaint.[4]

Abbott downplays its glaring systemic failures by claiming that they were merely

"technical" or "garden variety" missteps in a complicated regulatory regime.  But Abbott's gross

dereliction and flagrant disregard for the most basic steps to prevent contamination at the Sturgis

facility were anything but minor.  Abbott, a major manufacturer of drugs, nutritional products, and

medical equipment with manufacturing facilities around the world, cannot credibly argue that it

was incapable of navigating the core requirements of safe manufacturing practices.  It also

incorrectly claims that the Complaint lacks facts regarding materiality and instead focuses on

conclusory assertions.  As described above, the Complaint alleged (1) specific false certifications

of compliance; (2) that FDA filed a complaint for injunctive relief based on Abbott's

noncompliance; (3) that Abbott conducted a Class I recall of its infant formula; and (4) that USDA

would not have paid for formula had it known about Abbott's noncompliance.  In other words, the

United States not only identified the specific failures in Abbott's processes that created risks of

contamination but also pleaded that those same failures led to Government action – an FDA

consent decree and a Class I Recall of the very same product at issue here and for which false

claims were submitted.  For that reason, Abbott's reliance on *Yu v. Grifols* is misplaced.  *Yu v.

Grifols*, No. 22-107, 2022 WL 7785044 at \*4-5 (2d Cir. Oct. 14, 2022) (alleged cGMP violations

about 'errors in documentation' were not sufficiently tied to any adverse impact on the product's

quality with enough specificity to evaluate their impact).  Moreover, *Grifols* did not involve USDA

---

[4] Contrary to Abbott's assertions, the fact that WIC awards contracts to the lowest price bidder does not undermine the critical importance of cGMP requirements designed to ensure product safety.  Contracts are awarded to the lowest bidder only because, by design, *all bidders* must certify compliance with cGMP and the FDCA and *all contracts* contain those mandatory terms.

or the WIC program, and, as a result, that case did not implicate cGMP requirements expressly set forth in the USDA statute, implementing regulations, and State contracts that are central to this case.  The allegations in the Complaint make this case easily distinguishable from the remaining cases Abbott cites.  *C.f. United States ex rel. Laughlin v. Radiation Therapy Servs., P.S.C.*, 148 F.4th 791, 799-800 (6th Cir. 2025) (conditions alleged by relator were not actually required by the regulations); *United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co.*, 48 F.4th 1146, 1157 (10th Cir. 2022) (no factual allegations about extent and value of the misrepresentations or damages); *United States ex rel. Lee v. N. Metro. Found. for Healthcare, Inc.*, No. 13-cv-4933, 2021 WL 3774185, at *9 (E.D.N.Y. Aug. 25, 2021) (granting post-trial judgment for defendants where no evidence was introduced indicating that defendants certified compliance with underlying statute); *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237 (5th Cir. 2020) (contract merely required adherence to all federal and state laws); *Zotos v. Town of Hingham*, 98 F.4th 339, 345 (1st Cir. 2024) (complaint did not clearly allege that defendants certified compliance to applicable laws and regulations); *Jacobs v. Lambda Rsch., Inc.*, No. 1:10-cv-0536, 2014 WL 12654911, at *10 (S.D. Ohio June 16, 2014) (granting summary judgment for defendant where the Government testified that the requirements were irrelevant); *United States ex rel. Askari v. Pharmerica Corp.*, 2024 WL 1132191, at *3-4 (2d. Cir. Mar. 15, 2024) (relator's evidence of materiality limited to citations to a DOJ complaint and a CMS manual that were not shown to be similar to the allegations in relator's complaint).

Moreover, **all** the cases that Abbott cites where the Court held that materiality was not established were declined *qui tam* actions.  Since *the Government* did not intervene in those cases, it did not file a pleading asserting that the noncompliance was material to it.  *See, e.g., United States ex rel. D'Cunha v. Luketich*, No. 19-495, 2022 WL 2359417, at *2 (W.D. Penn. June 30,

23

2022) (denying motion to dismiss where Government's complaint contended that it would not have paid claims if it had known about misconduct); *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 179 (4th Cir. 2017) (noting that the Government's intervention was evidence of materiality).

In addition, Abbott cites several distinguishable cases where the court found a lack of materiality, but they shed no light at all on the question of whether the particularly central requirements that Abbott failed to comply with are material. *See. e.g., Taylor v. Boyko*, 39 F.4th 177, 193-94 (4th Cir. 2022) (noncompliance regarding a hospital's failure to renew its corporate charter); *Hall v. Abington Mem'l Hosp.*, No. 22-cv-2429, 2025 WL 777638, at *4 (E.D. Pa. Mar. 10, 2025) (noncompliance with informed consent provisions); *Postal Fleet Servs., Inc.*, 2024 WL 1765593, at *16  (failure to pay minimum wages to employees where government contracted for ground transportation services); *Zotos*, 98 F.4th at 345 (non-compliant speed limit signs where government paid for roadway projects); *United States ex rel. Powell v. Medtronic, Inc.*, No. 18 Civ. 1628, 2024 WL 4165522, at *15 (S.D.N.Y. Sept. 12, 2024) (regarding Medicare's reimbursement for single use devices that were reused); *United States ex rel. Patel v. Catholic Health Initiatives*, 792 Fed. App'x 296, 301 (5th Cir. 2019) (potential misrepresentation of hospital ownership).  In contrast, the cGMP and FDCA requirements in this case are of critical importance to the safety of the product to prevent and detect micro contamination and Abbott knew they were material to the USDA when providing funds to pay for formula to feed vulnerable infants.

In sum, the Complaint sufficiently alleged that Abbott's noncompliance and false certifications were material.  The Complaint alleged that (1) certifications regarding FDCA and cGMP compliance were prerequisites to bidding on WIC contracts and mandatory provisions in WIC contracts; (2) Abbott's noncompliance culminated in a Class I recall of its infant formula; (3) FDA filed a complaint for injunctive relief after discovering the extent of Abbott's noncompliance

with the FDCA and cGMP; and (4) USDA would not have paid for non-compliant WIC formula if it had known about Abbott's failures to comply with statutory, regulatory, and contractual requirements. Abbott contests the United States' allegations, offering a competing view of the facts. But the pleading stage is not the time to weigh evidence. The United States has sufficiently pleaded materiality.

### D.    The Complaint Adequately Pleaded Falsity

The United States adequately pleaded that claims for payment using USDA funds for powder infant formula manufactured at the Sturgis facility are false under both express and implied false certification theories. In an express false certification, the defendant signs or otherwise certifies compliance with a material law or regulation that is integral to the claim submission process. *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006). The implied false certification theory targets omissions that "'fall squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations.'" *Triple Canopy*, 857 F.3d at 178 (quoting *Escobar*, 579 U.S. at 188). It is triggered with a demand for payment of a claim with an omission about a failure to comply with material violations of statutory, regulatory, or contractual requirements. *Id.* at 176; *see also United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010).

As alleged in the Complaint, between 2019 and 2022, Abbott entered contracts with State agencies and expressly certified that its formula complied with the FDCA and related regulations and that it performed reasonable quality assurance activities and testing. Compl. PageID.838-841 ¶¶ 49, 53, 56. Those certifications were critical to the WIC program and its operation, which depended on Abbott's provision of powder infant formula for purchase by WIC recipients using

UDSA funds.  As a result, authorized WIC vendors presented claims for payment of USDA funds for Abbott formula to WIC participants.  Compl., PageID.867 ¶ 173.  During that same period, Abbott made certifications knowing it was not compliant with significant cGMP requirements and, therefore, could not protect powder infant formula manufactured at the Sturgis facility against the risk of micro contamination.  Compl., PageID.846-856 ¶¶ 83-125.  These were not merely "promises" but expressly false statements since Abbott was already out of compliance with cGMP and FDCA requirements at the time they made them.  Abbott's repeated affirmative and explicit misrepresentations in contracts with State agencies indicated that it produced compliant WIC infant formula when it did not, and it caused downstream claims for payment of USDA funds for Abbott contract formula to be false.

Along the same lines, courts have found that a failure to comply with contractual quality assurance or testing requirements can result in a violation of the FCA.  *See, e.g., U.S. ex rel. Compton v. Midwest Specialties, Inc.* 142 F.3d 296, 302 n. 4 (1981); *U.S. ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 996 (S.D. Ohio 2014).  This is because the manufacturing deficiencies put the product at risk and significantly impact its reliability, quality, and safety, and the failure to disclose such deficiencies is a material omission.  In addition to its express false statements, Abbott personnel also failed to both test for the presence of micro and disclose positive test results to FDA.  Compl., PageID.856-865 ¶¶ 126-164.  Authorized WIC vendors sought payment of USDA funds from WIC recipients where Abbott knowingly failed to disclose to anyone – FDA, USDA, State agencies, authorized WIC vendors, or WIC recipients – that it violated contractual, statutory, and regulatory USDA requirements that were critical for ensuring the safety of the product that infants consumed and was funded with federal money.  Compl., PageID.842, 867 ¶¶ 63, 173.  Abbott thus caused authorized WIC vendors to impliedly

certify, falsely, that the infant formula purchased with USDA funds was manufactured in compliance with the contractual requirements as well as USDA statutory and regulatory requirements binding all WIC-participating manufacturers.[5]

Abbott argues that the United States did not plead what it "said" or how it "tricked" USDA.  But this is in error because the United States' case is based on Abbott's concealment and material omissions, which are clearly actionable under the FCA (as they are under common law). *See Escobar*, 579 U.S. at 188 ("half-truths…can be actionable misrepresentations").  Abbott also complains that its certifications of compliance with cGMP were too broad to be actionable.  But Abbott misses the mark–Abbott made statements about its compliance with cGMP.  It is also clear that those statements were false and knowingly so.  But the Complaint did not end there. The United States also alleged the specifics of Abbott's conduct that violated cGMP requirements, that the violations impacted the safety and reliability of the products that it paid for, and that it was Abbott's noncompliance – facilitated by its concealment and material omissions – that rendered the claims false.

As Abbott acknowledges, the United States may also proceed on a "promissory fraud" or fraudulent inducement theory.  *Hendow,* 461 F.3d at 1173 ("another approach to finding False Claims Act liability…is the "promissory fraud" or "fraud in the inducement theory"); *see* Def.'s Mot. to Dismiss, ECF. No. 112, PageID.1361.  Here, the Complaint alleges that Abbott knew at

---

[5] Courts have held the proper inquiry under the False Claims Act is not whether an intermediary controls government funds for any period of time, but whether the defendant causes, or will cause, the intermediary to make a false claim against the Government, resulting in a financial loss to the Federal treasury.  *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 184-85 (3d Cir. 2011).  This is true even when, as in this case, an intermediary is merely a conduit of federal funds.  Courts have also found that "unlawful acts by non-submitting entities may give rise to a false or fraudulent claim even if the claim is submitted by an innocent party."  *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 390 (1st Cir. 2011).

the time that it made its certifications of FDCA compliance to State agencies that Abbott was currently out of compliance and, as the United Staes has alleged, intended to continue to produce non-compliant formula.  Therefore, Abbott's reliance on *Lynn* is misplaced because the false claims at issue there were annual certifications and assurances that the city "will comply" with federal statutes and regulations.  *Lynn v. City of Detroit,* No. 17-cv-14168, 2024 WL 4340694, at *9-10 (E.D. Mich. Sept. 27, 2024).  Contrary to Abbott's contentions, the company's certifications to State agencies between 2019 and 2022 were knowing false representations at the time of the contract that induced State agencies contracting with Abbott to provide formula to the WIC program, not honest "representations about future performance" or mere "broken contractual promises."  *See* Def.'s Mot. to Dismiss, ECF. No. 112, PageID.1361-1362.

### E.    The Complaint Adequately Pleaded Scienter

The Complaint plausibly alleged that Abbott knew that claims for USDA funds to pay for powder infant formula manufactured at Abbott's Sturgis facility were false.  The FCA does not require an individual to have proof of specific intent to defraud, but rather defines the term "knowing" or "knowingly" to encompass (1) possessing actual knowledge of the information; (2) acting in deliberate ignorance of the truth or falsity of the information; or (3) acting in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).  The reckless disregard provision was included "to target that defendant who has buried his head in the sand and failed to make some inquiry into the claim's validity."  *United States v. Life Care Ctrs. of Am., Inc.*, 114 F. Supp. 3d 549, 567 (E.D. Tenn. 2014) (citing *United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir. 2012)).  At the motion to dismiss stage, a plaintiff need only allege the scienter element generally.  Fed. R. Civ. P. 9(b); *Prather*, 892 F.3d at 837.

28

The *claims* at issue here are the authorized WIC vendors' claims for payment resulting from WIC participants' purchase of Abbott infant formula using USDA funds.  Compl., PageID.867 ¶ 173; *see also United States ex rel. Souza v. Embrace Home Loans, Inc.,* No. 1:22-CV-453-JJM-PAS, 2025 WL 3072653, at *23 (D.R.I. Nov. 4, 2025) (citing *United States ex. rel. Hutcheson v. Blackston Med., Inc.*, 647 F.3d 377, 390 (1st Cir. 2011)) (finding the FCA reaches those who do *not* submit the false certification personally (*i.e.*, the "non-submitting entities") if they "knowingly caused the submission of either a false or fraudulent claim.").  The Complaint alleged that Abbott personnel at Abbott's corporate headquarters and at the Sturgis facility knew that WIC participants used USDA funds to purchase powder infant formula manufactured at the Sturgis facility from authorized WIC vendors.  Compl., PageID.866 ¶ 172.  As alleged, it was also widely known within Abbott that, as a formula manufacturer participating in WIC, Abbott was required to manufacture infant formula in compliance with the FDCA, including cGMP.  Compl., PageID.856-857 ¶¶ 129, 132-33.  Significantly, as the United States has alleged, Abbott's concealment of systemic cGMP violations and results of micro testing and misrepresentations about its compliance and micro contamination indicate that it sought to avoid the regulatory and financial consequences of failing to manufacture infant formula in a safe environment.  Compl., PageID.856-865 ¶¶ 126-164.  The United States has alleged facts sufficient to infer, at a minimum, Abbott's deliberate ignorance or reckless disregard that the claims for payment of USDA funds for Abbott infant formulas were false because Abbott was not in compliance with the statutory, regulatory, and contractual requirements for WIC infant formula.

Abbott's argument that the complaint fails to allege that individuals who signed certifications to State agencies in "extraneous Government contracts" knew that the certifications

were false is without merit.  Def.'s Mot. to Dismiss, ECF No. 112, PageID.1360.  Courts have declined to adopt this "single actor" requirement that Abbott proposes because it risks incentivizing businesses to establish "certifying offices" that do nothing more than execute government contract certifications in an effort to improperly immunize themselves against FCA liability.  *United States ex. rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d. 908, 919-920 (4th Cir. 2003).  Further, when a complaint does not contain allegations that any specific employee either knew of or recklessly disregarded the truth or falsity of a statement or claim for payment, "a court may look to whether there are facts alleged from which inferences may be drawn regarding intent."  *United States v. Quicken Loans Inc*., 239 F. Supp. 3d 1014, 1032 (E.D. Mich. 2017).  Abbott executives' and senior employees' certifications that Abbott produced compliant infant formula were far from "mistaken beliefs."  Def.'s Mot. to Dismiss, ECF No. PageID.1359.  Rather, as alleged in the Complaint, Abbott executives and corporate representatives were aware of both the financial benefits of participation in the WIC program and the WIC program requirements to produce FDCA compliant formula.  Compl., PageID.866 ¶¶ 170, 171.  But, Abbott leadership, including leadership at corporate headquarters and the Sturgis facility, knowingly facilitated a culture of concealment that resulted in failure to maintain the Sturgis facility in a clean and sanitary condition, failure to test for and investigate the presence of micro, and failure to disclose the presence of micro to FDA.  Compl., PageID.849, 857, 860, 862, 865 ¶¶ 94, 134, 143, 152, 163-164.

Finally, Abbott is incorrect in suggesting that FDA's inspection observations identifying cGMP violations at the Sturgis facility prior to 2022 and the WIC program's continuing purchases of Abbott powder infant formula during that time somehow negate scienter.  Def.'s Mot. to Dismiss, ECF No. 112, PageID.1360.  As the Complaint alleged, FDA and USDA did

30

not have actual knowledge of the totality of ongoing cGMP violations at the Sturgis facility or the attendant risk to the powder infant formula manufactured there because Abbott concealed the true condition of the facility and its lack of effort to control the presence of micro in its powder infant formulas from FDA, USDA, and consumers.  For example, the Complaint alleged that in 2019, Abbott was aware of and failed to disclose that powder infant formula tested positive for *Cronobacter* (micro contamination) during an FDA inspection in response to FDA investigators' request for all micro test results.  Compl., PageID 865 ¶ 164.  Allegations like these that show efforts to "pull the wool over the Government's eyes" or "dupe" a government program are, indeed, evidence of the requisite scienter.  *Lambda Research, Inc.*, 2014 WL 12654911 at *9 (citing *United States ex. rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1019-20 (7th Cir. 1999)).  If Abbott truly believed that its noncompliance was permissible, negating its scienter, then it would not have taken repeated steps to conceal it from the Government.

## II.    The Complaint Sufficiently Pleaded All Elements of an Unjust Enrichment Claim

The Complaint raised an additional equitable claim of unjust enrichment.  To establish a claim for unjust enrichment, the United States must plead facts that show: (1) the receipt of a benefit by Abbott from the United States; and (2) an inequity resulting to the United States because of the retention of the benefit by Abbott.  *PCA Mins., LLC v. Merit Energy Co.*, LLC, 725 F. App'x 342, 345 (6th Cir. 2018) (citing *Karaus v. Bank of N.Y. Mellon*, 300 Mich.App. 9, 831 N.W.2d 897, 905 (2012)).  The Complaint sufficiently pleaded both elements.  Specifically, the Complaint adequately pleaded that the Government funded the payments to Abbott for the non-compliant powder infant formulas, and that it would be inequitable for Abbott to retain the benefit based on their failure to comply with the applicable statutory, regulatory, and contractual requirements.

Compl., PageID.870, ¶¶ 191-193.  Accordingly, the Complaint adequately pleaded an unjust enrichment claim.

Abbott raises three arguments for the dismissal of the unjust enrichment claim, but none of these arguments have merit.  First, Abbott argues that the Complaint lacks particularity regarding Abbott's fraudulent scheme.  But as discussed in section I.A and I.B, the Complaint alleged with particularity Abbott's false certifications, why those certifications were false, and how those false certifications led to payment from the United States.  The Complaint reincorporated those same allegations in the unjust enrichment claim.  *See* Compl. PageID.870 ¶ 190.  These allegations are sufficient to establish with particularity why equity demands that Abbott return the proceeds from their inequitable conduct.

Second, Abbott argues that the unjust enrichment claim is precluded by the contracts between Abbott and the State agencies.  However, because USDA itself was not a party to those contracts, the existence of these State contracts does not preclude an unjust enrichment claim to recoup *Federal* funds.  *See Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App 2006) (holding that the existence of express contracts does not bar unjust enrichment recovery where the contract was between different parties).  Further, even if the Court determines at this stage that the State agency contracts cover the same subject matter, courts routinely allow the claims to survive a motion to dismiss at the pleading stage in the event the court later determines that the contracts do not cover the same subject.  *See, e.g., United States v. Bae Sys. Tactical Vehicle Sys., LP*, No. 15-12225, 2016 WL 894567, at *5 (E.D. Mich. Mar. 9, 2016); *United States v. Assocs. in Eye Care, P.S.C., No. 13–27–GFVT*, 2014 WL 414231, at *8 (E.D. Ky. Feb. 4, 2014).

Third, Abbott argues that the claim should fail because the Government would have spent the money on infant formula anyway.  However, unjust enrichment is focused on the inequity caused by the "retention of the benefit by defendant." *Barber v. SMH (US), Inc.* 509 N.W.2d 791, 798 (Mich. App. 1993); *see also Restatement (First) of Restitution* § 1 *cmt. e* (1937) ("In other situations, a benefit has been received by the defendant, but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust.").  Here, the Complaint alleged that there were several infant illnesses that were identified as potentially associated with Abbott's formula. Compl., PageID.843 ¶ 69. The Complaint also alleged that FDA discovered insanitary conditions at the facility, including the presence of *Cronobacter.*  Compl., PageID.843 ¶ 70.  The Complaint further alleged that Abbott distributed nearly 13 million cases of potentially contaminated non-compliant products into commerce.  Compl., PageID.843 ¶ 73.  Given these circumstances and given Abbott's legal and contractual obligations to manufacture infant formula in compliance with the FDCA and cGMP requirements, it would be unjust for Abbott to retain the revenues from USDA funds obtained from the sale of non-compliant products that violated USDA requirements.

Abbott repeatedly and misleadingly casts itself as the victim who graciously sells powder infant formula at discounted prices for "pennies" on the dollar.  Nothing could be further from the truth.  Abbott made millions from its sales and its infant formula (*i.e.*, "Abbott Nutrition") division was highly profitable.  As the Complaint illustrated, Abbott was plagued with deficient controls over contamination risks, and it deliberately chose not to spend money to fix them, prioritizing its own profits over the safety of the infants who consumed and needed its products.  Abbott also confusingly claims the United States is pursuing a "windfall."  Abbott is correct that FDA played its part by requiring Abbott to enter a Consent Decree to ensure that, going forward, the company

33

abided by fundamental manufacturing requirements to address risks of contamination in its powder infant formula products.  This FCA action serves the equally important purpose of recovering USDA funds that were misspent, protecting the integrity of the WIC program, and holding accountable a company that knowingly caused false claims.  Finally, to the extent that there is a dispute regarding these facts or whether the United States received the benefit of the bargain, that dispute "is a question of fact that is inappropriate for resolution at the motion to dismiss stage." *United States v. Honeywell Intern. Inc.*, 798 F. Supp. 2d 12, 26 (D.D.C. 2011).

### CONCLUSION

For these reasons, the Complaint adequately pleaded with particularity that Abbott knowingly caused the submission of false claims to State agencies using USDA funds to purchase powder infant formula that Abbott manufactured contrary to material contractual, statutory, and regulatory obligations and certifications.  The Court should therefore deny Abbott's motion to dismiss.

Alternatively, to the extent the Court determines that the Complaint does not contain sufficient detail to satisfy Rule 9(b) or (12)(b)(6), the United States respectfully requests the Court provide leave to amend so that it can furnish the Court with additional allegations. *See Newberry v. Silverman*, 789 F.3d 636, 646 (6th Cir. 2015) ("dismissal with prejudice and without leave to amend is not appropriate unless it is clear on *de novo* review that the complaint could not be saved by amendment") (internal quotations removed).

Dated: February 9, 2026

Respectfully submitted,

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division

TIMOTHY VERHEY
United States Attorney

/s/ Erin Colleran
JAMIE A. YAVELBERG
COLIN HUNTLEY
ERIN COLLERAN
ASHA NATARAJAN
Attorneys, Civil Division
United States Department of Justice
175 N St. NE, Room 10.1811
Washington, DC 20002
Tel: (202) 514-0336
Email: Erin.Colleran@usdoj.gov
Email: Asha.M.Natarajan@usdoj.gov

/s/ Whitney M. Schnurr
WHITNEY M. SCHNURR
JACOB CARLTON
Assistant United States Attorneys
U.S. Attorney's Office
Western District of Michigan
330 Ionia Avenue NW, Suite 501
Grand Rapids, MI 49503
Tel: (616) 808-2045
Email: Whitney.Schnurr@usdoj.gov
Email: Jacob.Carlton@usdoj.gov

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

I hereby certify that the United States' Opposition to Defendant Abbott's Motion to Dismiss with Prejudice United States' Complaint in Intervention complies with Local Rule 7.2(b)(i) and contains 10,237 words. I further certify that to calculate this word count I used Microsoft Word Office 365, and specifically included all text, headings, footnotes, and quotations in the word count.

Dated: February 9, 2026                    Respectfully submitted,


ERIC HAMILTON                              TIMOTHY VERHEY
Deputy Assistant Attorney General          United States Attorney
Civil Division




                                           */s/ Whitney M. Schnurr*
JAMIE A. YAVELBERG                         WHITNEY M. SCHNURR
COLIN HUNTLEY                              JACOB CARLTON
ERIN COLLERAN                              Assistant United States Attorneys
ASHA NATARAJAN                             U.S. Attorney's Office
Attorneys, Civil Division                  Western District of Michigan
United States Department of Justice        330 Ionia Avenue NW, Suite 501
175 N St. NE, Room 10.1811                 Grand Rapids, MI 49503
Washington, DC 20002                       Tel: (616) 808-2045
Tel: (202) 514-0336                        Email: Whitney.Schnurr@usdoj.gov
Email: Erin.Colleran@usdoj.gov             Email: Jacob.Carlton@usdoj.gov
Email: Asha.M.Natarajan@usdoj.gov